William J.F. Roll, III
Fredric Sosnick
Daniel H.R. Laguardia
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

*Attorneys for Plaintiff BANK OF AMERICA, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtor. | Chapter 11 Case<br><br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>Debtor. | Chapter 11 Case<br><br>No. 08-13888 (JMP) |
| BANK OF AMERICA, N.A.,<br><br>Plaintiff,<br><br>v.<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC. and<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Defendants. | Adv. Proc. No. 08-01753 (JMP)<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF**
**BANK OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................ 5

    A.    The Parties ............................................................................................ 5

    B.    Bank of America's Derivative Claims Against LBSF and LBHI ............... 6

    C.    The Challenged Accounts and the Security Agreement ............................ 9

ARGUMENT ............................................................................................................... 20

   I.    BANK OF AMERICA'S SETOFF DID NOT VIOLATE THE CODE'S AUTOMATIC STAY ................................................................................. 21

   II.    EVEN IF THE COURT FINDS THAT THE AUTOMATIC STAY DOES PRECLUDE BANK OF AMERICA'S SETOFF, THE COURT SHOULD ANNUL THE STAY *NUNC PRO TUNC* ............................................................ 24

   III.    LEHMAN BROTHERS HAS CONCEDED THAT THERE WAS NO MOVEMENT OF FUNDS AMONG AFFILIATES TO EFFECTUATE THE SETOFF ................................................................................................... 26

   IV.    BANK OF AMERICA HAD A RIGHT TO SET OFF AGAINST THE LBHI DEPOSITS ............................................................................................... 27

    A.    Banks are Entitled to Set Off Against Deposits ...................................... 28

    B.    The Security Agreement Protects, and Does Not Waive, Bank of America's Right to Set Off Against the Deposit Account ......................... 31

    C.    The Security Agreement Does Not Create a Special Purpose Account .... 42

CONCLUSION ............................................................................................................ 49

## TABLE OF AUTHORITIES

### CASES

**Pages(s)**

*In re Adelphia Commc'n Corp.*, 06 Civ. 4983 (JGK), 2008 WL 3919198
(S.D.N.Y. Aug. 22, 2008).................................................................................31

*Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*,
136 F.3d 82 (2d Cir. 1998) ...........................................................................33

*In re Alibrandi*, No. 87-00384, 1990 Bankr. LEXIS 1002
(Bankr. N.D.N.Y. Apr. 25, 1990) ................................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................21

*In re Applied Logic Corp.*, 576 F.2d 952 (2d Cir. 1978)..............................*passim*

*Aspen Indus., Inc. v. Marine Midland Bank*, 421 N.E.2d 808 (N.Y. 1981) ...................28

*Banco de la Provincia de Buenos Aires v. BayBank Boston N.A.*, 985 F.Supp. 364
(S.D.N.Y. 1997)......................................................................................20, 28

*In re Bennett Funding Group*, 146 F.3d 136 (2d Cir. 1998) ........................*passim*

*In re Bennett Funding Group*, 212 B.R. 206 (B.A.P. 2d Cir. 1997) ..............*passim*

*Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979) ...........................25

*In re BOUSA, Inc.*, No. 89-B-13380 (JMP), 2006 WL 2864964
(Bankr. S.D.N.Y. Sept. 29, 2006).................................................21, 22, 25, 26

*In re Cairns & Assocs.*, 372 B.R. 637 (Bankr. S.D.N.Y. 2007) .................................21

*Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206 (S.D.N.Y. 2007) ................33

*Curry Rd. Ltd. v. K-Mart Corp.*, 893 F.2d 509 (2d Cir. 1990)........................33, 34, 42

*Delano v. Equitable Trust Co. of N.Y.*, 181 N.Y.S. 852 (Sup. Ct. 1920) ..........................28

*In re Denby Stores, Inc.*, 86 B.R. 768 (Bankr. S.D.N.Y. 1988) ................................22

*Dolman v. U.S. Trust Co. of N.Y.*, 138 N.E.2d 784 (N.Y. 1956)..............................32

*E. Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d 169 (2d Cir. 1998) ................25

*In re Enron Creditors Recovery Corp.*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007) ...........................29

*Fenton v. Ives*, 634 N.Y.S.2d 833 (App. Div. 1995) .......................................................................42

*Filner v. Shapiro*, 633 F.2d 139 (2d Cir. 1980)..............................................................................31

*Gerrity Co. v. Bonacquisti Constr. Co.*, 549 N.Y.S.2d 532 (App. Div. 1989)..............................48

*In re Hale Desk Co.*, 97 F.2d 372 (2d Cir. 1938) ......................................................................31, 32

*Hale v. First USA Bank, N.A.*, No. 00-CIV-5406 (JGK), 2001 WL 687371
      (S.D.N.Y. Jun. 19, 2001) .........................................................................................................30

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002).....................33

*Johnson v. Chase Manhattan Bank USA, N.A.*, No. 603101/02, 2004 WL 413213
      (N.Y. Sup. Feb. 27, 2004).......................................................................................................30

*Jordan v. Nat'l Shoe & Leather Bank*, 74 N.Y. 467 (1878).........................................................28

*In re Kissinger*, 72 F.3d 107 (9th Cir. 1995) ................................................................................25

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004)........................................................................................24

*In re Lehman Bros. Holdings, Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009)..................................21

*Merrill Lynch Mortgage Capital, Inc. v. F.D.I.C.*, 293 F. Supp. 2d 98 (D.D.C. 2003) ...............45

*In re Midland Ins. Co.*, 590 N.E.2d 1186 (N.Y. 1992)..................................................................29

*Morrissey v. Gen. Motors Corp.*, No. 00-9402, 2001 WL 1313753 (2d Cir. Oct. 23, 2001)........34

*In re Myers*, 491 F.3d 120 (3d Cir. 2007)......................................................................................25

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117 (1991) .............................31

*In re Orlinski*, 140 B.R. 600 (Bankr. S.D. Ga. 1991)...................................................................25

*Palazzetti Import/Export, Inc. v. Morson*, No. 98 CIV. 722 (FM), 2001 WL 1568317
      (S.D.N.Y. Dec. 6, 2001) ..........................................................................................................32

*Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327 (2d Cir. 1992) .......................42, 45, 46

*In re Prudential Lines, Inc.*, 148 B.R. 730 (Bankr. S.D.N.Y. 1992)............................................21

*R/S Assocs. v. N. Y. Job Dev. Auth.*, 771 N.E.2d 240 (N.Y. 2002)...............................................33

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir. 1996).........................33, 42

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S.2d 511
    (App. Div. 2008).................................................................................33, 34

*In re Schultz*, No. 05-8038, 2006 WL 1407466 (B.A.P. 6th Cir. May 19, 2006).........................25

*In re Schwartz*, 954 F.2d 569 (9th Cir. 1992) .................................................................25

*In re Shortt*, 277 B.R. 683 (Bankr. N.D. Tex. 2002) ........................................................25

*Spencer Co. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194 (Bankr. D. Mass. 1987)...................47

*Stone v. I.N.S.*, 514 U.S. 386 (1995).............................................................................24

*Swan Brewery Co. v. U.S. Trust Co. of N.Y.*, 832 F. Supp. 714 (S.D.N.Y. 1993).................42, 43

*In re Vargas*, 342 B.R. 762 (Bankr. N.D. Ohio 2006) ......................................................26

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255
    (S.D.N.Y. 2004)..............................................................................................31

*W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990) ......................................33, 42

*Wasserman v. Broderick*, 250 N.Y.S. 84 (Sup. Ct. 1931) .................................................48

*W. Harlem Pork Ctr., Ltd. v. Empire Nat. Bank*, 400 N.Y.S.2d 859 (App. Div. 1978)................29

*In re Westchester Structures, Inc.*, 181 B.R. 730 (Bankr. S.D.N.Y. 1995)...........................21, 29

*In re Whitaker*, 173 B.R. 359 (Bankr. S.D. Ohio 1994).....................................................25

*In re WorldCom, Inc.*, 304 B.R. 611 (Bankr. S.D.N.Y. 2004) ...........................................21

## STATUTES

11 U.S.C. § 101 ....................................................................................................21

11 U.S.C. § 101 (22A) (2007)..................................................................................22

11 U.S.C. § 101 (22A)(A) (2007)..............................................................................23

11 U.S.C. § 101 (53B) (2007)..................................................................................23

11 U.S.C. § 101 (53B)(A)(V) (2007) .........................................................................23

11 U.S.C. § 101 (53C) (2007) ........................................22, 23

11 U.S.C. § 301 (2005) ..............................................22

11 U.S.C. § 302 (2009) ..............................................22

11 U.S.C. § 303 (2007) ..............................................22

11 U.S.C. § 330 (a)(1) (2005) ......................................24

11 U.S.C. § 362 (2006) ..............................................21

11 U.S.C. § 362(a)(7) (2006) .......................................22

11 U.S.C. § 362(b)(17) (2006) ................................*passim*

11 U.S.C. § 362(d) (2006) ........................................24, 26

11 U.S.C. § 362(d)(1) (2006) .......................................25

11 U.S.C. § 363 (2005) ..............................................21

11 U.S.C. § 553 (2005) ..............................................21

11 U.S.C. § 553(a) (2005) ........................................25, 28

11 U.S.C. § 560 (2005) ...........................................1, 2, 22

11 U.S.C. § 1107(a) (2008) ..........................................5

11 U.S.C. § 1108 (2008) ............................................5, 6

12 C.F.R. § 223.3 (j) (2009) ........................................35

Pub. L. No. 109-8, § 907(d)(1)(C), 119 Stat. 23 (2005)............2, 24

N.Y. Debt. & Cred. Law art. 6-A § 151 (2001)....................28, 29

N.Y. U.C.C. § 9-104 (a)(3) (2001) ..................................40

N.Y. U.C.C. § 9-340 (b) (2009).....................................40

**RULES**

B.A.P. (6th Cir.) R. 8013-1(b) (1997) ..............................26

FED. R. BANKR. P. 7056-1 ...................................................................... 1

FED. R. BANKR. P. 7056-1(b) ................................................................ 1

FED. R. CIV. P. 56(c) .............................................................................. 20

## MISCELLANEOUS

N.Y. Jur. 2d. Banks & Fin. Inst. § 258 (2009) .......................................... 42

Pursuant to Rule 7056-1 of the Federal Rules of Bankruptcy Procedure, plaintiff Bank of America N.A. ("Bank of America" or the "Bank") respectfully submits this memorandum of law in support of its motion for summary judgment granting it declaratory relief with regard to Lehman Brothers Holdings Inc. ("LBHI")[1] and Lehman Brothers Special Financing Inc. ("LBSF") and dismissing LBHI's counterclaims against Bank of America.[2] In support of its motion, Bank of America also submits the accompanying Statement of Undisputed Facts pursuant to Rule 7056-1(b), and the Declaration of Kevin M. Behan, dated September 14, 2009 (the "Behan Decl."), and the exhibits annexed thereto.

## PRELIMINARY STATEMENT

Through this action, Bank of America seeks declaratory relief that its setoff of its derivative claims against LBHI deposits held at the Bank was proper. There can be little question that it was. It is indisputable that banks have the right to set off mutual debts against deposits under New York law. Furthermore, sections 362(b)(17) and 560 of the Bankruptcy Code expressly provide that parties to derivative contracts may exercise their rights to set off derivative claims against debtors – whether that right be pursuant to contract, common law, or otherwise – unhindered by the Code's automatic stay. All of this is black letter law.

Nevertheless, when LBHI challenged the propriety of Bank of America's actions in a letter, and asserted that the Bank had violated the stay, the Bank immediately brought this action for a declaratory judgment from this Court that the Bank had acted properly and also requested, in the alternative, that the Court grant relief from the automatic stay should such relief

---

[1] LBHI and its affiliates are referred to collectively herein as "Lehman Brothers."

[2] LBHI has stipulated to the dismissal of its Third-Party Complaint against Bank of America Trust and Banking Corporation (Cayman) Limited ("Bank of America Cayman"). *See* Stipulation and Dismissal as to Third-Party Defendant Bank of America Trust and Banking Corporation (Cayman) Limited, dated July 23, 2009, attached as Exhibit 1 to the Declaration of Kevin M. Behan.

ultimately prove to be necessary. LBHI then identified the purported bases of its challenge to Bank of America's actions in its answer and counterclaims to the Complaint. Its challenge is completely without merit.

*First*, with regard to the automatic stay, section 362(b)(17) (the derivative safe harbor) provides that the filing of a Chapter 11 petition does not stay "the exercise by a swap participant or financial participant . . . of any contractual right [including common law rights] to offset or net out any termination value . . . arising under or in connection with 1 or more [swap] agreements, including any master agreement for such agreements."[3] That is exactly what Bank of America did; it exercised its right to set off debts it was owed by LBHI under derivative agreements and transactions against debts it owed to LBHI – the deposits at issue. In its answer and counterclaims, LBHI cited and misconstrued a (now-replaced) 2005 version of section 362(b)(17) to support an assertion that the derivative safe harbor only permits setoff against collateral posted pursuant to a derivative agreement. But LBHI cannot rewrite the statute. Congress made clear that the safe harbor applies beyond posted collateral when it amended section 362(b)(17) in 2006 to delete the language that stated a swap participant could set off "against any payment . . . cash, securities, or other property held . . . *to margin guarantee, secure, or settle any swap agreement.*" Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 907(d)(1)(C), 119 Stat. 23, 176 (2005) (emphasis added).

*Second*, LBHI asserted in its answer and counterclaims that Bank of America improperly moved funds that LBHI had allegedly deposited with an affiliate (Bank of America

---

[3] 11 U.S.C. § 362(b)(17) (2006). *See also* 11 U.S.C. § 560 (2005) (including common law rights in definition of "contractual right").

Cayman) to Bank of America to create mutuality and facilitate setoff.[4] These allegations are completely unfounded and simply untrue. We believe that LBHI has conceded as much by subsequently dismissing its claims against the affiliate. (Behan Decl., Ex. 1.)

*Third*, LBHI asserted in its answer and counterclaims that Bank of America's setoff against $501,820,712.17 that was held in two particular deposit accounts was improper because those deposits were governed by an agreement through which, according to LBHI, Bank of America had waived its common law and statutory rights to set off against the deposits. The agreement, titled "Security Agreement (Deposit Account)," and dated August 25, 2008 (Behan Decl., Ex. 2 [Security Agreement]), is the last thread sustaining LBHI's challenge to the setoff. It is far too slender to support LBHI's position.

There is no waiver in the Security Agreement. To the contrary, the Security Agreement expressly states – in two separate operative provisions – that Bank of America retained all of its existing rights and remedies as well as those additional rights set forth in the Agreement. As its name implies, the Security Agreement created a limited security interest in a deposit held in two Bank of America deposit accounts. After what both sides agree were heavy negotiations between sophisticated counterparties employing two of the top law firms in the world as outside counsel, the Security Agreement provided a guarantee by LBHI and four express remedies to Bank of America should LBHI or any of its affiliates suffer an event of default – two of which were limited by the defined term "Indebtedness" and two of which were not:

- Bank of America could declare all Indebtedness (as defined in the Agreement) immediately due and payable;

---

[4] *See* Behan Decl., Ex. 4 [Answer] at 8 (Third Affirmative Defense), [Countercl.] at ¶¶ 4-7, 34-37. (LBHI and LBSF's Answer and Affirmative Defenses are found at pages 2-8 of Ex. 4 and are referred to herein as "Answer"; LBHI's Counterclaims are found at pages 9-31 of Ex. 4 and are referred to herein as "Countercl.")

- Bank of America could exercise all rights of ownership over the deposit;

- Bank of America could apply the deposited funds against any Indebtedness owed by LBHI or any LBHI affiliate to the Bank or any Bank affiliate immediately and without notice; and

- Bank of America could "*exercise any other remedy provided under [the] Agreement or by any applicable law.*"[5]

The last point was reiterated in a separate provision that states that "[t]he rights, powers and remedies given to the Bank by this Agreement shall *be in addition to* all other rights, powers and remedies given to the Bank by virtue of any statute or rule of law." (*Id.* at § 14) (emphasis added). Those reserved rights include the Bank's well-established right to set off mutual debts, and there is simply no basis upon which LBHI can credibly assert a waiver of that right.

*Fourth*, LBHI's final fallback is its affirmative defense that there was no mutuality of obligation between the Bank and LBHI (and therefore no viable right of setoff) because the Security Agreement created a "special purpose account" and not a true debt from the Bank to LBHI. Again, the Security Agreement cannot support the weight of such an argument. Special purpose accounts are most commonly escrow, trust, or other accounts that hold funds that actually belong not to a depositor or bank, but to a third party. There is no third party here, nor an escrow, nor the creation of any trust. Under New York law, deposits are debts banks owe to depositors, and there is a heavy presumption against finding that any particular account is a special purpose account. Here, none of the factors New York courts consider in making that rare determination are present: (i) it is undisputed that the Security Agreement itself is titled "Deposit Account"; (ii) LBHI earned interest on the deposit; (iii) LBHI could add to or withdraw from the deposits at its sole discretion with limited notice; and (iv) there was no requirement in the Security Agreement that the funds be segregated. In short, although Bank of America negotiated

---

[5] Behan Decl., Ex. 2 [Security Agreement] at § 11(a)-(d) (emphasis added).

to receive significant additional rights with regard to the deposits, they remained deposits. And the Bank expressly maintained and protected its common law and statutory right to set off against them. The Bank's exercise of that right in the instance at issue here was appropriate, and the Bank respectfully urges that the Court so rule.

## BACKGROUND

**A.    The Parties**

Plaintiff Bank of America is a national banking association organized and existing under the laws of the United States of America. (Behan Decl., Ex. 3 [Compl.] at ¶ 2; Behan Decl. at ¶ 3.)

Defendant LBHI is a corporation organized and incorporated under the laws of Delaware. (Behan Decl., Ex. 3 [Compl.] at ¶ 3; Ex. 4 [Answer] at ¶ 3.) It is registered to do business in this State and has its principal business address at 1271 Sixth Avenue, New York, New York 10020. (Behan Decl., Ex. 4 [Answer] at ¶ 3.) On September 15, 2008, LBHI filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the United States Bankruptcy Code (the "Filing"), and since that date it has operated its business and managed its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Code. (Behan Decl., Ex. 3 [Compl.] at ¶ 3; Ex. 4 [Answer] at ¶ 3.)

Defendant LBSF is a corporation organized and incorporated under the laws of Delaware. (Behan Decl., Ex. 3 [Compl.] at ¶ 4; Ex. 4 [Answer] at ¶ 4.) It is registered to do business in this State and has its principal business address at 1271 Sixth Avenue, New York, New York 10020. (Behan Decl., Ex. 4 [Answer] at ¶ 4.) LBSF is a subsidiary of LBHI. (Behan Decl., Ex. 3 [Compl.] at ¶ 4; Ex. 4 [Answer] at ¶ 4.) On October 3, 2008, LBSF filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking relief

under Chapter 11 of the United States Bankruptcy Code, and since that date it has operated its business and managed its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Code. (Behan Decl., Ex. 3 [Compl.] at ¶ 4; Ex. 4 [Answer] at ¶ 4.)

### B. Bank of America's Derivative Claims Against LBSF and LBHI

*1. The Pertinent Derivative Contracts*

Bank of America and LBSF entered into an ISDA Master Agreement (Multicurrency-Cross Border) dated as of October 31, 1996 (the "Master Agreement"). (Behan Decl., Ex. 3 [Compl.] at ¶ 9; Ex. 4 [Answer] at ¶ 9; Ex. 5 [Master Agreement].) The Master Agreement governs the swap transactions executed between the two parties. (Behan Decl., Ex. 5 [Master Agreement].) Pursuant to the Schedule to the Master Agreement, LBHI is designated as "Credit Support Provider" to LBSF. (Behan Decl., Ex. 3 [Compl.] at ¶ 10; Ex. 4 [Answer] at ¶ 10; Ex. 5 [Master Agreement] at § 14, Schedule Part 4(g).) In connection with the Master Agreement, LBHI (the "Guarantor") issued a guarantee to Bank of America (the "Guarantee") in which LBHI agreed unconditionally to guarantee and pay the due and punctual payment of all amounts payable by LBSF to Bank of America under the Master Agreement. (Behan Decl., Ex. 3 [Compl.] at ¶ 11; Ex. 6 [Guarantee].) LBHI's Guarantee provided credit support and a credit enhancement to LBSF for the swap transactions with Bank of America and was essential as an inducement for Bank of America to trade with, or enter into transactions with, LBSF. (Behan Decl., Ex. 3 [Compl.] at ¶ 12; Ex. 5 [Master Agreement] at Ex. B to Schedule.)

Under the Master Agreement, an Event of Default occurs, *inter alia*, when one of the parties, or any "Credit Support Provider" of a party "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due," "institutes or has instituted against it a proceeding seeking a judgment of insolvency or

bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights" or "seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets." (Behan Decl., Ex. 3 [Compl.] at ¶ 13; Ex. 5 [Master Agreement] at § 5(a)(vii)(2), (4), (6).) Upon the occurrence of an Event of Default, the non-defaulting party may designate an Early Termination Date in respect of all outstanding transactions under the Master Agreement. (Behan Decl., Ex. 3 [Compl.] at ¶ 14; Ex. 5 [Master Agreement] at § 6(a).)

> 2. *Bank of America's Derivative Claims Against LBHI and LBSF and the Instant Dispute*

On September 15, 2008, LBHI filed for Bankruptcy. (Behan Decl., Ex. 3 [Compl.] at ¶ 3; Ex. 4 [Answer] at ¶ 3.) Because LBHI is a designated Credit Support Provider to LBSF, the Filing constituted an Event of Default under section 5(a)(vii) of the Master Agreement, and LBSF became a Defaulting Party. (Behan Decl., Ex. 3 [Compl.] at ¶ 16; Ex. 5 [Master Agreement] at § 5(a)(vii).) On the day of the Filing, Bank of America sent LBSF a notice (a) designating that date, September 15, 2008, as the Early Termination Date in respect of all outstanding transactions pursuant to section 6(a) of the Master Agreement and (b) demanding the immediate return of all collateral provided by Bank of America in support of the transactions. (Behan Decl., Ex. 3 [Compl.] at ¶ 17; Ex. 4 [Answer] at ¶ 17; Ex. 7.) At the time, LBSF held about $360,000,000 of Bank of America's posted collateral. (Behan Decl., ¶ 4; *id.* Ex. 3 [Compl.] at ¶ 18; Ex. 8.) Bank of America repeatedly requested the return of the collateral, with interest, from LBSF, but LBSF never returned those funds.[6]

---

[6] Behan Decl., ¶ 5; *id.* Ex. 3 at ¶ 22; Ex. 8; Ex. 9; Ex. 10; Ex. 11 at ¶¶ 15-16, 19-24.

In accordance with the provisions of the Master Agreement, Bank of America calculated the amount payable by LBSF to the Bank in respect of all of the terminated transactions under the Master Agreement (the "Termination Amount"). For the purposes of this Adversary Proceeding, it is undisputed that the Termination Amount exceeded the $509 million against which the Bank set off. (*See* Behan Decl., Ex. 8.) On November 10, 2008, Bank of America sent a statement to LBSF and LBHI in which Bank of America provided details of its calculations and demanded the payment of the Termination Amount, together with accrued interest and related expenses. (Behan Decl., Ex. 3 [Compl.] at ¶ 20; Ex. 8 at Annex A; Ex. 12.)

Pursuant to the terms of the Master Agreement and Guarantee, Bank of America also submitted a written demand under the Guarantee (the "Guarantee Demand") for payment by LBHI of the Termination Amount, together with interest thereon and legal fees and expenses payable under the Master Agreement (the "Master Agreement Termination Value"). (Behan Decl., Ex. 3 [Compl.] at ¶ 21; Ex. 8.) Bank of America further notified LBHI that, effective as of November 10, 2008, the Bank would partially set off the amount owed to it by LBSF and LBHI against the amount of $509,304,584.29, which was the aggregate amount held in seven LBHI deposit accounts at Bank of America.[7] (Behan Decl., Ex. 3 [Compl.] at ¶ 23; Ex. 8; Ex. 14 at ¶ 29.)

On Friday November 21, 2008, LBHI advised Bank of America of its position that (a) Bank of America had no valid setoff right against approximately $500 million held in the account established pursuant to the Security Agreement (account numbers 6550xxx465 and

---

[7] The account numbers of those accounts are 6550xxx536 ($10,000.72); 7009xxx536 ($2,112,519.75); 6014xxx58013 ($1,152,284.81); 6064xxx05010 ($3,713,066.84); 123xxx459 ($496,000); 6550xxx465 ($1,820,712.17); 40xxx1 ($500,000,000). (*See* Ex. 8 at Ex. A, Annex B.) 123xxx459 was later determined to be an account held by Lehman Brothers Inc., and the setoff against the funds in that account was reversed. *See* Behan Decl., ¶ 8. The parties have stipulated that because of the complexities surrounding derivative valuation, the amount actually owed by Lehman Brothers to Bank of America will not be litigated during this declaratory relief action. (*See* Behan Decl., Ex. 13.)

8

40xxx1, each a "Challenged Account" and collectively, the "Deposit Account") and (b) the Bank's setoff of funds violated the Automatic Stay under the Code. (*See* Behan Decl., Ex. 15.) LBHI demanded immediate return of the funds, with interest. (*See id.*) Bank of America filed for declaratory relief the following Wednesday, November 26, 2008. (Behan. Decl., Ex. 3 [Compl.].)

### C. The Challenged Accounts and the Security Agreement

#### 1. The Challenged Accounts

The basic nature of the Challenged Accounts is largely undisputed. On August 25, 2008, LBHI placed a $500 million deposit into account 6550xxx465, a demand deposit account on Bank of America's Wholesale Banking System ("WBS") platform.[8] Pursuant to LBHI's instructions, the $500 million was transferred to a Eurodollar time deposit (Challenged Account 40xxx1)[9] at Bank of America's Cayman branch.[10] The LBHI representative who placed that deposit testified that he was familiar with deposits in standard bank accounts and Eurodollar deposits and, in fact, regularly made such deposits as part of his cash management duties for Lehman Brothers. (*See* Behan Decl., Ex. 29 [Rahavy Dep. Tr.] at 49:4-50:3, 50:11-21.) LBHI's treasurer testified that Lehman Brothers had as much as $15 billion in liquid deposits (including Eurodollar deposits) on a daily basis over the relevant time period. (*See* Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 72:18-73:8.) As is standard in the banking industry, and as set out in the standard confirmations the Bank generated for the deposit,

---

[8] *See* Behan Decl., Ex. 4 [Countercl.] at ¶ 30; Ex. 14 at ¶ 25; Ex. 16 [Mazzella Dep. Tr.] at 131:18-22; Ex. 17; Ex. 18 [Alpert Dep. Tr.] at 15:6-11, 60:17-62:2. The Wholesale Banking System platform is "a deposit account platform" used "mainly for financial institutions." *See* Behan Decl., Ex. 19 [Hawk Dep. Tr.] at 22:18-20; Ex. 20.

[9] "Eurodollar deposits are funds [that are] booked in a foreign domiciled branch or bank, but remain denominated in U.S. dollars" which "have been in use for many years as a facility to maximize the value of short-term liquid funds." (Behan Decl., Ex. 21 at 15.)

[10] *See, e.g.,* Behan Decl., Ex. 4 [Countercl.] at ¶ 30; Ex. 8 at Annex B; Ex. 14 at ¶ 25; Ex. 18 [Alpert Dep. Tr.] at 19:11-23:10, 62:18-66:10; Ex. 22; Ex. 23; Ex. 24; Ex. 25; Ex. 26 at LEH 000468-469; Ex. 27 at LEH 001503; Ex. 28.

the Eurodollar deposit was a general liability of Bank of America, N.A. and was recorded as such on the Bank's general ledger.[11] As of the date of setoff, the LBHI Eurodollar time deposit had accrued a total of $1,820,712.17 in interest, which was held in a demand deposit account – Challenged Account 6550xxx465. (*See* Behan Decl., Ex. 8 at Annex B; Ex. 21 at 19.)

A demand deposit account ("DDA") is the most basic type of checking account. (*See* Behan Decl., Ex. 21 at 15.) Lehman Brothers has maintained DDAs on Bank of America's WBS Platform since at least 1995. (*See* Behan Decl., ¶ 9.) Unfortunately, it appears that the account opening records for those accounts have been lost by both parties – probably as a result of the destruction of offices in the terrorist attacks on September 11, 2001. (*See* Behan Decl., Ex. 33; Ex. 34 [Internal Bank e-mail, dated August 15, 2008, noting that "[Lehman] had offices in the WTC on 9/11 as well so much of their documentation was lost."]) As is standard in the industry, funds held in DDAs, including the WBS DDAs, are also general liabilities of the Bank and are reflected as such on the Bank's general ledger. (*See* Behan Decl., ¶ 10; *id.* Ex. 21 at 16.) Indeed, LBHI's treasurer testified that he understood that deposit accounts are liabilities of the bank holding the accounts. (*See* Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 83:3-11.)

Bank of America's standard terms and conditions for accounts on the WBS platform (such as Challenged Account 6550xxx465) and accounts that hold Eurodollar time deposits (such as Challenged Account 40xxx1) expressly set out the Bank's right to set off against funds in the account.[12] The Bank's practice is that use of the accounts constitutes

---

[11] *See* Behan Decl., Ex. 28 at ¶ 11 ("Eurodollar deposits are deposit obligations of the issuing bank"); Ex. 31 at ¶ 11; Ex. 32 [Behan Dep. Tr.] at 81:16-82:3.

[12] *See* Behan Decl., Ex. 20 at 19 ("[w]e may exercise the right of setoff – that is, the right under certain circumstances, to use funds in your account to pay any debts you owe us, or any of our affiliates, either before or after any default"); Ex. 35 [Customer Agreement] at § 3 ("You hereby grant BANA, Bank of America Securities LLC ("BAS") and each of our affiliates (collectively, "BofA Entities") a continuing security interest in, lien on, and right of set-off with respect to, all Financial Instruments and other property, including cash balances (collectively, "Property") now or hereafter held or carried by any BofA Entity in your accounts . . . as collateral security for the payment and performance of all your obligations to any BofA Entity, now existing or hereinafter arising, whether or

agreement to the terms. (*See* Behan Decl., Ex. 20 ("When you open a corporate deposit account with us, you agree to the terms and conditions discussed in this Agreement.").) Bank of America had sent the WBS booklet and a number of other documents setting forth this policy to Lehman Brothers. (*See, e.g.,* Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 17:21-18:12, 35:16-36:11; Ex. 20 at 4; Ex. 36 at 7 ("Whenever you use any of the Services covered by this Booklet, you agree to be bound by these terms and conditions, as amended from time to time, and to follow the procedures in the applicable Materials.").)

### 2. The Negotiation of the Security Agreement

The deposits in the Challenged Accounts had been made following a request by Bank of America and the negotiation of the Security Agreement. The facts surrounding this request and negotiation are also largely, if not entirely, undisputed.

#### (a) The Request For a Deposit

In early 2008, deteriorating market conditions and abnormal use of daylight overdraft limits by certain broker-dealers, including Lehman Brothers, prompted Bank of America to assess its business activities with these clients more closely.[13] The Bank's focus intensified when several large overdrafts occurred at the end of the second quarter of 2008, resulting in a decision by the Bank to request cash deposits from several clients and to formally monitor as many as twenty other clients.[14]

---

not such obligations arise under this Agreement or any other agreement between any BofA Entity and you and irrespective of the number of accounts you may have with the BofA Entities or which BofA Entity holds such Property . . . .").

[13]  *See, e.g.,* Behan Decl., Ex. 37 [Harney Dep. Tr.] at 50:22-51:11; Ex. 38 (7/29/08 e-mail from Regina Regan stating "I firmly believe from a Risk perspective that due to current market conditions there needs to be a review from end to end of limit assignment, current policies, processes, monitoring etc.")

[14]  *See, e.g.,* Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 30:5-19; Ex. 19 [Hawk Dep. Tr.] at 63:4-65:10, 78:7-22, 83:18-84:8; Ex. 37 [Harney Dep. Tr.] at 50:22-53:15; Ex. 38 ("It is also Risk Management's intention to implement [a] remediation procedure across the entire B/D sector for existing GTS clients with large DOLs (i.e., Lehman and others)"); Ex. 39 [Dever Dep. Tr.] at 52:17-56:21; Ex. 40; Ex. 41 ("This is an initial meeting to discuss how to address future book overdrafts for select clients by requesting a cash deposit."); Ex. 42 at BOA_AP00034137;

Daylight overdraft limits are uncommitted lines of credit made available by the Bank to its institutional clients. (*See* Behan Decl., Ex. 21 at 3, 8; Ex. 30 [Tonucci Dep. Tr.] at 26:23-25; Ex. 47 [Birney Dep. Tr.] at 80:2-17; Ex. 48 [Fielding Dep. Tr.] at 57:24-58:12.) As clients conduct business throughout the day, the balances in their accounts fluctuate. (*See* Behan Decl., Ex. 21 at 3; Ex. 48 [Fielding Dep. Tr.] at 178:12-179:25.) The limits allow for the efficient processing of transactions by permitting client accounts to be overdrawn during the day. (*See* Behan Decl., Ex. 21 at 7; Ex. 39 [Dever Dep. Tr.] at 89:12-18; Ex. 47 [Birney Dep. Tr.] at 80:2-17; Ex. 48 [Fielding Dep. Tr.] at 57:24-58:16.) It is assumed that no overdrafts will remain at the close of business. (*See* Behan Decl., Ex. 21 at 3, 8; Ex. 48 [Fielding Dep. Tr.] at 58:6-59:9; Ex. 49 [Hawk Dep. Tr.] at 198:8-13.) One of the risks associated with these lines is the possibility that a client will be unable to replenish an account at the end of the day, resulting in an overnight or "book" overdraft, with reporting and regulatory consequences for the Bank.[15]

Lehman Brothers became a greater risk priority for the Bank on July 25, 2008, when an overdraft in the amount of $650 million remained in a Lehman Brothers account at the end of the business day. (*See* Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 30:5-31:6; Ex. 19 [Hawk Dep. Tr.] at 59:11-62:20; Ex. 37 [Harney Dep. Tr.] at 71:8-72:19; Ex. 47 [Birney Dep. Tr.] at 87:13-89:13; Ex. 51.) Bank of America immediately informed Lehman Brothers of the shortfall and the need to resolve the issue. (*See, e.g.*, Behan Decl., Ex. 52; Ex. 53; Ex. 39 [Dever Dep.

---

Ex. 43 ("[I]t is the intention of Risk all the way to the top of the house to mitigate the OD risk in Broker Dealer space – either through having a deposit to look to or we will reduce the limits."); Ex. 44 ("We are not going to run naked ODs for broker dealers. Full stop."); Ex. 45 ("Clearly you know that the 3 B/Ds are where we have the most concern about both [overdrafts] over quarter end---and their general financial health, due to the complexity of their business models"); Ex. 46 ("Overdraft Risk Mitigation for Key Clients" PowerPoint presentation dated August 11, 2008).

[15] *See, e.g.,* Behan Decl., Ex. 19 [Hawk Dep. Tr.] at 28:11-23, 36:9-19, 63:16-64:2; Ex. 21 at 9-10; Ex. 39 [Dever Dep. Tr.] at 74:17-74:22; Ex. 50 ("[I]f operationally we cannot 'guaranty' that DOLs will not become overnight ODs, how much $$ do we want on deposit and then mechanically how does that work."); *id.* (e-mail expressing Bank's need "to review appropriateness of DOLs for . . . LEH specifically" and "in the context of recent activity, etc. determine and make recommendations . . . on . . . the appropriate sized deposits [to] ask for in the context of the DOLs to reasonably offset overnight OD risk.") (redacted material omitted).

Tr.] at 48:6-48:25.) In response, Lehman Brothers identified the overdrawn account as a segregated account that, although opened by a Lehman Brothers entity at Bank of America, held funds belonging to the broker-dealer's clients.[16] Through Emil Cornejo, Senior Vice President of Global Treasury, and Paolo Tonucci, Vice President and Global Treasurer, Lehman Brothers informed Bank of America that the segregated nature of the account precluded Lehman Brothers from covering the overdraft, because a broker-dealer could not commingle its own funds with client monies.[17] Regardless of the source of the overdraft, however, it was the Bank that was left with a deficit in the amount of $650 million.[18] Moreover, the fact that this particular overdraft had occurred in an account that Lehman claimed was a client segregated account was worrisome because, unlike standard deposit accounts in which the funds belong to Lehman Brothers, Lehman contended that the Bank could not set off funds in other LBHI accounts against overdrafts in an LBHI segregated funds account.[19] In other words, if a client of Lehman Brothers failed to deposit funds sufficient to restore the balance in the account, Lehman contended that the Bank's recourse was limited. In August 2008, Bank of America decided that it would no longer allow any Lehman Brothers entity to incur daylight overdrafts absent a deposit that could be used to limit the Bank's exposure to negative balances in all Lehman Brothers accounts.[20]

---

[16] See Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 30:17-31:1; Ex. 34; Ex. 54 at BOA_AP00043650; Ex. 55 at LEH 000643.

[17] See Behan Decl., Ex. 34; Ex. 54 at BOA_AP00043650; Ex. 56 [Sparks Dep. Tr.] at 89:5-15.

[18] See, e.g., Behan Decl., Ex. 37 [Harney Dep. Tr.] at 72:4-19 ("Q: Did you care what the reasons were for the overdraft? A: No. Q: Did you care how long the overdraft remained in overdraft status? A: No. Q: Why not? A: Given the liquidity issues in the market at the time for financial institutions and for broker-dealers . . . what gave rise to the creation of the overdraft did not mitigate the risk of the overdraft itself given the heightened level of risk in the market").

[19] See Behan Decl., Ex. 34 (Internal Bank e-mail noting that "[Emil Cornejo] confirmed that we would NOT be allowed to use this as collateral and we would NOT have right of offset").

[20] See, e.g., Behan Decl., Ex. 19 [Hawk Dep. Tr.] at 28:11-23; Ex. 53; Ex. 57; Ex. 58; Ex. 59.

<u>(b)  The Deposit Account and the Security Agreement</u>

In early August 2008, the parties began discussing the structure of the deposit.

Lehman Brothers initially proposed a "plain vanilla" account and noted during one of the parties'

many conference calls that the Bank would have a right of setoff.  (*See* Behan Decl., Ex. 60.)

During his deposition, Stirling Fielding, a Senior Vice President in Treasury and Head of Cash

Management Europe for Lehman Brothers, and the Lehman employee who made the suggestion,

explained that a "plain vanilla" account was "[a] standard operating DDA style cash account."

(Behan Decl., Ex. 48 [Fielding Dep. Tr.] at 184:14-15.)

The resolution ultimately negotiated took the form of two standard Bank of

America accounts:  a Eurodollar time deposit at Bank of America's Cayman Islands branch

(account number 40xxx1), which allowed Lehman Brothers to earn a competitive rate of interest

on the cash deposit, and a demand deposit account (account number 6550xxx465) on the Bank's

WBS platform.  (*See, e.g.*, Behan Decl., Ex. 22; Ex. 24; Ex. 61; Ex. 62.)  Bank of America

negotiated to receive a security interest in the accounts and certain special rights, all of which

were memorialized in the Security Agreement.  (*See* Behan Decl., Ex. 2 [Security Agreement].)

The accounts are referred to collectively in both the Security Agreement and herein as the

"Deposit Account."  (*See id.*)

It is undisputed that the Security Agreement was "heavily negotiated" by

"sophisticated" in-house and outside counsel.[21]  The Agreement was executed on August 25,

2008.[22]  Andrew Yeung, an in-house attorney for Lehman Brothers, led the negotiations on its

behalf, with advice from outside counsel at Simpson Thatcher & Bartlett LLP.  (*See* Behan

Decl., Ex. 63 [Yeung Dep. Tr.] at 57:8-11, 102:17-103:6, 134:17-21; Ex. 30 [Tonucci Dep. Tr.]

---

[21]  *See, e.g.,* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 65:4-14; Ex. 64.

[22]  Behan Decl., Ex. 2 [Security Agreement].

at 52:3-9.) Messrs. Tonucci and Cornejo were the other Lehman Brothers employees who played the most significant roles in the negotiation and approval of the Agreement.[23] In addition, Janet Birney, Global Head of Network Management Americas, was responsible for the account opening, and Stirling Fielding played a leading role on operational calls in connection with the Deposit Account on August 21, 2009 and August 22, 2009. (*See* Behan Decl., Ex. 66; Ex. 63 [Yeung Dep. Tr.] at 45:2-46:3, 70:12-71:15; Ex. 48 [Fielding Dep. Tr.] at 108:10-109:3; 134:14-24, 189:4-9.)

For Bank of America, Randy Sparks, an in-house attorney, and Sally Hawk, Client Delivery and Service Executive for GCIB Global Product Solutions, together with Christopher McDermott, a lawyer with the law firm of Cadwalader, Wickersham & Taft LLP, negotiated the Security Agreement. (*See* Behan Decl., Ex. 19 [Hawk Dep. Tr.] at 31:20-32:11, 33:2-9; Ex. 56 [Sparks Dep. Tr.] at 67:25-68:8, 102:24-104:2; Ex. 63 [Yeung Dep. Tr.] at 168:3-9.)

On August 21, 2008, Bank of America provided the first draft of the Agreement to Lehman Brothers, together with a copy of a Customer Agreement that set forth certain terms and conditions of the account that would hold the Eurodollar deposit at the Bank. (Behan Decl., Ex. 67.) On the afternoon of August 22, 2008, Mr. Yeung responded on behalf of Lehman Brothers, proposing changes to the Security Agreement that focused, in relevant part, on the scope of a defined term, "Indebtedness" (section 2 of the Agreement), which was incorporated into certain remedies provided for under the Agreement, the guarantee provided by LBHI (section 14), the defined events of default and the Bank's related remedies (sections 10 and 11), and the provision in section 15 of the Agreement that stated that the "rights, powers and

---

[23] *See* Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 12:19-25, 42:19-43:1; Ex. 63 [Yeung Dep. Tr.] at 207:15-208:15; Ex. 65 at LEH 006503 (8/21/08 e-mail from Emil Cornejo: "Andrew, we will need your help this evening in reviewing a deposit agreement.")

remedies given to the Bank by this Agreement shall be in addition to all rights, powers and remedies given to the Bank by virtue of any statute or rule of law." (Behan Decl., Ex. 68 at §§ 2, 10, 11, 14, 15.)

Significantly for their arguments in this action, Lehman Brothers asked in that first round of negotiations that "Indebtedness" be limited to debts from overdrafts. (*See id.* at § 2.) Similarly, Lehman Brothers sought to limit the events of default listed in the Security Agreement and to have the associated remedies apply only to Lehman Brothers Holdings Inc., as Pledgor under the Agreement. (*Id.* at §§ 10, 11.) Mr. Yeung's comments (on behalf of Lehman Brothers) further reflected a proposal by Lehman Brothers to remove the guarantee and "other rights" provisions of the Security Agreement entirely. (*See id.* at §§ 14, 15.) In addition, on the customer agreement that accompanied the initial draft of the Security Agreement, Mr. Yeung penned the following question regarding a paragraph titled "Security Interest" (which also included an express right of setoff): "Shouldn't this section be governed by the Security Agreement?" (Behan Decl., Ex. 68 [Customer Agreement] at § 3; Ex. 63 [Yeung Dep. Tr.] at 142:21-143:6.) This inquiry is the only evidence of any attempt by Lehman Brothers to raise the issue of Bank of America's right of setoff during the negotiations (if, in fact, it reflects such an attempt). (*See* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 143:9-145:6.) According to deposition testimony by employees of both Bank of America and Lehman, the topic of setoff was not otherwise discussed during the negotiations. (*See* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 149:7-150:9; Ex. 30 [Tonucci Dep. Tr.] at 45:6-12, 103:4-9; Ex. 56 [Sparks Dep. Tr.] at 160:17-161:23, 195:7-13.)

Late on August 22, 2008, Mr. McDermott (of the Cadwalader law firm) circulated Bank of America's responses to Lehman Brothers' proposed changes. In the cover e-mail to the

revised draft, Mr. McDermott informed Lehman Brothers that the Bank was willing to accept only some of Mr. Yeung's proposals. (*See* Behan Decl., Ex. 69 at BOA_AP00030267 ("This version reflects comments from Lehman's mark-up accepted by the bank . . .").) Lehman Brothers employees testified that they understood that comments that they had made to the Bank's initial August 21 draft that were not reflected in the August 22 draft from Mr. McDermott had not been accepted by Bank of America. (*See* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 184:19-25, 185:24-186:4; Ex. 30 [Tonucci Dep. Tr.] at 59:13-18.)

In relevant part, the Bank's August 22 revisions to the Security Agreement retained the guarantee from LBHI and the section preserving all rights of the Bank in addition to those created by the Agreement and, in fact, reinserted those provisions into the draft of the document. (*See* Behan Decl., Ex. 69 at §§ 13, 14.) On the definition of "Indebtedness" itself, the Bank proposed broader language that defined the term in two parts:

- (a) "any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or involuntary for overdrafts of the Pledgor, any of its subsidiaries or any of its affiliates, owed to the Bank" or any of its subsidiaries or affiliates; and
- (b) "all obligations" of Lehman Brothers "now or hereafter existing under this Agreement, including without limitation under the guarantee made by the Pledgor pursuant to Paragraph 13 hereof."

(*Id.* at § 2.) This was the Bank's attempt to resolve Lehman Brothers' request with respect to the "Indebtedness" term, and Lehman Brothers felt it basically addressed its concerns. (Behan Decl., Ex. 56 [Sparks Dep. Tr.] at 163:3-163:15; Ex. 63 [Yeung Dep. Tr.] at 173:6-174:19). The Bank's changes also made clear that several of the events of default would not be limited to Indebtedness at all or to an event affecting LBHI. (Behan Decl., Ex. 69 at §§ 10(b)-(f), 11.)

Following an exchange of several additional drafts, LBHI and Bank of America reached an agreement. In relevant part, the executed Security Agreement reflected the following rights and obligations of the parties:

- LBHI placed $500 million into the Deposit Account, which was defined in the Security Agreement as two standard Bank of America accounts: a Eurodollar time deposit at Bank of America's Cayman Islands branch (account number 40xxx1) and a Demand Deposit Account (account number 6550xxx465) on the Bank's WBS platform.[24]

- The nature of the Deposit Account was not otherwise addressed in the Security Agreement, except for the provision that LBHI retained sole discretion to add and remove funds from the Deposit Account, subject only to the restriction that it had to provide three business days' notice before removing funds.[25]

- Bank of America was given a secured interest in the Deposit Account that was limited to "Indebtedness," a defined term that covered in general terms (a) overdrafts owed by the Pledgor or its affiliates or subsidiaries to any Bank of America affiliate and (b) any other obligation of the Pledgor arising under the Security Agreement, including the guarantee made by the Pledgor pursuant to section 13. (*See* Behan Decl., Ex. 2 [Security Agreement] at § 2(a), (b).)

- LBHI guaranteed "the prompt and complete payment by any of the Pledgor's subsidiaries or any of the Pledgor's affiliates, when due (whether at the stated maturity, by acceleration or otherwise) of the Indebtedness." (*Id.* at § 13(a).)

- The Security Agreement also provided a number of additional remedies to the Bank if one of several defined Events of Default occurred – some of which involved the defined term "Indebtedness" and some of which did not. (*Id.* at §§ 10(a)-(g), 11(a)-(d).)[26]

- If an Event of Default occurred, the remedies available to Bank of America included several rights that were not limited to Indebtedness. Section 11(b)

---

[24] *See* Behan Decl., Ex. 2 [Security Agreement] at § 3; Ex. 4 [Countercl.] at ¶ 30; Ex. 14 at ¶ 25; Ex. 18 [Alpert Dep. Tr.] at 19:11–23:10, 62:18-66:10; Ex. 22; Ex. 23; Ex. 24; Ex. 25; Ex. 28.

[25] *See* Behan Decl., Ex. 2 [Security Agreement] at § 4(a); Ex. 18 [Alpert Dep. Tr.] at 23:11–24; Ex. 29 [Rahavy Dep. Tr.] at 76:23–77:2; Ex. 48 [Fielding Dep. Tr.] at 151:14–153:5.

[26] The defined Events of Default included: (a) a failure by "the Pledgor, or any of its subsidiaries or affiliates, or any comaker, accommodation maker, surety or guarantor of the Indebtedness or any endorser of any note or other document evidencing the Indebtedness (a "Credit Party")" to pay Indebtedness when due; (b) the appointment of a "custodian, receiver or trustee . . . of any Credit Party"; (c) the insolvency, inability to pay debts when due, or commencement of a bankruptcy proceeding by a Credit Party; (d) the commencement of a bankruptcy proceeding against a Credit Party; (e) the attachment of an involuntary lien to the Deposit Account for longer than three (3) business days; (f) the provision of false information by a Credit Party; and (g) any termination event, event of default or other similar event in connection with an Indebtedness exceeding $50,000,000 and arising from any derivatives or hedging transactions between the parties. (Behan Decl., Ex. 2 [Security Agreement] at §§ 10(a)-(g).)

allowed the Bank to "*[e]xercise as to the Deposit Account all of the rights powers and remedies of an owner* and all of the rights powers and remedies of a secured party under the UCC . . . *and any other applicable law*." (*Id.* at § 11(b) (emphasis added).) Section 11(d) permitted Bank of America to "exercise any other remedy provided under this Agreement *or by any applicable law*." (*Id.* at § 11(d) (emphasis added).)

- Section 14 of the Security Agreement expressly provided that the "rights, powers and remedies given to the Bank by this Agreement shall be *in addition to all rights, powers and remedies given to the Bank by virtue of any statute or rule of law*." (*Id.* at § 14) (emphasis added).)

### 3. The Setoff

As described above, the Filing constituted an Event of Default under the Master Agreement, and the Bank immediately exercised its right to terminate all outstanding transactions under the Master Agreement. (Behan Decl., Ex. 3 [Compl.] at ¶ 16; Ex. 5 [Master Agreement] at § 5(a)(vii); Ex. 7.) The Bank began assessing the values of its existing derivatives transactions with Lehman Brothers entities, and LBSF in particular and, in anticipation of a large receivable, began considering its setoff options. (*See* Behan Decl., Ex. 32 [Behan Dep. Tr.] 44:23-46:9.) On September 25, 2008, while the Bank was in the process of calculating its derivatives exposures to Lehman Brothers and evaluating its setoff options, the $500 million Eurodollar time deposit was set to mature.[27] (*See* Behan Decl., Ex. 71.) The Bank renewed the trade on a "Till Further Notice" or "TFN" basis, meaning that the deposit continued to roll and accrue interest daily, which allowed more flexibility in terms of releasing the funds without a penalty. (*See* Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 26:22-27:8; Ex. 19 [Hawk Dep. Tr.] at 172:20-24; Ex. 71; Ex. 72.)

Thereafter, the Bank completed its calculations of the termination values of all terminated transactions under the Master Agreement. (Behan Decl., Ex. 3 [Compl.] at ¶ 19;

---

[27] At LBHI's instructions, the Eurodollar time deposit had been booked for a 31 day term, with an expiration date of September 25, 2008. (*See* Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 23:11–13; Ex. 23; Ex. 28; Ex. 30 [Tonucci Dep. Tr.] at 74:13-15; Ex. 70 at LEH 00250-251.)

Ex. 32 [Behan Dep. Tr.] at 46:10-47:9.) The challenged setoff was effected on November 10, 2008.

Bank of America conducted a detailed analysis of all accounts held at the Bank by all Lehman Brothers entities to determine which accounts held funds against which the Bank had a legal right to set off amounts due under the Master Agreement. (Behan Decl., ¶ 6.) For example, the Bank did not exercise a right of setoff against client segregated funds (*id.*), and it only set off against funds in accounts held by LBHI. (*Id.*) Ultimately, on the basis of its careful analysis, the Bank set off against seven LBHI accounts. (*Id.* at ¶ 7; *see also, supra* p. 8 note 7.)

## ARGUMENT

The Bankruptcy Code expressly allows swap counterparties like Bank of America to exercise their setoff rights to settle terminated swap contracts. That is exactly what the Bank did here. LBHI had $509 million deposited with Bank of America, N.A. on September 15, 2008. Those were debts the Bank owed to LBHI. LBHI also owed Bank of America, N.A. an amount well in excess of that amount as a result of the termination of swap contracts. It was proper for the Bank to set off one set of debts against the other. After originally contending that the Bank moved funds from one affiliated entity to another, LBHI has conceded that the Bank did not do so and, thus, there was mutuality of entity and capacity on either side of the setoff. And LBHI's claim that the Bank waived its right of setoff or created a "special purpose" account for the Challenged Deposit is entirely without support.

Summary judgment should be granted when the moving party establishes that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Banco de la Provincia de Buenos Aires v. BayBank Boston N.A.*, 985 F.Supp. 364, 367 (S.D.N.Y. 1997). Whether a fact is material is determined by

the substantive law governing the case and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Bankruptcy courts apply the non-bankruptcy law (*i.e.* state law) regarding setoff rights of the state where the operative facts occurred. *In re Lehman Bros. Holdings, Inc.,* 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009) (Peck, J.) ("[A]ssuming no federal common law right of setoff is concerned, [the applicable non-bankruptcy law is] 'the law of the state where the relevant facts transpired.'") (quoting *In re WorldCom, Inc.,* 304 B.R. 611, 619 (Bankr. S.D.N.Y. 2004)); *In re Westchester Structures, Inc.,* 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995) ("The law to be applied to establish whether setoff is permissible is the law of the state where the relevant facts transpired.") (citing *In re Prudential Lines, Inc.,* 148 B.R. 730, 751 (Bankr. S.D.N.Y. 1992)). In this case, all of the operative facts occurred in New York, and the Security Agreement and the swap contracts and guarantee expressly state that they are governed by New York law. (*See* Behan Decl., Ex. 2 [Security Agreement] at § 16(d); Ex. 5 [Master Agreement] at Schedule Part 4(h); Ex. 6 [Guarantee].) Accordingly, New York law applies.

## I. BANK OF AMERICA'S SETOFF DID NOT VIOLATE THE CODE'S AUTOMATIC STAY

Section 553 of the Bankruptcy Code protects the right of a creditor to offset mutual, pre-petition debts.[28] The Derivative Claims made under the Master Agreement and

---

[28] 11 U.S.C. § 553 (2005) ("Except as otherwise provided in this section and in sections 362 and 363 of this title [11 U.S.C. §§ 362 and 363], this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title [11 U.S.C. § 101 et seq.] against a claim of such creditor against the debtor that arose before the commencement of the case . . . ."); *see also In re Bennett Funding Group,* 146 F.3d 136, 140 (2d Cir. 1998) (holding that a bank's setoff of mutual debts under section 553 was valid); *In re Cairns & Assocs.,* 372 B.R. 637, 660 (Bankr. S.D.N.Y. 2007) (finding that pre-petition, mutual debts were subject to setoff under section 553); *In re BOUSA, Inc.,* No. 89-B-13380 (JMP), 2006 WL 2864964, at **3-4 (Bankr. S.D.N.Y. Sept. 29, 2006) (Peck, J.) (finding that the government had a valid right to set off pre-petition, mutual debts under section 553 that had not been waived).

Guarantee arose before LBHI's filing, and the amounts in the LBHI accounts were deposited before its filing. Accordingly, Bank of America's right of setoff was maintained.[29]

Furthermore, although section 362 of the Code (the "Automatic Stay") stays "the setoff of any debt owing to the debtor that arose before the commencement of the case . . . against any claim against the debtor" upon a Chapter 11 filing, 11 U.S.C. § 362(a)(7), section 362(b)(17) expressly excepts the setoff of debts against derivative claims from the Automatic Stay:

> The filing of a petition under section 301, 302, or 303 of this title . . . , does not operate as a stay –
>
> . . .
>
> (17) under subsection (a) of this section, of *the exercise by a swap participant* or financial participant of any contractual right (as defined in section 560 [11 U.S.C. § 560]) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or *of any contractual right* (as defined in section 560 [11 U.S.C. § 560]) *to offset* or net out *any termination value*, payment amount, or other transfer obligation *arising under or in connection with 1 or more such agreements, including any master agreement for such agreements.*

11 U.S.C. § 362(b)(17) (emphasis added). The term "contractual right" as defined in section 560 of the Bankruptcy Code, and made applicable to section 362(b)(17), includes common law rights of setoff. *See* 11 U.S.C. § 560 (2005) ("As used in this section, the term 'contractual right' includes . . . a right, whether or not evidenced in writing, arising under *common law*, under merchant law, or by reason of normal business practice.") (emphasis added).

Furthermore, Bank of America is a "financial participant" and "swap participant," as each term is defined in, respectively, sections 101(22A) and 101(53C) of the Bankruptcy

---

[29] *See In re Denby Stores, Inc.*, 86 B.R. 768, 778 (Bankr. S.D.N.Y. 1988) (guarantor's claim against a debtor arose pre-petition, at the time when the guaranty was executed, not post-petition, when guarantor actually made payments pursuant to the guarantee); *see also In re BOUSA, Inc.*, 2006 WL 2864964, at *3 ("[f]or purposes of setoff, a debt arises when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed") (internal citation omitted) (Peck, J.)

Code. *See* 11 U.S.C. §§ 101(22A)(A)[30] and (53C).[31]  The Master Agreement is a "swap agreement" as defined in section 101(53B) of the Bankruptcy Code, and the Guarantee is a credit enhancement forming a part of or related to a swap agreement.[32]  Accordingly, Bank of America's exercise of its right of setoff with respect to the termination value due to the Bank under the Master Agreement and Guarantee was protected by the safe harbor – which expressly permits the exercise of such rights under swap agreements and credit enhancements related to such swap agreements – and the Automatic Stay did not apply.

Despite the clear language of the Code, however, LBHI contends that Bank of America violated the Automatic Stay because, LBHI asserts, section 362(b)(17) "protects a financial participant's or a swap participant's setoff of a payment due under or in connection with a swap agreement against collateral that is pledged to the swap participant or financial participant to 'guarantee, secure, or settle any swap agreement'" but "does not extend to permit a setoff by such swap participant or financial participant against collateral pledged for some other purpose." (Behan. Decl., Ex. 4 [Countercl.] at ¶ 8.)  That is simply not the case.

LBHI's recitation of the safe harbor includes terms from a version of the provision enacted in 2005, but those terms were deleted when the provision was amended in

---

[30] "The term 'financial participant' means—(A) an entity that . . . at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph . . . (5) . . . of section 561(a) [swap agreement] with the debtor or any other entity . . . of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding at such time . . . ." 11 U.S.C. § 101(22A)(A) (2007).

[31] "The term 'swap participant' means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C) (2007).  As of September 14, 2008, the day before LBHI filed for bankruptcy, the Master Agreement and Guarantee constituted outstanding swap agreements between Bank of America and Lehman Brothers. *See supra* pp. 6-7.

[32] *See* 11 U.S.C. § 101(53B)(A)(v); *see also* Compl. at ¶¶ 35, 36, Ex. A.

"The term 'swap agreement'—

(A) means—(v) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), or (iv), together with all supplements to any such master agreement, and without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement under this paragraph . . . ." 11 U.S.C. § 101(53B)(A)(v) (2007).

2006.[33] While it could colorably (though inaccurately) be argued that the earlier, superseded provision limited the safe harbor to setoff against posted collateral, Congress deleted the words that could have suggested such limitations in 2006 – thus clarifying that the right to set off against derivative claims was absolutely safe harbored without any such limitation.

As the United States Supreme Court has explained, "[t]he starting point in discerning congressional intent is the existing statutory text, and not the predecessor statutes." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal citation omitted) (holding that the plain language of section 330(a)(1) of the Bankruptcy Code does not authorize compensation awards to debtor's attorneys from estate funds, unless they are employed as authorized by section 327). Moreover, when Congress amends a statute, courts presume that Congress "intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). In enacting the 2006 amendment to section 362(b)(17), Congress simplified the language of the provision such that the right to set off claims under a swap agreement against unrelated debts is now unmistakably clear. LBHI cannot contend that earlier unclear language in a previous statute changes the plain meaning of the current statute.

## II.   EVEN IF THE COURT FINDS THAT THE AUTOMATIC STAY DOES PRECLUDE BANK OF AMERICA'S SETOFF, THE COURT SHOULD ANNUL THE STAY *NUNC PRO TUNC*

Section 362(d) of the Bankruptcy Code permits a Bankruptcy Court to grant relief from the Automatic Stay "by terminating, annulling, modifying, or conditioning" the stay. 11 U.S.C. § 362(d) (2006). "[A]n order 'annulling' a stay [has] retroactive effect, and thereby

---

[33] The superseded version of section 362(b)(17) allowed setoff against "any payment due to the debtor from the swap participant or financial participant under or in connection with any swap agreement or against cash, securities, or other property held by, pledged to, under the control of, or due from such swap participant or financial participant *to margin, guarantee, secure, or settle any swap agreement*." Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 907(d)(1)(C), 119 Stat. 23, 176 (2005) (emphasis added).

reaches back in time to validate proceedings or actions that would otherwise be deemed void *ab initio*." *E. Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (citations omitted). Pursuant to section 362(d)(1), retroactive relief is to be granted "for cause," and Bankruptcy Courts have wide latitude in determining whether to grant such relief.[34]

This is a particularly compelling case warranting retroactive relief. *First*, as demonstrated in detail below, Bank of America had a valid right of setoff (*see* Point IV, *infra*), which was expressly preserved by section 553(a) of the Bankruptcy Code (11 U.S.C. § 553(a) (2005)). This Court has recognized that "[e]quity favors setoff and thus a creditor's valid setoff right should not be disallowed 'unless compelling circumstances require it . . . .'" *In re BOUSA*, 2006 WL 2864964, at *9 (Peck, J.) (quoting *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979); *see also In re Alibrandi*, No. 87-00384, 1990 Bankr. LEXIS 1002, at *7 (Bankr. N.D.N.Y. Apr. 25, 1990) ("the policy of the Bankruptcy Code favors set off"). Accordingly, this Court and other courts have held that a party's valid right of setoff constitutes "cause" for lifting or annulling the stay. *See, e.g., In re BOUSA*, 2006 WL 2864964, at *9 (lifting the stay to allow setoff by creditor even though the setoff would diminish distributions to other creditors); *In re Shortt*, 277 B.R. 683, 694 (Bankr. N.D. Tex. 2002) (granting *nunc pro tunc* relief from the stay where creditor established valid right of setoff).[35]

---

[34] 11 U.S.C. § 362(d)(1); *In re Myers*, 491 F.3d 120, 128 (3d Cir. 2007) (affirming retroactive annulment of stay); *In re Kissinger*, 72 F.3d 107, 109 (9th Cir. 1995) ("section 362 gives the bankruptcy court wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay") (quoting *In re Schwartz*, 954 F.2d 569, 572 (9th Cir. 1992)). An order annulling the stay is relief specific to a particular party. *See, e.g., E. Refractories*, 157 F.3d 169; *In re Shortt*, 277 B.R. 683 (Bankr. N.D. Tex. 2002).

[35] *See also In re Alibrandi*, 1990 Bankr. LEXIS 1002, at *8 (lifting the stay to allow setoff because "absent compelling circumstances, the establishing of a right to setoff also demonstrates 'cause' for lifting the stay pursuant to Code § 362(d)(1)"); *In re Orlinski*, 140 B.R. 600, 603 (Bankr. S.D. Ga. 1991) (lifting stay to allow setoff because "[b]y establishing its right of setoff, the IRS has made a prima facie showing of 'cause' for relief from stay under § 362(d)(1)"); *In re Whitaker*, 173 B.R. 359, 361 (Bankr. S.D. Ohio 1994) (same) (citing *Orlinski*). Although there is authority holding that establishing a valid, pre-petition right of setoff is not "cause" for post-confirmation relief from the automatic stay, those cases are clearly distinguishable from the present case because those decisions turned solely on the fact that relief was sought post-confirmation. *See, e.g., In re Schultz*, No. 05-8038, 2006 WL 1407466,

Second, there are no "compelling circumstances" for disallowing Bank of America's right of setoff. There is no cognizable harm to the debtor's estate or to other creditors as a result of the setoff,[36] and Bank of America exercised the setoff in the good faith belief (a) that it had a firmly grounded legal right to do so, and (b) that the setoff was safe-harbored under section 362(b)(17). Even if this Court finds that the safe harbor does not apply, this is not a case of renegade action in conscious disregard of the automatic stay. To the contrary, Bank of America's immediate reaction to Lehman's assertion that the setoff violated the automatic stay was to file this action seeking a declaration that Bank of America exercised a valid right of setoff that was safe harbored by section 362(b)(17), or in the alternative, seeking an order granting retroactive relief from the stay under section 362(d). Thus, there is ample cause for granting retroactive relief from the stay.

## III.  LEHMAN BROTHERS HAS CONCEDED THAT THERE WAS NO MOVEMENT OF FUNDS AMONG AFFILIATES TO EFFECTUATE SETOFF

Stretching to find some basis to challenge the setoff, LBHI alleged in its counterclaims that Bank of America's setoff was unlawful because of a lack of mutuality between the parties. (Behan Decl., Ex. 4 [Countercl.] at ¶ 7.) Without any factual basis, LBHI falsely alleged that the $500 million deposit placed by LBHI was transferred to and held in a separate Bank of America affiliate, Bank of America Cayman. (*Id.* at ¶¶ 7, 29-30.) LBHI further alleged that to facilitate setoff and to overcome the alleged lack of mutuality between

---

at **3-4 (B.A.P. 6th Cir. May 19, 2006); *In re Vargas*, 342 B.R. 762, 766 (Bankr. N.D. Ohio 2006). In this case, no plan has been confirmed yet. Moreover, the decision in *Schultz* has no precedential effect in this case because it is an unpublished decision, which, by order of the Sixth Circuit Bankruptcy Appellate Panel, is limited in its precedential effect only to that specific case and the parties therein. *Schultz*, 2006 WL 1407466, at *1 (citing B.A.P. LBR 8013-1(b)).

[36] The diminution in assets available for distribution to other creditors is necessarily a consequence of setoff and does not support denial of relief from the stay. In *In re BOUSA, Inc.*, this Court considered "the impact of the stay on the parties and the balance of the harms," and explicitly acknowledged that setoff would "diminish distributions to other creditors," but did not find this a compelling reason to deny the requested relief for purposes of effectuating setoff. 2006 WL 2864964, at *9.

Bank of America Cayman and LBHI, just before effectuating the setoff, Bank of America

improperly (that is, without authorization from LBHI) moved the funds from Bank of America

Cayman back to Bank of America. (*Id.* at ¶ 37.) Although Bank of America repeatedly told

Lehman Brothers that the funds were never held by Bank of America Cayman,[37] and although

Lehman Brothers never produced any evidence at all to support this wild allegation, Lehman

Brothers refused to drop the claim until relatively recently. However grudging it might have

been, Lehman Brothers' voluntary dismissal of that claim is effectively a concession of mutuality

of entity. (Behan Decl., Ex. 1.)

## IV. BANK OF AMERICA HAD A RIGHT TO SET OFF AGAINST THE LBHI DEPOSITS

In the absence of any prohibition under the Code, it is clear that Bank of America

had a right to set off against the cash deposit. As discussed below, that right is supported by

common law, statute, and the unambiguous language of the Security Agreement itself. Even if

this Court did turn to parol evidence – and there is no reason to do so – the extrinsic evidence

clearly demonstrates that no party ever suggested that the Bank should or did waive its right of

setoff before this litigation. Finally, Lehman's suggestion that the Security Agreement created a

"special purpose account" – unable to be set off against – is unsupported by both the facts and

the law. Bank of America's right of setoff was clearly preserved, and the Bank was entitled to

set off against the LBHI deposit.

---

[37] *See, e.g.,* Behan Decl., Ex. 73 [May 5, 2009 letter from D. Laguardia to R. Rothman] ("[W]e asked you months ago to provide any evidence you have that [Bank of America Cayman] had any role at all in connection with the issues in this adversary proceeding [and y]ou have not produced any such evidence to date."); Ex. 74 at response to interrogatory 9 ("BofA and BofA Cayman state that the Deposit Account and funds deposited therein were maintained at all times at Bank of America, N.A.").

## A.    Banks Are Entitled to Set Off Against Deposits

It is well settled that a bank deposit is a debt owed by a bank to the depositor and

that the bank has a common law and statutory right to set off funds in a deposit account against

debts due from a depositor. *See, e.g., Jordan v. Nat'l Shoe & Leather Bank*, 74 N.Y. 467 (1878);

*Delano v. Equitable Trust Co. of N.Y.*, 110 Misc. 704, 181 N.Y.S. 852 (Sup. Ct. 1920). *See also*

11 U.S.C. § 553(a); *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 139 (2d Cir. 1998)

("[F]unds in a general deposit account can be used to set off debts owed to the bank because

when a depositor deposits funds into a general account he parts with title to the funds in

exchange for a debt owed to him by the bank, thereby establishing a standard debtor-creditor

relationship."); *Banco de la Provincia de Buenos Aires v. BayBank Boston N.A.*, 985 F. Supp.

364, 369 n.4 (S.D.N.Y. 1997) ("[f]unds in general accounts are considered the property of the

bank, while funds in special accounts remain the property of the depositor") (internal citation

omitted); *In re Applied Logic Corp.*, 576 F.2d 952, 957-958 (2d Cir. 1978) (explaining setoff

rights and that these rights "[have] been embodied in every bankruptcy act the nation has had,

and creditors, particularly banks, have long acted in reliance upon it"). New York statutory law

also supports Bank of America's right of setoff. Section 151 of the New York Debtor & Creditor

law states in pertinent part:

> Every debtor shall have the right upon: (a) the filing of a petition
> under any of the provisions of the federal bankruptcy act or
> amendments thereto or the commencement of any proceeding
> under any foreign bankruptcy, insolvency, debtor relief or other
> similar statute or body of law, by or against a creditor; . . . *to set off
> and apply against any indebtedness, whether matured or
> unmatured, of such creditor to such debtor, any amount owing
> from such debtor to such creditor . . .*

N.Y. Debt. & Cred. Law art. 6-A § 151 (2001) (emphasis added). *See also Aspen Indus., Inc. v.*

*Marine Midland Bank*, 421 N.E.2d 808 (N.Y. 1981) (allowing bank's setoff of entire amount in

debtor's account under N.Y. Debt. & Cred. Law § 151 even though it left no funds available to satisfy creditor's judgment); *W. Harlem Pork Ctr., Ltd. v. Empire Nat. Bank*, 400 N.Y.S.2d 859 (App. Div. 1978) (affirming bank's right to set off amount of debtor's deposit against outstanding balance of bank's loan to debtor under N.Y. Debt. & Cred. Law § 151 because right to set off was superior to restraining notice served by creditor).

A party seeking to set off against a debt must demonstrate mutuality by showing that (i) the debts are in the same right; (ii) between the same parties; and (iii) that those parties are in the same capacity. *In re Westchester Structures, Inc.*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995); *see also In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007) (mutuality established where debtor and creditor incurred debts to one another in the same right or capacity). Mutuality is clearly established here. LBHI guaranteed LBSF's debts to Bank of America and owed "the due and punctual payment of all amounts payable." (Behan Decl., Ex. 6 [Guarantee].) LBHI has given up on its claim that Bank of America Cayman is a separate legal entity, and has stipulated to the dismissal of that entity. (*See supra* p. 27.) Accordingly, LBHI and Bank of America have simple contractual claims against one another. All the elements of mutuality are met here. *See In re Midland Ins. Co.*, 590 N.E.2d 1186, 1192 (N.Y. 1992) ("Contracting principals, who are debtors and creditors of each other by virtue of entry into a contract or contracts, have the same legal capacity and may set off debts against each other.")

Indeed, Bank of America's right of setoff – in addition to being ingrained in the common law and New York statute – is expressly set forth in the standard terms and conditions for accounts on the WBS platform (such as Challenged Account 6550xxx465) and accounts which hold Eurodollar time deposits (such as Challenged Account 40xxx1). (*See supra* p. 10

note 12.) For example, the Corporate Deposit Agreement and Disclosures Account Programs booklet noted that the Bank "may exercise the right of setoff – that is, the right under certain circumstances, to use funds in your account to pay any debts you owe us, or any of our affiliates, either before or after any default." (Behan Decl., Ex. 20.) The Customer Agreement further stated:

> You hereby grant BANA, Bank of America Securities LLC ("BAS") and each of our affiliates (collectively, "BofA Entities") a continuing security interest in, lien on, and right of set off with respect to, all Financial Instruments and other property, including cash balances (collectively, "Property"), now or hereafter held or carried by any BofA Entity in your accounts . . . as collateral security for the payment and performance of all your obligations to any BofA Entity, now existing or hereinafter arising, whether or not such obligations arise under this Agreement or any other agreement between any BofA Entity and you and irrespective of the number of accounts you may have with the BofA Entities or which BofA Entity holds such Property . . . .

(Behan Decl., Ex. 35 at § 3.) The Bank's fully disclosed practice is that use of the accounts constitutes agreement to the terms.[38]

It is indisputable that banks have the right to set off mutual debts against deposits under New York law. That is what Bank of America did here, and this Court should declare the setoff proper.

---

[38] *See* Behan Decl., Ex. 20 at 4 ("When you open a corporate deposit account with us, you agree to the terms and conditions discussed in this Agreement.")); Ex. 18 [Alpert Dep. Tr.] at 17:21-18:12, 35:16-36:11; Ex. 36 at 7 ("Whenever you use any of the services covered by this Booklet, you agree to be bound by these terms and conditions, as amended from time to time, and to follow the procedures in the applicable Materials."). New York cases involving credit card account holders demonstrate that an account holder's use of an account constitutes the account holder's acceptance of the account agreement. *See, e.g., Hale v. First USA Bank, N.A.,* No. 00-CIV-5406 (JGK), 2001 WL 687371, at *1 (S.D.N.Y. Jun. 19, 2001); *Johnson v. Chase Manhattan Bank USA, N.A.,* No. 603101/02, 2004 WL 413213, at *5 (N.Y. Sup. Feb. 27, 2004).

**B.     The Security Agreement Protects, and Does Not Waive, Bank of America's Right to Set Off Against the Deposit Account**

In the face of an unassailable right to set off against the Deposit Account,

Lehman Brothers makes a strained effort to contend that the setoff was improper by asserting

that the Security Agreement somehow waived the Bank's right of setoff.  There is no waiver in

the Agreement.  To the contrary, the Security Agreement preserves the Bank's common law right

of setoff.

*1.    The Express Terms of the Contract Unambiguously Protect the Bank's Right of Setoff*

The Security Agreement expressly states – in two separate operative provisions –

that Bank of America retains all of its rights and remedies in addition to those special rights set

forth in the Agreement.  (Behan Decl., Ex. 2 [Security Agreement] at §§ 11, 14.)  In fact, *the*

*only references* to rights outside of those actually enumerated in the agreement *preserve*, rather

than waive, all such rights.  (*See supra* p. 19.)[39]

It is a basic tenet of contract interpretation, including under New York law, that

"[l]aws which subsist at the time and place of the making of a contract, and where it is to be

performed, enter into and form a part of it, as fully as if they had been expressly referred to or

incorporated in its terms." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117,

130 (1991) (internal quotation omitted); *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir. 1980) ("[a]

contract is deemed to incorporate all the rights conferred upon the parties by the laws of the state

in which the contract was executed"); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP,*

---

[39] New York courts have previously had occasion to discuss similar provisions in contracts that explicitly preserve rights and remedies in an agreement. *See, e.g., In re Adelphia Commc'n Corp.,* 06 Civ. 4983 (JGK), 2008 WL 3919198, at *4 (S.D.N.Y. Aug. 22, 2008) (finding that contractual language in which Appellants explicitly retained their right to pursue, among other things, "any other remedy at law or equity against the Borrower," suggested that the remedy listed in the Agreements at issue was not intended to be an exclusive remedy); *In re Hale Desk Co.,* 97 F.2d 372, 373 (2d Cir. 1938) ("whether the provision for damages in a contract should be treated as an exclusive remedy is to be determined by the intent of the parties as revealed in all the facts of the particular case").

348 F. Supp. 2d 255, 265 (S.D.N.Y. 2004) ("[t]he law wisely presumes that contracts, especially those drawn by attorneys as this was, are concluded with reference to applicable law . . . [p]ut another way, the gloss of existing law is implicit in every contract") (internal quotations and footnote omitted); *Dolman v. U.S. Trust Co. of N.Y.*, 138 N.E.2d 784, 787 (N.Y. 1956) ("it is basic that, unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in light of such law.") Thus, "[a] contract is deemed to incorporate all the rights conferred upon the parties by the laws of the state in which the contract was executed," common law rights included. *Filner*, 633 F.2d at 143.

The Security Agreement expressly contemplates such incorporation and makes clear that the rights granted thereunder are in addition to all other rights held by the Bank under applicable law. One of the four remedies expressly provided for under the Agreement is that Bank of America could "[e]xercise any other remedy provided under [the] Agreement *or by any applicable law*." (Behan Decl., Ex. 2 [Security Agreement] at § 11(d)) (emphasis added). And this point is reiterated in a separate provision providing that "[t]he rights, powers and remedies given to the Bank by this Agreement *shall be in addition to all rights, powers and remedies given to the Bank by virtue of any statute or rule of law*." (*Id.* at § 14) (emphasis added). Indeed, "under New York law, contractual remedies are deemed to be nonexclusive absent some indication of contrary intent." *Palazzetti Import/Export, Inc., v. Morson*, No. 98 CIV. 722 (FM), 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001) (citing *In re Hale Desk Co.*, 97 F.2d 372, 373 (2d Cir. 1938)). Accordingly, Bank of America's right of setoff over the Deposit Account was

not waived in, but is in fact retained by, the Security Agreement. This court should so rule, on the basis of the Agreement's plain language.

## 2. Parol Evidence Does Not Support a Waiver of the Right of Setoff

Despite the fact that the Security Agreement is fully integrated and unambiguous regarding the rights granted and preserved thereunder, LBHI has contended that pre-execution negotiations regarding the definition of the term "Indebtedness" and over the type of deposit to be made by LBHI should be understood to effect a waiver of Bank of America's right of setoff. Even if the Court were to reach such contentions (and the Bank contends it should not), the evidence would not support them.

Where, as here, a contract is unambiguous, the Court may not look beyond the four corners of the contract to assign additional meaning to its terms.[40] "Under New York law . . . parol evidence is not admissible to create an ambiguity.'" *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) (citing *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990)); *see also Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S.2d 511, 516 (App. Div. 2008) ("[p]arol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous.") (internal citation omitted). "[P]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 235 (S.D.N.Y. 2007) (internal quotations and citations omitted). "Only when the language

---

[40] *See, e.g., Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("'[I]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence....'") (quoting *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)); *Curry Rd. Ltd. v. K-Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990) ("Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract"); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms") (quotations and citations omitted).

of the contract is ambiguous may a court turn to extrinsic evidence of the contracting parties' intent." *Curry Rd. Ltd.*, 893 F.2d at 511; *see also Riverside S. Planning Corp.*, 869 N.Y.S.2d at 516. Indeed, prior negotiations and other such extrinsic evidence is inadmissible in connection with an unambiguous and fully integrated contract. *See Morrissey v. Gen. Motors Corp.*, No. 00-9402, 2001 WL 1313753, at *2 (2d Cir. Oct. 23, 2001) ("[u]nder New York law, the parol evidence rule bars proof of oral statements offered to refute the unambiguous terms of a written, integrated contract") (internal quotations omitted). There is, of course, no ambiguity in the Security Agreement with regard to the rights granted thereunder or the rights waived or preserved. Even if there were, however, neither the negotiations over the definition of indebtedness nor any other parol evidence would support a conclusion of implied waiver.

In the original draft of the Agreement, the term "Indebtedness" was defined as broadly as possible so that Bank of America could get the broadest protection possible. (*See* Behan Decl., Ex. 67.) The definition was narrowed during negotiation. (*See* Behan Decl., Ex. 68 at § 2; Ex. 69 at § 2; Ex. 2 [Security Agreement] at § 2.) That process, however, has nothing to do with the Bank's ability to assert its common law rights. It only affects the rights delimited by the scope of the term "Indebtedness." And that definition is incorporated into certain provisions of the Security Agreement – but not others.

In the executed Security Agreement the definition of "Indebtedness" limits the security interest provided under the Agreement in section 1 and the exercise of the special remedies set out in sections 11(a) and (c) of the Agreement. Accordingly, the secured interest the Bank obtained through the Security Agreement is limited to "Indebtedness," and the Bank has a contractual ability (a) to declare debts immediately payable upon an Event of Default if the debts are included in the definition of "Indebtedness" and (b) to apply the funds in the Deposit

Account (deposited by LBHI) immediately against a debt regardless of which Lehman Brothers affiliate may have incurred the debt, if the debt is included in the definition of "Indebtedness." (*See* Behan Decl., Ex. 2 [Security Agreement] at §§ 1, 11(a), (c).) (This effectively grants the Bank the right of cross-affiliate netting of debts covered by the term "Indebtedness."[41]) The Agreement also provided the Bank with guarantees related to Indebtedness. (*See id.* at § 13.)

The Security Agreement does not, however, limit other remedies to "Indebtedness": for example, the right of ownership of the account upon an Event of Default and all of the Bank's other rights and remedies. (*See id.* at §§ 10(b)-(f), 11(b), 11(d), 14.) There is, therefore, no reason to conclude that negotiations over the scope of the definition of Indebtedness should be held to limit rights not even mentioned in the Security Agreement.

In fact, and as one would expect in connection with an agreement that was "heavily negotiated" by "sophisticated parties," no other parol evidence indicates anything other than what is conveyed by the Agreement's plain language. Nobody involved in the negotiation of the Security Agreement thought that Bank of America was waiving its right of setoff over the Deposit Account. Not a single witness has testified that anyone ever suggested that the Bank should waive, or was waiving, its right of setoff, or that the idea was discussed in any negotiation. To the contrary, numerous witnesses from both Bank of America and Lehman Brothers have noted that not only was the *waiver* of the right of setoff never discussed, the concept of setoff generally was never discussed during the negotiations. For example, Andrew Yeung, Lehman Brothers' in-house lawyer working on the Security Agreement negotiations, and

---

[41] A cross-affiliate netting arrangement means an arrangement among a member bank, one or more affiliates of the member bank, and one or more nonaffiliates of the member bank in which: (1) a nonaffiliate is permitted to deduct any obligations of an affiliate of the member bank to the nonaffiliate when settling the nonaffiliate's obligations to the member bank; or (2) the member bank is permitted or required to add any obligations of its affiliate to a nonaffiliate when determining the member bank's obligations to the nonaffiliate. 12 C.F.R. § 223.3 (j) (2009).

its designated 30(b)(6) witness on the topic of the Security Agreement negotiations, testified as follows:

> Q:  Do you have any recollection of either side . . . saying anything with respect to the bank's right of set off, in connection with the agreement?
>
> A:  I do not.  I don't recall any of that.

Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 131:22-132:4.

Janet Birney, a Lehman Brothers employee who was also involved with the process and who was responsible for opening the Deposit Account, testified that she also did not recall any discussion about setoff rights:

> Q:  Do you recall any discussion about rights of offset or setoff?
>
> A:  No.  I don't recall.

Behan Decl., Ex. 47 [Birney Dep. Tr.] at 102:10-12.

The documents produced by the parties mirror this testimony, demonstrating no discussions about any alleged waiver by Bank of America.  What the documents do demonstrate is that Lehman Brothers attempted to remove the express protection of the "Other Rights" and other broad terms.  (*See* Behan Decl., Ex. 68 at LEH000537-538.)  But the Bank rejected these changes (Behan Decl., Ex. 69), and Lehman Brothers eventually agreed to retain a majority of the provisions.  (Behan Decl., Ex. 2 [Security Agreement].)

Nevertheless, in the expert witness report submitted on behalf of LBHI, Mr. Richard W. George asserted that Lehman Brothers negotiated – and Bank of America accepted – a waiver of the Bank's right of setoff.  (*See* Behan Decl., Ex. 14 at ¶ 37.)  His argument appears to be based on (a) a handwritten notation by Lehman Brothers' in-house Counsel Andrew Yeung, on a separate Customer Agreement that was circulated at the same time as the Security Agreement, (b) an unsupported assertion that Bank of America chose to seek a

security interest in the Deposit Account *instead* of relying on its common law right of setoff, and (c) the inclusion of the "solely in respect of overdrafts of the Pledgor" language contained in the first half of the definition of "Indebtedness." (Behan Decl., Ex. 14 at ¶¶ 18, 20, 36, 37; Ex. 2 [Security Agreement] at § 2(a).) It is not clear on what basis Mr. George is qualified to opine as to the intent of the parties or the effect of contractual negotiations, but it is clear that none of the issues he raises can create a genuine issue of material fact here.[42]

With regard to the notation on a separate Customer Agreement: on August 22, Mr. Yeung sent comments to Bank of America that included a question whether a paragraph titled "Security Interest" in a Customer Agreement that accompanied an initial draft of the Security Agreement should have been "covered by the security agreement." (Behan Decl., Ex. 2 [Security Agreement] at § 3 of Customer Agreement.) Mr. Yeung testified at his deposition that this handwritten comment on the Customer Agreement resulted from his understanding that "[t]his was a broad security interest, which was not consistent with what we were looking at in the security agreement for overdrafts, including many things like a general right of set-off." (Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 143:16-22.) Accordingly, Mr. Yeung testified, he "put a comment saying this should not apply and rejected it." (*Id.* at 143:21-22.) Whether this comment was simply one of many made during the course of the negotiations, or whether it represented something more significant as Mr. George argues, is made clear by testimony from Lehman Brothers' Treasurer Paolo Tonucci. Mr. Tonucci – who played a pivotal role in the Security Agreement negotiations – testified that he did not ascribe any particular significance to the comment:

---

[42] As discussed above, (*see supra* pp. 31-33) the Security Agreement is an integrated, unambiguous contract that in no way incorporates the Customer Agreement on which this handwritten note was found, let alone the handwritten notes composed during the negotiation of the Agreement. Indeed, both the Customer Agreement and Mr. Yeung's handwritten note constitute extrinsic evidence which the court may not consider in light of the unambiguous contract at hand.

A: I didn't – you know, I recall seeing the comment. I don't recall, you know, having that thought or – you know, understanding, you know, exactly what they – what – what was intended by the comment.

Q: Did you understand generally what was intended by the comment?

A: Well, I understand that, you know, it's referring to the security agreement.

Q: That's what you understood at the time?

A: Yeah.

Q: Anything else?

A: No.

Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 57:12-24.

Unsurprisingly, then, despite Mr. Yeung's apparent concerns regarding this provision, he testified that other than the handwritten note, he could not "recall if we had much discussion, if any, on this particular comment." (Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 145:4-6.) Furthermore, despite his concerns, Mr. Yeung testified that he never asked Bank of America to execute a waiver of setoff, and that Lehman ultimately dropped the issue.

Q: Did you ask Bank of America to consider executing a letter or a separate writing explicitly waiving the right of set off as a result of your concern over the point?

A: No, I did not. After this comment came out I would have expected that they would have proposed some other language but they did not. From what I gathered, they just let it go.[43]

Id. at 166:10-19.

In addition to the question he raised regarding the Customer Agreement, Mr. Yeung's August 22 comments on the draft of the Security Agreement that accompanied the Customer Agreement further reflected a proposal by Lehman Brothers to remove the guarantee

---

[43] The Customer Agreement was never finalized or executed. Bank of America allows thirty days after an account is opened for the execution of such agreements (Behan Decl., Ex. 75; Ex. 76) but Lehman had filed for bankruptcy before the end of that thirty day period.

and "other rights" provisions of the Security Agreement entirely. (*See* Behan Decl., Ex. 68

at §§ 14, 15.) But, as Mr. Yeung acknowledged, the mark-up he received from Mr. McDermott

of the Cadwalader firm on behalf of the Bank in response to his comments restored the "other

rights" provision. And Mr. Yeung testified (a) that he could not recall making any effort to find

out why Bank of America had restored this provision and (b) that he ultimately communicated to

Bank of America that Lehman was willing to accept the restoration of that paragraph. (*See*

Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 175:2-22, 176:15-18, 201:4-15.)

Furthermore, Lehman Brothers employees testified that they understood that

comments they had made that were not reflected in the August 22 draft from Mr. McDermott had

not been accepted by Bank of America. (*See* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 184:19-

25, 185:24-186:4; Ex. 30 [Tonucci Dep. Tr.] at 59:13-18.) There was, of course, no revised

customer agreement addressing Mr. Yeung's inquiry. To the extent it was addressed at all, the

Bank required that all of its rights be preserved through section 14 of the Agreement.[44]

Nor does it make any sense at all to conclude that Bank of America chose to

obtain a security interest instead of a right of setoff. There is no evidence of such a decision, and

the New York Uniform Commercial Code expressly states that security interests do not interfere

with a bank's common law right of setoff:

> *Recoupment or set off not affected by security interest.* Except as
> otherwise provided in subsection (c), the application of this article
> to a security interest in a deposit account does not affect a right

---

[44] Mr. Yeung initially testified that when he received Bank of America's markup restoring section 14 of the Security Agreement entitled "Other Rights," he understood that to be a response to his comment in the Customer Agreement. (*See* Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 174:20-175:22.) However, after meeting with counsel during a break, Mr. Yeung clarified that testimony and stated that, in fact, he understood the restoration of section 14 to be a response to his comment striking that same provision of the Security Agreement in an earlier draft. (*Id.* at 184:11-25.)

of recoupment or set off of the secured party as to a deposit account maintained with the secured party.[45]

N.Y. U.C.C. § 9-340 (b) (2009) (emphasis added). Subsection (b) of section 9-340 of the UCC makes clear that a bank may hold both a right of setoff against, and an Article 9 security interest in, the same deposit account: "by holding a security interest in a deposit account, a bank does not impair any right of set off it would otherwise enjoy." (*Id.*) Mr. George's expert report suggests that because Lehman Brothers and Bank of America discussed various options regarding whether LBHI should make a deposit to a "vanilla account," which would have a right of setoff, or a "pledged account," the Security Agreement reflects a choice against a right of setoff. But, at deposition, Mr. George testified that in fact that was not his opinion, and conceded that there was no evidence that the Bank consciously forewent its right of setoff. (Behan Decl., Ex. 77 [George Dep. Tr.] at 243:12 - 244:3.)

In his expert report, Mr. George further asserted that the phrase "solely in respect of overdrafts of the Pledgor" (included in the definition of "Indebtedness") implies that the "parties agreed that this particular deposit would be used for no other purpose than as collateral for any Indebtedness, as defined in the Security Agreement." (Behan Decl., Ex. 14 at ¶ 36.) But in his deposition testimony, Mr. George conceded that the phrase had no special meaning in the banking industry and that he was simply interpreting the meaning of the English words. (*See* Behan Decl., Ex. 77 [George Dep. Tr.] at 208:19-209:21.) Furthermore, Lehman Brothers has

---

[45] The other relevant provisions of the UCC are as follows: (a) *Exercise of recoupment or set off.* Except as otherwise provided in subsection (c), a bank with which a deposit account is maintained may exercise any right of recoupment or setoff against a secured party that holds a security interest in the deposit account. (c) *When set off ineffective.* The exercise by a bank of a set-off against a deposit account is ineffective against a secured party that holds a security interest in the deposit account which is perfected by control under section 9--104(a)(3), if the setoff is based on a claim against the debtor.

contended that practice regarding its deposit agreements with other banks is irrelevant.[46] More

importantly, Lehman Brothers' treasurer, Paulo Tonucci, who signed the Security Agreement,

testified that he did not remember any particular significance being placed on the words "solely

in respect" of overdrafts.

> Q: You don't recall conversations regarding this drafting language?
>
> A: No.
>
> Q: You don't recall having an understanding about what this language in particular implied or did not imply?
>
> A: No.

Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 63:9-16.

Mr. Yeung testified similarly. Recalling his reaction to Bank of America's initial

August 22, 2008 mark-up of Lehman's revised Indebtedness paragraph (which did not contain

the "solely in respect of" language), Mr. Yeung noted that:

> [I]t came back with Lehman's general view that it should be for overdrafts as reflected in the third line of that section. We may have tweaked it a little bit afterwards but it was, it was a good start.

Behan Decl., Ex. 63 [Yeung Dep. Tr.] at 174:11-16. And, asked whether he believed that the

definition of "Indebtedness" was close to final as of that Bank of America draft on August 22,

Mr. Yeung further testified:

> You know, I think so. I think we just wanted to put in a couple of words to help, you know, focus on the point. I think it was only a few words, but the bulk of the concept was in as – as revised by the Cadwalader draft.

---

[46] *See, e.g.,* Behan Decl., Ex. 64 [Letter from P. Isakoff of Weil Gotshal Manges, LLP to Hon. James M. Peck, dated June 23, 2009] ("The notion that the intent of the parties who negotiated and drafted the carefully worded language of the Security Agreement at issue in this case – or the legal import of such language – could be determined by reference to the terms of other accounts opened with different counterparties and at different times is groundless."); Ex. 47 [Birney Dep. Tr.] at 113:14-118:4, 120:8-121:12 (objecting to questions regarding Lehman Brothers' deposits with other banks as irrelevant).

*Id.* [Yeung Dep. Tr.] at 191:12-17.

In the face of clear testimony of its insignificance by the contracting parties, the specific language used in the defined term "Indebtedness" cannot create a genuine issue of material fact precluding summary judgment.[47]

### C. The Security Agreement Does Not Create a "Special Purpose" Account

There is a strong presumption under New York law that accounts are general rather than "special purpose" accounts – and thus that setoffs are proper. *Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 332 (2d Cir. 1992) (describing the presumption that accounts are general as "strong"); *Swan Brewery Co. v. U.S. Trust Co. of N.Y.*, 832 F. Supp. 714, 718 (S.D.N.Y. 1993) (collecting cases). Accordingly, LBHI must provide "compelling" evidence that there was an "express or clearly implied" agreement between the parties that the Deposit Account would constitute a special purpose account and that, accordingly, no debtor-creditor relationship was formed.[48] As a matter of law, and contrary to its allegations (*see* Answer, Fourth Affirmative Defense, at 8), LBHI cannot establish that the Deposit Account was a special purpose account.

---

[47] Mr. George also references an August 24, 2008 e-mail from Randy Sparks to Christopher McDermott, Andrew Yeung and Joshua Smith, in which Mr. Sparks provided them with the account number for the 6550xxx465 account. In that e-mail, Mr. Sparks stated "[t]his is a regular DDA that will be dedicated solely to this collateral pledge." (Behan Decl., Ex. 61.) While Mr. George makes much of Mr. Sparks' use of the words "dedicated solely to this collateral pledge," he entirely ignores the fact that Mr. Sparks referred to the account as a *"regular DDA"* (emphasis added). Moreover, as discussed above, it is clear that Mr. Sparks' e-mail cannot change the meaning of a fully integrated and unambiguous agreement. *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("Under New York law . . . parol evidence is not admissible to create an ambiguity" (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990)); *Curry Rd. Ltd.*, 893 F.2d at 511 ("Only when the language of the contract is ambiguous may a court turn to extrinsic evidence of the contracting parties' intent.") (internal citation omitted).

[48] *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 139 (2d Cir. 1998) (explaining that the depositor must set forth "compelling circumstances" for the court to disregard setoff rights); *Fenton v. Ives*, 634 N.Y.S.2d 833, 834 (App. Div. 1995) (quoting 9 N.Y. Jur. 2d, Banks & Fin. Inst., § 258, at 498 (2009)) (explaining that under New York law "the burden devolves on the party who claims that the deposit is a special one to show that it was received by the bank *with the express or clearly implied agreement* that it should be kept separate from the general funds of the bank and that it should remain intact") (emphasis in original); *In re Applied Logic Corp.*, 576 F.2d at 961 (declining to find that account was special, rather than general, because of the lack of "convincing evidence" to that effect).

Each factor considered by the New York courts in determining whether an account is general or special weighs in favor of finding a general account here: (i) the evidence demonstrates that the parties did not intend to create a special purpose account; (ii) there was no agreement to segregate Deposit Account funds from the banks' other funds; (iii) interest was paid on the Account; (iv) Lehman had the right to withdraw the funds; and (v) no third party had an interest in the Deposit Account.

### 1. There is No Evidence of Any Intent to Create a Special Purpose Account

In analyzing whether a deposit is a general or special purpose account, courts give significant weight to the parties' expressed intent. *See In re Applied Logic Corp.*, 576 F.2d 952, 960 (2d Cir. 1978) (scrutinizing the parties' intent in finding that the deposit was a general account). To create a special purpose account, the parties must do more than merely intend that the funds be put to a particular use.[49] Rather, the Second Circuit has held that an account is general and a bank's right of setoff is preserved in the absence of an agreement to waive that right. *Applied Logic Corp.*, 576 F.2d at 960.

For example, in *Applied Logic Corp.*, the debtor and a consortium of creditors, including the bank, entered into an agreement pursuant to which the debtor deposited one note with the bank on behalf of a creditor and another note in a separate account on behalf of the bank and other creditors. *Id.* at 955-56. The purpose of the first account was to pay the creditor, and the purpose of the second account was to pay the bank and the other creditors. *Id.* In an opinion by Judge Friendly, the Second Circuit explained that the bank had a right to set off against both accounts – even though the parties intended that they be used for other, specific purposes:

---

[49] *In re Bennett Funding Group*, 212 B.R. 206, 213 (B.A.P. 2d Cir. 1997) (explaining that just because funds are deposited "for a specific purpose," it does not automatically follow that the account is a "special purpose" account); *Swan Brewery Co.*, 832 F. Supp. at 719 (explaining that "[t]he fact that funds are deposited for a specific purpose is not determinative of the question of whether an account is general or specific" and deeming the account general).

> The other parties to the . . . agreements were highly sophisticated
> extenders of credit; if their intention was that [the bank] should not
> use its right of set off to their detriment, it would have been simple
> to say so . . . That right was preserved by law, and it stood absent
> an agreement to waive it.

*Id.* at 960.

Like the depositor in *Applied Logic Corp.*, Lehman Brothers is also "highly

sophisticated." *Id.* at 960. And, as noted above, like the agreement at issue in *Applied Logic*

*Corp.*, the Security Agreement preserves, rather than waives, the Bank's right of setoff.

Nor do the parties' extensive negotiations regarding the Account demonstrate any

intent to create a special purpose account. During these negotiations, Lehman Brothers never

discussed creating a special purpose account or waiving the Bank's right of setoff.[50]

Lehman Brothers had ample experience creating special accounts, and knew that,

in order to establish such an account, it needed to execute an agreement which "basically says

you cannot offset against the liabilities of Lehman Brothers or that entity." (Behan Decl., Ex. 78

[Cornejo Dep. Tr.] at 45:10-12; *see also* Behan Decl., Ex. 47 [Birney Dep. Tr.] at 74:20-25;

Ex. 30 [Tonucci Dep. Tr.] at 21:9-22:1.) Like the "sophisticated extenders of credit" in *Applied*

*Logic Corp.*, "if [Lehman's] intention was that [the bank] should not use its right to set off to

[its] detriment, it would have been simple to say so." Lehman Brothers never did.

### 2. The Security Agreement Does Not Require Segregation of the Account Funds

Another critical factor in the general/special purpose account analysis is whether

the parties explicitly agreed to segregate the depositor's account. *See In re Bennett Funding*

*Group*, 212 B.R. 206, 215 (Bankr. App. 2d Cir. 1997) (account was a general account subject to

setoff where there was no requirement that the funds on deposit in the Account be segregated),

---

[50] *See, e.g.,* Behan Decl., Ex. 56 [Sparks Dep. Tr.] at 204:10-18; Ex. 63 [Yeung Dep. Tr.] at 131:22-132:8; Ex. 47
[Birney Dep. Tr.] at 102:10-12; Ex. 30 [Tonucci Dep. Tr.] at 44:7-45:12.

*aff'd*, 146 F.3d 136, 140 (2d Cir. 1998) (affirming ruling and explaining that under New York law, "a party claiming special-fund status has the burden of showing an intent to have the funds 'kept separate from the general funds of the bank'") (internal citation omitted). The absence of a requirement to segregate funds in an account agreement is a "profound demonstration of the presumption that the treatment of the funds in the [account] was to be the same as that of any other 'general' account." *Bennett Funding Group, Inc.* 212 B.R. at 215; *See also Westchester Sav. Bank*, 961 F.2d at 331 (ruling that an IOLA account was a general account because "the documents generated in opening the [account] do not evidence that [the bank] assumed a duty to segregate those funds from its own general assets").[51]

Here, nothing in the Security Agreement requires that the Account proceeds be held separately from the Bank's other assets. (Behan Decl., Ex. 2 [Security Agreement] at § 3.) Additionally, like the general account in *Bennett Funding Group*, the funds on deposit "were in fact commingled with the Bank's other general deposits." 212 B.R. at 215. Bank of America booked the funds together and commingled the funds with its other assets. (Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 23:3-6; Ex. 32 [Behan Dep. Tr.] at 81:16-22.)

Lehman Brothers knew how to establish segregated accounts and the importance of ensuring that funds in such accounts are not commingled. (Behan Decl., Ex. 48 [Fielding Dep. Tr.] at 42:10-43:11; Ex. 47 [Birney Dep. Tr.] at 55:25-56:12, 74:14-25; Ex. 78 [Cornejo Dep. Tr.] at 43:13-45:12.) Indeed, Paolo Tonucci, who was heavily involved in negotiating the Security Agreement, testified to his understanding of a segregated account arrangement as a

---

[51] *See also Merrill Lynch Mortgage Capital, Inc. v. F.D.I.C.*, 293 F. Supp. 2d 98, 106 (D.D.C. 2003) (applying New York law and holding that an account which collected receivables from mortgages owned by a depositor was a special purpose account because of a mortgage servicing and account agreement "explicitly obligating the bank to segregate deposited funds" into a "[c]ustodial [a]ccount" in trust for a third party). Unlike the deposit agreement in *Merrill Lynch Mortgage Capital, Inc.*, which required the bank to "segregate and hold all funds collected" and to keep the mortgage funds "separate and apart from any of its own funds and general assets," nothing in the Security Agreement requires Bank of America to hold Account proceeds separately from its other assets.

"locked box," which holds funds in a special account, typically when Lehman Brothers is the servicer in a securitization and the funds are used only to make coupon payments. But Mr. Tonucci further conceded that Lehman Brothers never asked Bank of America to create such a locked-box type arrangement. (Behan Decl., Ex. 30 [Tonucci Dep. Tr.] at 77:22- 78:25.) Lehman Brothers' failure to create a segregated account here further demonstrates that the Account was a general account subject to Bank of America's setoff rights rather than a special purpose account.

### 3. Bank of America Paid Interest on the Account

Under New York law, the fact that a bank pays interest on an account is also a "critical term[]" and "very strong evidence" that an account was general rather than a special purpose account. *In re Bennett Funding Group*, 212 B.R. at 215; *Peoples Westchester Sav. Bank*, 961 F.2d at 331. The parties structured the Deposit Account so that the deposit would be invested in a Eurodollar time deposit, which provided the greatest possible interest for Lehman Brothers' deposited funds under the circumstances.[52] Accordingly, this factor also clearly indicates that the Account was general and subject to setoff.

### 4. Lehman Brothers Had the Right to Withdraw the Funds

A depositor's withdrawal rights are also relevant to whether a deposit is a general or special purpose account. *In re Bennett Funding Group*, 146 F.3d 136, 139 (2d Cir. 1998) (explaining that "the proper test [for determining the nature of the] bank accounts is not a bright line test based on the existence of any withdrawal restrictions"). While a total lack of withdrawal rights weighs in favor of finding that an account is a special purpose account, courts have ruled that accounts with some limitations on withdrawal are general accounts. *Bennett*, 212

---

[52] *See* Behan Decl., Ex. 78 [Cornejo Dep. Tr.] at 18:15-25, 173:16-174:3; Ex. 70; Ex. 18 [Alpert Dep. Tr.] at 22:17-25; Ex. 79; Ex. 30 [Tonucci Dep. Tr.] at 19:5-20:6, 104:2-7. This interest accrued daily. (Behan Decl., Ex. 18 [Alpert Dep. Tr.] at 97:2-4; Ex. 80.)

B.R. at 214 (account deemed to be general even where withdrawal was only permitted on a periodic basis); *Applied Logic Corp.*, 576 F.2d at 964 (ruling that the account at issue was a general account though the bank refused to make a transfer and thereafter "examined each check to make certain that it was being used for operating purposes").

The withdrawal restrictions under the Security Agreement were minor and merely administrative, as compared to the restrictions on the accounts in *Bennett* and *Applied Logic Corp.* Rather than providing only periodic withdrawal rights, Lehman could withdraw the funds with three days' notice – and this notice requirement was necessary only so that the Bank would have time to accommodate the request. (Behan Decl., Ex. 2 [Security Agreement] at § 4(a); Ex. 18 [Alpert Dep. Tr.] at 23:20-24; Ex. 78 [Cornejo Dep. Tr.] at 128:12-14; Ex. 63 [Yeung Dep. Tr.] at 205:21-206:16.) In fact, Lehman Brothers considered the deposit to be a cash deposit, a "callable," liquid asset.[53] Moreover, unlike the accounts in *Applied Logic*, Lehman Brothers did not need to seek the permission of the Bank, and Bank of America had no authority to review the anticipated use for the requested withdrawal. *See Applied Logic Corp.*, 576 F.2d at 961. Lehman Brothers had the right under the Security Agreement to withdraw in relation to its desired amount of deposit overdraft lines "in its sole discretion." (Behan Decl., Ex. 2 [Security Agreement] at § 4(a).)

### 5. *No Third Party Had an Interest in the Account*

Courts also consider whether a third party has an interest in the deposit at issue, and the lack of any such interest indicates that the account is a general account. *See Spencer Co. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194, 199 (Bankr. D. Mass. 1987) (applying New York law and identifying the fact that persons other than the depositor have an interest in the account

---

[53] Behan Decl., Ex. 78 [Cornejo Dep. Tr.] at 173:16-174:3, 185-187, 186:7-12; Ex. 29 [Rahavy Dep. Tr.] at 46-48, 70:18-71:18; Ex. 81; Ex. 48 [Fielding Dep. Tr.] at 151:14-152:10; Ex. 30 [Tonucci Dep. Tr.] at 18:3-19:4.

as a common feature of special accounts cases); *Gerrity Co. v. Bonacquisti Constr. Co.*, 549 N.Y.S.2d 532, 534 (App. Div. 1989) (account that bank knows contains trust funds held by depositor as trustee is a special account). *But see Wasserman v. Broderick*, 250 N.Y.S. 84, 86-88 (Sup. Ct. 1931) (deeming account general even though the bank knew that the depositor held the funds in his capacity as a receiver because no express or implied contract required that "the funds deposited be kept separate from the other funds of the bank" and the depositor had withdrawal rights.)

Unlike the depositors in *Gerrity Co.* and *Wasserman*, Lehman Brothers was not serving as trustee or receiver with respect to the $500 million deposit. *Gerrity Co.*, 549 N.Y.S.2d at 802; *Wasserman*, 250 N.Y.S. at 85. Nor was the $500 million earmarked solely for the payment of a third party. The only two parties with any interest in the account were the depositor and the Bank. Like the other indicia considered by New York courts when analyzing the nature of a deposit, this factor suggests that the Account was a general account subject to setoff.

As set forth above, there was no express discussion between the parties of creating a special purpose account. The nature of the Deposit Account does not suggest it is such an account. And Lehman Brothers cannot possibly sustain its heavy burden to overcome the presumption that the account is a general one. Judgment should be entered in favor of Bank of America.

## CONCLUSION

For the foregoing reasons, Bank of America respectfully urges that the Court

grant summary judgment in favor of the Bank and order the declaratory relief sought in the

Bank's complaint.


Dated: New York, New York
      September 14, 2009

SHEARMAN & STERLING LLP

By: _____
      William J.F. Roll, III
      Fredric Sosnick
      Daniel H.R. Laguardia


599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Fax: (212) 848-7179

*Attorneys for Plaintiff BANK OF AMERICA, N.A.*