William J.F. Roll, III
Fredric Sosnick
Daniel H.R. Laguardia
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Attorneys for Plaintiff BANK OF AMERICA, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtor. | Chapter 11 Case<br><br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>Debtor. | Chapter 11 Case<br><br>No. 08-13888 (JMP) |
| BANK OF AMERICA, N.A.,<br><br>Plaintiff,<br><br>v.<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC. and<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Defendants. | Adv. Proc. No. 08-01753 (JMP) |

**BANK OF AMERICA'S POST-HEARING MEMORANDUM**
**IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO LEHMAN'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 4

I.     THE BANK HAD A RIGHT OF SETOFF BECAUSE IT PROPOSED, AND
LEHMAN MADE, A CASH DEPOSIT IN STANDARD BANK DEPOSIT
ACCOUNTS .................................................................................................................... 4

II.    THE BANK NEVER WAIVED ITS SETOFF RIGHTS WITH RESPECT TO THE
DEPOSIT ACCOUNTS, NOR DID IT CONCEAL ITS PRESERVATION OF
THOSE RIGHTS ........................................................................................................... 10

     A.    Bank of America Intended to Preserve and Did Preserve All of the Rights
Associated With Deposit Accounts, Including Its Right of Setoff ...................... 11

     B.    Lehman Never Suggested That All of the Bank's Rights Over the Deposit
Would Be Limited to Covering "Indebtedness" .................................................. 13

     C.    The Preservation of the Bank's Right of Setoff Was Not a "Secret" ................... 15

III.   NOTHING ABOUT THE NATURE OR "PURPOSE" OF THE DEPOSIT
PRECLUDED SETOFF................................................................................................. 16

     A.    The Deposit Was Not Immune From Setoff By Reason of It Being Collateral ... 16

     B.    The Funds Were Not Deposited Into a "Special Purpose" Account..................... 17

CONCLUSION.............................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*In re Applied Logic Corp.*, 576 F.2d 952 (2d Cir. 1978) ...............................................................18

*In re Bradlees Stores, Inc.*,
    No. 01-CV-3934, 2001 WL 1112308 (S.D.N.Y. Sept. 20, 2001)....................................10

*In re Enron Corp.*, 307 B.R. 372 (S.D.N.Y. 2004).......................................................................14

*In re Kountze Bros.*, 27 F. Supp. 1002 (S.D.N.Y. 1938),
    *aff'd*, 103 F.2d 785 (2d Cir. 1939) ....................................................................................19

*Merrill Lynch Mortgage Capital, Inc. v. F.D.I.C.*,
    293 F. Supp. 2d 98 (D.D.C. 2003)..............................................................................18, 19

*Noah's Ark Auto Accessories, Inc. v. First Nat'l Bank of Rochester*,
    316 N.Y.S.2d 663 (Sup. Ct. 1970), *aff'd*, 37 A.D.2d 692 (App. Div. 1971)....................19

*Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327 (2d Cir. 1992) ............................18, 19

## STATUTES

N.Y. U.C.C. § 9-102(a)(12) (2001) ...........................................................................................16

N.Y. U.C.C. § 9-340(b) (2009)..................................................................................................17

## MISCELLANEOUS

H.R. Rep. No. 109-648 (2006) ......................................................................................................2

Following an evidentiary hearing (the "Hearing") over two and a half days, featuring testimony by current and former employees of Bank of America and Lehman, Bank of America respectfully submits this post-Hearing memorandum in further support of its motion for summary judgment granting it declaratory relief and dismissing LBHI's counterclaims against the Bank, and in opposition to Lehman's motion for summary judgment.[1]

## INTRODUCTION

Bank of America commenced this adversary proceeding to establish that it was proper for it to have set off deposits that LBHI maintained at the Bank against obligations owed by LBHI to the Bank. The Bank's position was and is simple: a deposit is a debt that a bank owes to a depositor; when that depositor owes a separate debt to the bank, the bank has the right under well-established New York law to set off the two debts; Lehman made a conventional cash deposit with Bank of America and, at the same time, executed a security agreement regarding the deposit; and the Bank did nothing to waive or preclude its right of setoff with respect to the deposit. The only significant difference between this deposit and Lehman's other cash deposits was that the Bank obtained certain *additional* rights with respect to this deposit, as set forth in the Security Agreement.

---

[1] The Hearing was held on January 29, February 1, and February 2, 2010. The transcripts for those dates are cited herein, respectively, as "Hrg. Tr. 1-29-10," "Hrg. Tr. 2-1-10," and "Hrg. Tr. 2-2-10," and are found in Volume I of the separately bound Appendix filed with this Post-Hearing Memorandum at tabs 1, 2, and 3, respectively. Citations to deposition testimony presented at the Hearing refer to the deposition transcripts in addition to the Hearing transcripts because of inaccuracies in the audio transcriptions of the deposition testimony played by video at the Hearing. Counsel for Lehman has indicated that Lehman does not object to the use of the designated portions of the deposition transcripts in lieu of the Hearing transcripts. The transcripts of the depositions of Paolo Tonucci, Janet Birney, and Sean Rahavy, marked to show Bank of America's designations in yellow, Lehman's designation in green, and joint designations in pink, are found, respectively, at tabs 4, 5, and 6 of Volume I of the Appendix. The transcript of the December 10, 2009 argument in this matter is cited herein as "Hrg. Tr. 12-10-09" and is appended hereto at tab 7 of Volume I of the Appendix. Summary judgment exhibits referred to herein are found in Volume II of the Appendix. These have all been previously submitted in connection with the parties' summary judgment filings, but they are resubmitted now for the Court's convenience.

All capitalized terms used herein have the same meanings as in the Memorandum of Law in Support of Bank of America's Motion for Summary Judgment ("BOA Br."), the Bank's Memorandum of Law in Opposition to Lehman's Motion for Summary Judgment ("BOA Opp."), and in the Reply Memorandum of Law in Further Support of Bank of America's Motion for Summary Judgment ("BOA Reply").

Although Lehman contends that the terms of the Security Agreement – specifically, the definition of "Indebtedness" in Section 2 – reflect an express waiver of the right of setoff and that this is what was intended by the parties,[2] the Security Agreement in fact expressly *preserves* all of the Bank's legal remedies – indeed, "all rights, powers and remedies given to the Bank by virtue of any statute or rule of law," which necessarily include the right of setoff, a bedrock principle of New York banking law. Andrew Yeung, Lehman's internal counsel responsible for the Security Agreement, expressly acknowledged at the Hearing what this language makes crystal clear, that there is no express waiver of the Bank's right of setoff in the Agreement.[3]

The testimony of both sides' witnesses confirmed that the Bank consistently intended to obtain, and did in fact obtain, a standard cash deposit placed by Lehman in standard Bank of America accounts, *augmented* by the rights set forth in the Security Agreement and subject to setoff like any other deposit account. That result followed the recommendation made internally by a team led by Sally Hawk, the Bank's primary business person involved in the Security Agreement negotiations and a banker with many years of experience analyzing and mitigating risk exposures across the Bank's various financial products, including treasury services and deposit accounts.[4] The Bank initially requested a cash deposit from Lehman on August 14, 2008.[5] On August 21, 2008, Lehman agreed to provide the Bank with a cash deposit[6] and

---

[2] Although not addressed at the Hearing, Lehman has also asserted that the setoff was improper because it was barred by the automatic stay arising under Section 362(a) of the Bankruptcy Code. As the Court is aware, the Bank's position is that the setoff was exempt from the automatic stay based on the plain language of Section 362(b)(17) of the Bankruptcy Code and its legislative history, which shows that potentially limiting language was removed in 2006 by legislation intended to confirm that Section 362(b)(17) protects "free from the automatic stay, all rights previously protected … including self-help foreclosure on collateral rights, setoff rights and netting rights … including not only rights evidenced by agreements between the parties, but other rights as set forth in" Section 560 of the Code, which includes common law rights. H.R. Rep. No. 109-648, at 7 (2006).

[3] *See* Hrg. Tr. 2-1-10 at 99:14-23 [Yeung testimony].

[4] Hrg. Tr. 1-29-10 at 37:3-39:2, 62:9-65:6, 74:24-75:7 [Hawk testimony]; Ex. 202 at BOA_AP000560009 [PowerPoint Presentation dated August 8, 2008, titled "Overdraft Risk Mitigation for Key Clients"].

[5] Hrg. Tr. 1-29-10 at 191:4-192:23 [Dever testimony]; *see also* Ex. 91 [email from James Dever dated August 14, 2008]; Hrg. Tr. 1-29-10 at 75:3-7, 75:16-17 [Hawk testimony].

[6] *See* Ex. 161 [email from James Dever dated August 21, 2008]; Hrg. Tr. 1-29-10 at 197:4-14 [Dever testimony].

Lehman then proposed that the deposit be held in a standard "vanilla account" – in other words, a regular deposit account subject to the usual rights and remedies inherent in a regular deposit account, but without the additional rights that the Bank required.[7] When Mr. Yeung began negotiating the Security Agreement, he understood that the Bank would obtain a security interest in cash held in a cash deposit account,[8] and that is what the Bank obtained from Lehman when the Security Agreement was executed on August 25, 2008.[9]

As the witnesses confirmed, no one at Lehman attempted to negotiate anything but a standard cash deposit held in standard deposit accounts subject to the standard rights and remedies understood to accompany such accounts. When the Bank said that it needed more, the negotiations then focused solely on the *separate* issues of the extent and terms of the security interest, or "pledge," that would be granted in the Security Agreement – in short, the nature of the *additional rights* that the Bank required. In fact, even when Lehman suggested a "vanilla account" without the additional rights sought by the Bank, it never suggested that the account would be stripped of any standard rights, especially the Bank's fundamental right of setoff. With the economy in free-fall and the financial community concerned about Lehman's continued viability – concerns that Stirling Fielding, Lehman's European head of treasury operations, acknowledged were all over the news at the time[10] – it strains credulity to suggest that the Bank would ever have considered giving up a right as fundamental as the right of setoff, especially when the impetus for the Bank's request for the deposit was its desire to mitigate its risk exposure to Lehman.[11] Moreover, the witnesses at the Hearing confirmed that (i) the Bank specifically rejected the proposal by Lehman to strike the provision in the Security Agreement that expressly

---

[7] Ex. 29 [email dated August 21, 2008 from Kathleen Gowin summarizing earlier call with Lehman]; Hrg. Tr. 2-1-10 at 19:2-10, 46:13-25 [Fielding testimony].

[8] Hrg. Tr. 2-1-10 at 88:21-89:1 [Yeung testimony].

[9] *See* Ex. 4 [Security Agreement]; Hrg. Tr. 2-1-10 at 163:3-164:2 [Tonucci testimony from Dep. Tr. 18:3-19:4 acknowledging that the deposit was a "cash deposit"].

[10] Hrg. Tr. 2-1-10 at 7:5-10, 32:1-34:15 [Fielding testimony].

[11] Hrg. Tr. 1-29-10 at 46:3-49:12 [Hawk testimony]; *id.* at 188:1-18 [Dever testimony].

preserved all the Bank's common law and statutory rights, and (ii) both parties were well aware that setoff rights are part of that package of standard and established rights.

Simply put, neither the facts nor the law support Lehman's claim that the Bank somehow forfeited its setoff rights because either "Bank of America, like Lehman did not intend to preserve the right of setoff" or because the Bank "lay in the weeds," secretly guarding a right of setoff without ever telling Lehman it thought it had one.[12]  The evidence at the Hearing showed that Lehman regularly made Eurodollar deposits, had dozens of WBS accounts on the Bank's systems, knew that banks have a right of setoff over deposits and received numerous deposit account agreements from Bank of America reflecting its setoff rights.  Lehman never suggested that its deposit of $500 million in this instance into these conventional, well-known types of accounts should be treated any differently.

As set forth in the Bank's briefs, the law in New York is clear that a party asserting waiver of an established right bears the burden of proving that there was a clear and unmistakable waiver of that right.  Similarly, a party asserting that an account is a "special" account not subject to setoff – Lehman's fallback argument[13] – must present clear and convincing evidence that the parties intended to create such an account.  Lehman has failed to meet its burden with respect to both theories.

## ARGUMENT

**I.   THE BANK HAD A RIGHT OF SETOFF BECAUSE IT PROPOSED, AND LEHMAN MADE, A CASH DEPOSIT IN STANDARD BANK DEPOSIT ACCOUNTS**

There can be no serious dispute that the parties intended and agreed that Lehman would make a deposit into standard, well-understood deposit accounts that everyone knew were

---

[12]  Hrg. Tr. 1-29-10 at 23:4-24:5 [Rothman opening statement].

[13]  LBHI and Lehman's Memorandum of Law in Support of Their Motion for Summary Judgment ("Lehman Br.")  at 43-49; LBHI and Lehman's Opposition to Bank of America's Motion for Summary Judgment ("Lehman Opp.") at 30-39; LBHI and Lehman's Memorandum of Law in Reply to the Bank's Opposition to Lehman's Motion for Summary Judgment ("Lehman Reply") at 26-36.

subject to setoff by the Bank. Ms. Hawk, whose team determined that the Bank should request a cash deposit from Lehman, testified that she was well aware of the rights that typically accompany such accounts, including the right of setoff.[14] Randy Sparks, who negotiated the Security Agreement and at the time had been an in-house lawyer for the Bank for twelve years, testified that "the right of setoff . . . is a very fundamental and deeply ingrained right in the business of taking deposit accounts . . . it's in all of [the Bank's] commercial deposit agreements, and . . . all of our consumer deposit agreements as well."[15] Thus, in August 2008, when the Bank determined that it needed to protect itself from counterparty exposures to Lehman (among other broker-dealer customers), including exposures posed by overdrafts and other credit risks,[16] the Bank sought to have Lehman (just as it did with other broker-dealers) deposit cash in a Bank of America deposit account that would afford the Bank certain rights *in addition* to all the usual features of a deposit account (*i.e.*, a "pledge").[17] As Ms. Hawk explained at the hearing: The Bank was "very firm on the point that . . . *we needed the deposit* of a billion in the account, *in a deposit account, plus we needed the protection* that would allow us to have the time to reduce the limits and would allow it to work across all legal entities."[18]

       In his opening statement at the Hearing, however, counsel for Lehman sought to downplay the significance of a cash deposit at the Bank by suggesting that the deposit (which was

---

[14] Hrg. Tr. 1-29-10 at 41:9-42:5 [Hawk testimony].

[15] Hrg. Tr. 1-29-10 at 100:3-11, 101:3-4, 105:2-8 [Sparks testimony].

[16] Hrg. Tr. 1-29-10 at 45:12-52:6 [Hawk testimony]; *id.* at 57:23-59:12 [Hawk testimony] (regarding Ex. 202 at BOA_AP00056004: PowerPoint Presentation dated August 11, 2008, titled "Overdraft Risk Mitigation for Key Clients") (explaining that the bullet point for "credit concerns" meant that "we were concerned about [Lehman's] general creditworthiness, their viability as an entity. As we were working with the counterparty readiness team, we had general concerns about their go-forward ability to do business"); *id.* at 188:1-18 [Dever testimony].

[17] Hrg. Tr. 1-29-10 at 64:3-65:6, 66:4-12, 74:4-75:7 [Hawk testimony]; *id.* at 188:19-190:14 [Dever testimony]. The Bank's request was commensurate with, and a rational response to, the real credit issue posed by Lehman's large daylight overdraft limit and Lehman's overdraft history (including the large daylight overdraft that Lehman had left uncovered at the close of business on July 25, 2008).

[18] Hrg. Tr. 1-29-10 at 81:4-10 [Hawk testimony] (emphasis added); *see generally* Ex. 202. More specifically, the extra protection the Bank required included (1) a security interest, (2) a mechanism allowing it to reduce daylight overdraft lines before withdrawals, and (3) an agreement providing that the funds covered overdrafts in any Lehman account regardless of the legal entity that controlled the account. Hrg. Tr. 1-29-10 at 64:3-65:6, 66:4-12 [Hawk testimony]; *id.* at 131:15-132:6 [Sparks testimony].

to serve as collateral under the Security Agreement) could "of course" only have been cash (indeed, he continued, "[w]hat else would it be?") and that the only alternative to placing it in a deposit account would have been to "put [it] into a mattress."[19] Both parts of his assertion, however, are flatly incorrect, and the Hearing demonstrated that Lehman's representatives were well aware of potential alternatives that they never chose to raise.

For example, collateral certainly need not be in the form of cash, and Lehman could have suggested non-cash collateral; Mr. Yeung testified that he was aware that security agreements could cover "different forms" of assets other than cash.[20] Lehman also could have suggested using other types of cash accounts, such as a segregated deposit account. Janet Birney, whose primary responsibility was opening and closing Lehman's cash and securities bank accounts,[21] was familiar with segregated accounts, knew that setoff could be waived in connection with such accounts, and discussed such accounts at Bank of America at the same time that she was discussing the Bank's request for a deposit and the Security Agreement.[22] More than that, Ms. Birney testified that segregated accounts were a standard item negotiated in connection with security agreements.[23] For his part, Paolo Tonucci, Lehman's treasurer and the signer of the Security Agreement,[24] testified that he was familiar with segregated accounts at the Bank and with using lock-box accounts to set aside funds.[25] Lehman also could have suggested that the deposit accounts be held at a bank other than Bank of America. But Lehman pressed for none of these approaches; rather, Lehman agreed to an unsegregated, standard cash deposit, with no waiver of setoff, without even suggesting any of these alternatives.

---

[19] Hrg. Tr. 1-29-10 at 22:4-7 [Rothman opening statement].

[20] Hrg. Tr. 2-1-10 at 86:10-14 [Yeung testimony].

[21] Hrg. Tr. 2-2-10 at 6:12-20 [Birney testimony from Dep. Tr. at 10:3-14].

[22] *Id*. at 28:13-29:13, 33:18-34:2 [Birney testimony from Dep. Tr. at 66:9-67:17, 74:14-25].

[23] *Id*. at 24:5-10 [Birney testimony from Dep. Tr. at 55:25-56:9].

[24] Hrg. Tr. 2-1-10 at 159:5-8, 161:14-16 [Tonucci testimony from Dep. Tr. at 10:13-16, 12:23-25].

[25] *See, e.g., id*. at 193:13-194:2 [Tonucci testimony from Dep. Tr. at 78:3-21].

Furthermore, the Hearing established that there was no secret about the rights associated with such deposits.  As Lehman witnesses testified, Lehman was very familiar with the types of deposits at issue (the DDA account on the WBS platform and the Eurodollar deposit, which together comprise the defined term "Deposit Account" in the Security Agreement) and was well aware that the Bank had setoff rights over the cash deposits it held.  Lehman regularly made Eurodollar deposits, which Lehman employees viewed as simple "bank deposits,"[26] had a longstanding relationship with Bank of America dating back to 1995, and had dozens of DDA deposit accounts at the Bank just like the WBS account created for Lehman's $500 million deposit here.[27]  Moreover, Bank of America had sent Lehman numerous copies of the WBS terms and conditions booklet (which expressly reflected the right of setoff) before the Security Agreement was ever negotiated,[28] and it sent Lehman two other customer agreements in connection with the Eurodollar deposit before and after the Security Agreement was negotiated, each of which also expressly reflected a right of setoff.[29]  In fact, Lehman representatives responsible for the deposit admitted that they were specifically aware that banks have setoff rights over cash deposits and that any waiver of such rights must be negotiated.  For example, Emil Cornejo, who oversaw Lehman's relationship with the Bank, said that such rights would be "struck" from any agreement as to which Lehman wanted the right waived,[30] and Ms. Birney testified that Lehman maintains a file of letters in which banks had expressly waived their setoff rights.[31]

---

[26] Hrg. Tr. 2-2-10 at 43:21-23 [Rahavy testimony from Dep. Tr. at 12:23-13:2]; *id.* at 20:13-17 [Birney testimony from Dep. Tr. at 39:24-40:4 ]; Hrg. Tr. 2-01-10 at 190:15-25 [Tonucci testimony from Dep. Tr. at 72:11-23].

[27] Hrg. Tr. 1-29-10 at 108:16-22, 154:1-12 [Sparks testimony]; *id.* at 186:25-187:3 [Dever testimony]; Hrg. Tr. 2-1-10 at 18:15-17 [Fielding testimony]; *see also* Hrg. Tr. 2-2-10 at 11:17-19 [Birney testimony from Dep. Tr. at 24:8-11].

[28] Hrg. Tr. 1-29-10 at 109:7-112:7, 116:8-117:2 [Sparks testimony]; Ex. 23 at BOA_AP00044931 [Corporate Deposit Agreement and Disclosures Account Programs – Facts about Wholesale Banking System (WBS)].

[29] Ex. 27 at BOA_AP00030195 [Customer Agreement]; Ex. 128 at LEH000265 [Account Agreement].

[30] Hrg. Tr. 2-1-10 at 147:19-148:16 [Cornejo testimony].

[31] Hrg. Tr. 2-2-10 at 29:1-13, 33:18-34:2 [Birney testimony from Dep. Tr. at 66:25-67:17, 74:14-25].

Accordingly, the use of a cash deposit to secure the Bank against overdraft exposure was a purposeful choice by the Bank, and it was knowingly accepted by Lehman even though its representatives understood that the deposit carried with it a right of setoff.[32] The record is clear that Lehman agreed to make a cash deposit and suggested that it should be held in a "vanilla account," *i.e.*, a standard deposit account, before the parties even began negotiating the terms of the Security Agreement and that, from the parties' initial conversation on the subject on August 14, 2008 to the time the agreement was reached, Lehman's resistance to the Bank's request focused not on the Bank's desire to hold a cash deposit in deposit accounts at the Bank, but rather on the amount of the deposit and on the extent of the "extra rights" that the Bank wanted. The substantial evidence on this point included the following:

- On August 14, 2008, when James Dever, the banker who oversaw the Bank's relationship with Lehman, called Lehman and "told [Mr. Tonucci] that . . . they would actually have to put up a cash deposit [to retain access to DOLs],"[33] Mr. Tonucci "wanted to see if there was any room to perhaps negotiate what we were asking for" and immediately asked "whether there was room to negotiate *the size of deposit*" and if Bank of America "*would consider allowing for offset against their other accounts*."[34] In other words, Lehman asked the Bank to forego the pledge, not the deposit or its right of setoff.

- On August 21, 2008, Lehman agreed to make a $1 billion deposit, but continued to negotiate the additional terms.[35]

- When Stirling Fielding (who reported to Janet Birney[36]) led the calls for Lehman on August 21 and the morning of August 22, he continued to propose that the Bank accept a

---

[32] The Bank is still reviewing the Examiner's Report, which was just made available to the public the day before this brief was filed. Section III.A.5 of that Report, however, reveals that the Bank's request to Lehman was not novel and that, over the Summer of 2008, Lehman representatives, including Mr. Cornejo and Mr. Tonucci, negotiated the types of collateral placed with various banks and the types of accounts established to hold such collateral with the specific aim of meeting Lehman's liquidity goals. (*See*, *e.g.* Examiner's Report, pp. 1240-41, 1251-53.) Mr. Tonucci and Mr. Cornejo were even involved in discussions with Citi regarding the right of setoff against deposits under New York law. (*See*, *e.g.* Examiner's Report, pp. 1243-44.) These facts further support the conclusion that Lehman agreed to a "deposit account plus" structure here for its own reasons and with the setoff issue fully in view.

[33] Hrg. Tr. 1-29-10 at 186:9-187:7, 192:14-23 [Dever testimony].

[34] *Id.* at 194:8-13 [Dever testimony]; Ex. 91 at BOA_AP00034075 (emphasis added). Mr. Cornejo testified that Mr. Dever indicated that the "sole purpose" of the deposit "was for providing intraday liquidity to – so we can manage our accounts" but conceded that the parties never actually discussed whether the bank would have the right to access the deposit for debts unrelated to overdrafts. Hrg. Tr. 2-1-10 at 136:22-25, 138:21-23, 139:3-18, 154:8-12.

[35] *See* Ex. 161; Hrg. Tr. 1-29-10 at 197:4-14 [Dever testimony].

[36] Hrg. Tr. 2-1-10 at 23:9-13 [Fielding testimony].

"vanilla account" instead of a pledged account.[37] His concern, as he phrased it himself, was that he wanted to have as much "flexibility" as possible, not that he wanted something other than a deposit account at Bank of America.[38]

- By the time Mr. Yeung became involved in the project, he understood that the arrangement between Bank of America and Lehman would be one where the Bank "took a security interest in cash, *that it would be in a cash deposit account*."[39]

- After the deposit had been made, Mr. Tonucci admitted that Lehman included the $500 million in its liquidity reporting because it was a "cash deposit."[40]

Significantly, Mr. Yeung admitted that the negotiations regarding the Security Agreement assumed a "cash deposit account" and focused on the additional rights that would be defined by the Agreement rather than on the nature of the accounts, flatly contradicting the claim made by Lehman's counsel in his opening that such a "two-part deal," involving deposit accounts plus a security interest, was "pure fiction" fabricated by the Bank's counsel:[41]

Q.     And when you started the negotiations, you knew that there would be two parts to it, the security interest which was your focus and the cash deposit – the cash account which was going to be somebody else's focus, right?

A.     No. I'm not aware of what the other process would have been. . . . I was, you know, focusing on my part. So I – you know, I really can't speak to that other process.

Q.     The other part – let's talk about your part and any other parts. Your part was the security agreement, right?

A.     That's correct.

Q.     And there was another part, which was the establishment of the accounts to be created, pursuant to the security agreement, right?

A.     That must have been the case, yes.

Q.     And you were involved only in the first part and not the second part, right?

---

[37] *Id.* at 19:2-21:14 [Fielding testimony]; Ex. 29 [email dated August 21, 2008 from Kathleen Gowin summarizing earlier call with Lehman].

[38] Hrg. Tr. 2-1-10 at 19:15-20:1 [Fielding testimony].

[39] *Id.* at 88:21-89:1 [Yeung testimony] (emphasis added).

[40] *Id.* at 163:3-164:2 [Tonucci testimony from Dep. Tr. 18:3-19:4].

[41] Hrg. Tr. 1-29-10 at 21:9-20 [Rothman opening statement].

A.    Right. . . .[42]

No one ever negotiated over the "other part," and there is no evidence that anyone on either side doubted that standard rules would apply to the accounts.  Just as the Bank asserted in its briefs, the parties agreed Lehman would make standard cash deposits and also execute a security agreement that conveyed to the Bank a limited security interest in the cash Lehman deposited.  Until the Bank later exercised its standard setoff rights over those deposits, Lehman never suggested or requested that the arrangement be otherwise.

## II.    THE BANK NEVER WAIVED ITS SETOFF RIGHTS WITH RESPECT TO THE DEPOSIT ACCOUNTS, NOR DID IT CONCEAL ITS PRESERVATION OF THOSE RIGHTS

Having agreed to make a deposit with the Bank, it fell to Lehman to negotiate a waiver of the Bank's setoff rights if that is what it intended to obtain.  As set forth in the Bank's briefs, it is well established that (i) banks have setoff rights against deposits as a matter of law, and (ii) rights recognized under applicable law – in this case, setoff rights – are presumed to be incorporated into all contracts, including security agreements, unless unequivocally waived.[43]  Lehman, the party asserting a purported waiver of that right, bears the burden of proving it.[44]

Although the Security Agreement is unambiguous on its face and therefore the Court need not consider extrinsic evidence to discern its meaning,[45] the extrinsic evidence adduced at the Hearing clearly showed that (i) the Bank always intended to maintain its setoff rights and did not expressly or impliedly waive those rights; (ii) Lehman never succeeded in reducing or eliminating these rights and never even discussed a waiver of setoff at all (Mr. Yeung in fact conceded that the testimony and documents on which Lehman relies in arguing otherwise

---

[42]  Hrg. Tr. 2-1-10 at 89:2-19 [Yeung testimony].

[43]  *See* BOA Br. at 28-29, 31-32; BOA Opp. at 19, 27; BOA Reply at 5.

[44]  *See In re Bradlees Stores, Inc.*, No. 01-CV-3934, 2001 WL 1112308, at *12 (S.D.N.Y. Sept. 20, 2001) ("Waiver is the intentional relinquishment of a known right.  It must be evidenced by a clear manifestation of intent and be unmistakable and unambiguous.  *The party asserting waiver bears the burden of proof*") (emphasis added, internal quotations and citations omitted).

[45]  *See* BOA Br. at 33-34; BOA Opp. at 22-23.

actually concerned the scope of the security interest, or "pledge," that Lehman gave the Bank); and (iii) the Bank's preservation of its setoff rights was not a secret.

**A.      Bank of America Intended to Preserve and Did Preserve All of the Rights Associated With Deposit Accounts, Including Its Right of Setoff**

The Bank did not expressly waive its setoff rights with respect to the Deposit Account. Contrary to Lehman's claims that the "Indebtedness" provision constitutes such a waiver, Mr. Yeung testified with respect to the Security Agreement that "I do not see or did not see a specific provision expressly waiving that right [*i.e.*, the right of setoff with respect to the Deposit Account]."[46] Likewise, Mr. Cornejo testified that, in August 2008, Huw Rees, then a senior executive at Lehman and head of European creditor relations, read the executed agreement and described it as providing the Bank with "a wide range of setoff capability."[47] Mr. Cornejo admitted that neither he nor anyone else at Lehman, to his knowledge, told Mr. Rees that he was wrong.[48] Given the absence of any ambiguity in the Security Agreement, these admissions alone should be dispositive of Lehman's claim that the right of setoff had been waived.

Moreover, the parties' intent to preserve such rights was manifested in their inclusion of two provisions in the Security Agreement, Sections 11(d) and 14. Section 11 contains four non-exclusive remedies available to the Bank upon Events of Default. Mr. Yeung acknowledged that two of these four non-exclusive remedies are not limited by the definition of "Indebtedness," including the Bank's right under Section 11(d) "to [e]xercise any remedy provided under this Agreement *or by any applicable law*."[49] Thus, by its terms, had any of the Events of Default occurred, the Security Agreement would have included setoff as a possible remedy. Section 14, of course, expressly preserves the Bank's common law and statutory "rights,

---

[46]  Hrg. Tr. 2-1-10 at 99:14-23 [Yeung testimony].

[47]  Ex. 169 [email dated August 28, 2008 from Huw Rees to Emil Cornejo]; Hrg. Tr. 2-1-10 at 148:25-150:25 [Cornejo testimony].

[48]  Hrg. Tr. 2-1-10 at 151:23-152:4 [Cornejo testimony].

[49]  *Id*. at 125:17-126:10 [Yeung testimony]; Ex. 4 at § 11(d).

powers, and remedies" – which includes setoff rights – regardless of whether there was an Event of Default, "until such right, power or remedy is specifically waived by an instrument in writing executed by the Bank."[50]

The absence of any express waiver of setoff rights and the inclusion of Sections 11(d) and 14 in the Security Agreement was not simply the result of inadvertence or poor drafting. Both Mr. Sparks and Lehman's own witnesses confirmed that no one ever asked the Bank to waive its setoff rights during the parties' discussions[51] – even though Lehman knew how to request such waivers, as Ms. Birney testified; even though Lehman knew how to strike setoff rights from agreements, as Mr. Cornejo confirmed; even though two of the Bank's four remedies were not limited by the definition of "Indebtedness;" and even though Lehman was a sophisticated party advised by the law firm of Simpson Thacher & Bartlett during the negotiations.[52] As Ms. Hawk testified, "the only discussion of that type occurred though the contract negotiation, where [Lehman] had suggested that we strike some language" – the "Other Rights" provision – "that we refused to strike."[53] She recalled learning of Lehman's proposal during the negotiations and she testified that the Bank's position was "very clearly that we would not accept that change."[54] Lehman never again challenged that position or even sought to discuss the provision's re-insertion into the draft.[55] The only possible conclusion from the Hearing is that the parties agreed to exactly what the contract provided: that the Bank would retain all of its rights over the Deposit Account in addition to those set out in the Security Agreement.

---

[50] Ex. 4 at § 14.

[51] Hrg. Tr. 1-29-10 at 154:17-155:4 [Sparks testimony]; Hrg. Tr. 2-1-10 at 51:13-16 [Fielding testimony]; *id.* at 148:17-24 [Cornejo testimony]; *see also id.* at 175:9-11 [Tonucci testimony from Dep. Tr. at 44:7-9].

[52] Hrg. Tr. 2-2-10 at 29:1-13, 33:18-34:2 [Birney testimony from Dep. Tr. at 66:25-67:17, 74:14-25]; Hrg. Tr. 2-1-10 at 147:19-148:16 [Cornejo testimony]; *id.* at 125:17-126:10 [Yeung testimony]; *id.* at 106:1-14 [Yeung testimony].

[53] Hrg. Tr. 1-29-10 at 98:1-3 [Hawk testimony].

[54] *Id.* at 87:3-11 [Hawk testimony]; *see also* Ex. 36 at LEH000537-538; Ex. 37 at BOA_AP00030276; Ex. 35 at LEH000584-585; Hrg. Tr. 1-29-10 at 142:5-9, 146:15-21 [Sparks testimony].

[55] Hrg. Tr. 1-29-10 at 147:5-12, 147:22-148:10 [Sparks testimony]; Hrg. Tr. 02-01-10 at 70:16-20, 80:11-19, 114:15-116:7, 120:1-121:1, 121:10-18 [Yeung testimony].

**B. Lehman Never Suggested That All of the Bank's Rights Over the Deposit Would Be Limited to Covering "Indebtedness"**

Although Lehman has consistently sought to string disparate pieces of extrinsic evidence together to make the case that, while negotiating the Security Agreement, the parties expressed an intent or believed that the *deposit* could only be used to cover overdrafts (and therefore, unlike any other deposit, could not be taken in setoff), the reality is that the only limitation discussed or intended by the parties was the limitation of the *security interest* granted under the Security Agreement to the amount of overdrafts at any given time. This is a hugely important distinction, and understanding it is critical to understanding the parties' intent. Mr. Yeung addressed each of the pieces of extrinsic evidence on which Lehman has relied and made it very clear that, just as the Bank has argued,[56] they related only to the latter issue, the extent of the pledge granted under the Security Agreement.

For example, Lehman has contended that negotiations over the term "Indebtedness" in the Security Agreement showed that the deposit was to be used "solely" to cover overdrafts and that Mr. Yeung had explained as much in a telephone conversation prior to Lehman's first set of edits to the draft Security Agreement.[57] At the Hearing, however, Mr. Yeung testified that, just as the Bank has contended,[58] his edits to the defined term "Indebtedness" and his reported comment that the "pledge account should be for overdrafts and not broader indebtedness" related only to the scope of the Bank's security interest or "pledge": "Our initial response [to the first draft of the Security Agreement] was that the first take of the definition of indebtedness did not conform to our *understanding of what this agreement was supposed to pledge*, which was on the call earlier that day, limited to overdrafts."[59]

---

[56] *See* BOA Br. at 34-38; BOA Opp. at 34-41; BOA Reply at 10-13.

[57] *See* Lehman Br. at 18-20; Lehman Opp. at 6; Lehman Reply at 6-10, 15.

[58] *See* BOA Br. at 18, 34-35; BOA Opp. at 35-36; BOA Reply at 11-12.

[59] Hrg. Tr. 2-1-10 at 70:2-5 [Yeung testimony] (emphasis added).

Similarly, just as the Bank has asserted, Mr. Yeung's own interpretation of his question regarding the "Security Interest" paragraph (paragraph 3) of the Customer Agreement was that it also related to the pledge reflected in the Security Agreement: "My comment [on paragraph 3 of the Customer Agreement] was . . . either you remove it or you make it refer to the security agreement. . . ."; "you know, [the Customer Agreement] seemed like a form document that had a generic formulation of the security interests, that was my starting point with them . . . ."[60] Thus, contrary to Lehman's assertions,[61] this question did not convey a wholesale rejection of the provision. Had Lehman intended to reject this provision, it would have struck through the provision. That is how Lehman denoted its rejection of certain provisions in its mark-ups of the draft Security Agreement,[62] and, according to Mr. Cornejo, that is how Lehman rejected setoff provisions in other draft agreements.[63]

None of these snippets of the negotiations related to broader uses of the Deposit Account, and none of them conveyed, or (according to Mr. Yeung) was intended to convey, that the Bank would have only limited access to the Deposit Account. Thus, there was no reason for the Bank to believe that Lehman thought that the Bank had no right of setoff, because Lehman had never suggested it. If Lehman had wanted the definition of "Indebtedness" to serve a purpose other than defining the scope of the Bank's security interest, and to have it limit *all* uses of the deposit, it should have suggested language stating as much and insisted on striking language that indicated otherwise.[64] Although Lehman repeatedly asked witnesses, in substance, whether the

---

[60] Hrg. Tr. 2-1-10 at 109:24-110:1, 110:25-111:2 [Yeung testimony]; *see also* BOA Opp. at 38; BOA Reply at 11.

[61] Lehman Br. at 2-3, 18-20, 23, 37-38; Lehman Opp. at 20, 23; Lehman Reply at 6-7.

[62] *See, e.g.,* Ex. 36; Hrg. Tr. 2-1-10 at 69:16-70:15 [Yeung testimony].

[63] Hrg. Tr. 2-1-10 at 147:19-148:16 [Cornejo testimony].

[64] *See* BOA Opp. at 23-25 (discussing *In re Enron Corp.*, 307 B.R. 372, 375-381 (S.D.N.Y. 2004)). Although Lehman contends that the remedy in Section 11(c) is the same as a right of setoff and therefore was intended to replace it, Ms. Hawk explained that, just as the Bank has asserted (*see* BOA Br. at 34-35; BOA Opp. at 18-19), the Bank had sought an important extra right of cross-affiliate netting – the ability to "apply [the] funds across all legal entities of Lehman." Hrg. Tr. 1-29-10 at 66:8-12; *see also id.* at 64:3-17, 80:21-81:10 [Hawk testimony]. That right was obtained in Section 11(c) and was limited by the definition of Indebtedness; the Bank's other rights, including the common-law right to setoff mutual debts between the same entities (though not affiliates), were not.

14

Bank ever suggested that the requested deposit would be used in connection with exposures other than overdrafts,[65] none of Lehman's witnesses at the hearing affirmatively testified that Lehman intended to negotiate an agreement that would limit the use of the funds to covering daylight overdrafts and nothing else. It would have been easy to draft language reflecting such terms, but that was never done.[66]

## C. The Preservation of the Bank's Right of Setoff Was Not a "Secret"

It was not the Bank's duty to warn Lehman of all of the legal remedies expressly preserved but not enumerated in the Security Agreement. Even so, the Bank's preservation of its setoff rights was not a secret. As a sophisticated financial institution, Lehman was well aware that the Bank had setoff rights with respect to cash deposits, and, as noted at page 7, *supra*, even the very individuals involved in making the deposit in this case testified that they were aware of such rights and knew exactly how to negotiate with banks for a waiver of the right of setoff.

Although there were multiple occasions on which Mr. Yeung or others could have raised setoff or questioned the effect of the Bank's retaining "Other Rights," the Hearing testimony established that they never did. If Mr. Yeung cared to know what "Other Rights" were being expressly protected under the Security Agreement, he should have checked with Lehman's counsel at Simpson Thacher or asked the Bank, but Lehman never raised the "Other Rights" issue with the Bank after his proposed deletion was rejected.[67] Similarly, when Mr. Sparks wrote on August 24, 2008 that the money would be placed in a "regular DDA," Mr. Yeung, who conceded at the hearing that he did not know what that meant, never asked anybody to explain it; not Ms.

---

[65] Hrg. Tr. 1-29-10 at 96:21-97:2, 97:20-25, 98:4-9 [Hawk testimony]; *id*. at 156:20-23, 164:9-12, 167:24-168:2, 168:8-10 168:17-19, 169:8-11, 174:22-175:1, 175:8-11 [Sparks testimony]; Hrg. Tr. 2-1-10 at 84:16-21 [Yeung testimony]; *id.* at 138:21-22, 139:7-8, 139:15-17 [Cornejo testimony].

[66] Lehman has suggested (although not expressly asserted) that it was under too much pressure to negotiate an agreement that fully dealt with all the relevant issues. *See, e.g.*, Lehman Br. at 20 n.66; Lehman Reply at 36 n.28. It is undisputed, however, that the Security Agreement was heavily negotiated by sophisticated counsel; Mr. Yeung testified that Simpson Thacher was engaged to lend its expertise in the negotiations. Hrg. Tr. 2-1-10 at 106:1-14 [Yeung testimony]. The only "evidence" of pressure is Mr. Fielding's concern about how "his specific little role at Lehman Brothers" would be affected without daylight overdraft limits. *Id.* at 30:12-21 [Fielding testimony].

[67] Hrg. Tr. 1-29-10 at 147:5-148:12 [Sparks testimony]; Hrg. Tr. 2-1-10 at 115:22-116:7 [Yeung testimony].

Birney, who was the Lehman expert on such accounts, not his own counsel, and certainly not Mr. Sparks.[68]  Even the inclusion of the Security Agreement's first "whereas" clause, incorporating rights and obligations under deposit account agreements between the Bank and Lehman, apparently did not lead Mr. Yeung (or anyone else at Lehman, for that matter) to consider or inquire what those obligations might be.[69]  Instead, he was focused on only one part of the deal, the scope of the Bank's security interest.  *See* pages 9-10, *supra*.  Lehman's failure to investigate, expressly limit, or seek a waiver of setoff rights is strong evidence that it did not care enough about them in this instance to take any steps to eliminate them.

The record simply does not support Lehman's fanciful image of Bank of America "lying in the weeds" waiting to exercise a fundamental right that it somehow kept secret from Lehman.  Lehman was a sophisticated party represented by well-qualified outside counsel and led in the negotiations by an inside lawyer presumed to know what he was doing, and it had a team well versed in the mechanics of setoff and waiver.  It should not be permitted to escape its own failure to negotiate for the waiver it now wishes it had obtained by claiming that it was somehow treated unfairly or deceived.  The evidence shows that it was not.

## III.  NOTHING ABOUT THE NATURE OR "PURPOSE" OF THE DEPOSIT PRECLUDED SETOFF

### A.  The Deposit Was Not Immune From Setoff By Reason of It Being Collateral

Lehman has contended that the Bank never had a right of setoff against the deposit because the Deposit Account held "collateral."  This contention is flatly wrong.  The term "collateral" refers only to an asset in which a party has a security interest on which it can foreclose to cover a debt.[70]  Under New York law, a bank can set off against such funds even if

---

[68]  Ex. 42 [email dated August 24, 2008 from Sparks describing the WBS account as a "regular DDA"]; Hrg. Tr. 2-1-10 at 83:16-2090:9-17, 129:4-8 [Yeung testimony]; Hrg. Tr. 1-29-10 at 154:1-16 [Sparks testimony].

[69]  *See* Ex. 40 at BOA_AP00030340; Ex. 4 at BOA_AP00030616.

[70]  *See* N.Y. U.C.C. § 9-102(a)(12) (2001); *see also* BOA Opp. at 57-61; BOA Reply at 13-15.  In his opening statement, counsel for Lehman feigned surprise that the Bank, in its opening statement, acknowledged that the cash deposit constituted "collateral" to the limited extent that it secured Indebtedness.  Hrg. Tr. 1-29-10 at 8:23-9:8; *id.* at 21:21-22:1.  The Bank has never denied this fact.  Instead, it has taken issue with characterization of the funds as

they serve as collateral for a separate debt; the section on setoff in New York's version of the Uniform Commercial Code even expressly provides that "a security interest in a deposit account does not affect a right of recoupment or set-off of the secured party as to a deposit account maintained with the secured party."[71]  It is only when the collateral arrangement results in the funds actually being owed to a party *other than the depositor* that setoff may be precluded through a lack of mutuality.[72]  These are fundamental legal principles that Lehman completely ignores.  The fact that Lehman's cash deposit was supposed to serve as "collateral" for Indebtedness did not render it immune from setoff, as Lehman has repeatedly asserted.

Furthermore, because the testimony at the Hearing confirmed that the security interest did not, at the time of setoff, result in the funds in the Deposit Account being owed to anyone but Lehman, the "collateral" issue cannot stand in the way of the Bank's setoff here.  As both Mr. Tonucci and Mr. Yeung testified, the Security Agreement gave Bank of America a security interest in the deposit that was limited to "Indebtedness" as defined in the agreement.[73] The parties agree that there were no overdrafts at the time of the setoff and, as a result, the collateral issue is irrelevant.[74]

## B.    The Funds Were Not Deposited Into a "Special Purpose" Account

Under New York law, there is a strong presumption that a deposit account is a general account and not a "special" account.[75]  A party asserting that an account is special bears the burden of proving that that the parties intended to create a special account through clear and

---

"collateral" without a corresponding acknowledgment that this term refers to the Bank's security interest, as expressly set forth and defined in the Security Agreement.  The Bank has also taken issue with Lehman's use of the term because, at the time of setoff, there was no question that the funds were not serving as "collateral" within the meaning of the Security Agreement because, as all parties agree, there were no overdrafts at that time.

[71]  N.Y. U.C.C. § 9-340(b) (2009); *see also* BOA Br. at 39-40; BOA Opp. at 57-61; BOA Reply at 13-15.

[72]  *See* BOA Opp. at 58-59.

[73]  Hrg. Tr. 2-1-10 at 162:6-13 [Tonucci testimony from Dep. Tr. 13:22-14:7]; *id*. at 70:2-7 [Yeung testimony].

[74]  *See* BOA Opp. at 5; Lehman Br. at 25-26.

[75]  BOA Br. at 42; BOA Opp. at 58; BOA Reply at 16.

convincing evidence.[76]  Lehman utterly failed to meet this heavy burden here.  Not a single witness recalled any discussion of creating a special purpose account,[77] and all of the factors that courts applying New York law have considered in order to determine whether the parties nevertheless intended to create a special account indicate that the Deposit Account was a general account.[78]

*First,* the witnesses confirmed that Lehman did not ask the Bank to keep the deposited funds segregated from its other funds (a key indicator), even though Mr. Tonucci was familiar with lock-box accounts and Ms. Birney testified that such segregation was often negotiated in connection with security agreements.[79]  *Second,* the Bank paid interest on the deposit and – even though it is irrelevant to the special account inquiry – Lehman considered the rate of interest surprisingly favorable.[80]  *Third,* although a nominal three-day notice period for withdrawals was put in place to allow the Bank to adjust its DOLs,[81] the period was so brief that Mr. Tonucci and Mr. Rahavy deemed the deposit callable and liquid,[82] and Lehman specifically negotiated the right to withdraw the funds at its sole discretion.[83]  *Fourth*, as Lehman

---

[76]  BOA Reply at 15-16 (citing *Peoples Westchester Sav. Bank v. F.D.I.C.*, 961 F.2d 327, 331 (2d Cir. 1992) (explaining that an account is general "absent clear evidence of intent to create a special deposit"); *In re Applied Logic Corp.*, 576 F.2d 952, 961 (2d Cir. 1978) (reversing the bankruptcy court's ruling because the Trustee failed to set forth convincing evidence in the briefing and evidentiary hearing that the account was a general account); *Merrill Lynch Mortgage Capital. Inc. v. F.D.I.C.*, 293 F. Supp. 2d 98, 105 (D.D.C. 2003) (proving a special deposit based on the parties' intent requires "clear evidence of intent to create a special deposit").

[77]  *See, e.g.*, Hrg. Tr. 1-29-10 at 155:5-18 [Sparks testimony]; Hrg. Tr. 2-1-10 at 50:6-9 [Fielding testimony]; *id*. at 175:12-14 [Tonucci testimony from Dep. Tr. at 44:10-12]; Hrg. Tr. at 97:13-98:3 [Yeung testimony].

[78]  *See* BOA Br. at 42-48; BOA Opp. at 41-61; BOA Reply at 15-20; Hrg. Tr. 12-10-09 at 67, 83-86 [Roll argument];

[79]  Hrg. Tr. 1-29-10 at 155:5-15, 155:23-156:3 [Sparks testimony]; Hrg. Tr. 2-1-10 at 50:13-18 [Fielding testimony]; *id*. at 193:13-194:2 [Tonucci testimony from Dep. Tr. at 78:3-21]; Hrg. Tr. 2-2-10 at 24:5-10 [Birney testimony from Dep. Tr. at 55:25-56:9].

[80]  Hrg. Tr. 1-29-10 at 83:9-15 [Hawk testimony]; Hrg. Tr. 2-02-10 at 52:21-53:19 [Rahavy testimony from Dep. Tr. at 70:11-71:18]; Hrg. Tr. 2-01-10 at 192:1-3 [Tonucci testimony from Dep. Tr. at 74:19-21].

[81]  Hrg. Tr. 2-01-10 at 82:3-8 [Yeung testimony]; Hrg. Tr. 01-29-10 at 64:14-17, 66:8-11 [Hawk testimony].

[82]  Hrg. Tr. 2-01-10 at 163:3-164:2 [Tonucci testimony from Dep. Tr. at 18:3-19:4]; Hrg. Tr. 2-02-10 at 53:2-19 [Rahavy testimony from Dep. Tr. at 70:18-71:18].

[83]  Hrg. Tr. at 2-1-10 at 178:23-179:3 [Tonucci testimony from Dep. Tr. at 53:17-22]; Hrg. Tr. 1-29-10 at 145:15-21, 176:5-16, 183:6-24 [Sparks testimony].

acknowledges, no third party had any interest in the Deposit Account.[84] *Fifth,* the Security Agreement expressly stated that Lehman did not retain title to the deposited funds.[85] *Sixth,* the witnesses confirmed what was clear on the face of the Security Agreement: the Bank never expressly waived its right of setoff. *See* Section II.A, *supra.* And *seventh,* neither party agreed that the deposited funds would be used for no purpose but covering overdrafts.[86] The Bank never agreed to limit its own use of the funds in that manner, and Mr. Fielding agreed that Lehman could withdraw the funds at will and "could have done anything it wanted" with the funds.[87]

As set out in the Bank's briefs, Lehman fundamentally mischaracterizes the facts and law by contending that the Deposit Account should be deemed a special account simply because the deposit was made for a particular reason, securing the Bank's exposure to overdrafts. Even though Lehman elicited testimony that only overdraft exposures were discussed between the parties negotiating the Security Agreement (although internal discussions at the Bank were not so limited[88]), no testimony suggested that the Bank agreed (or that Lehman intended) that the deposited funds would only be accessible to secure overdraft exposure, *see* Section II.B, *supra,* and no testimony suggested that the Bank agreed to hold the deposited funds as an agent for Lehman, or that the Bank was separately compensated for any such services.[89] To the contrary,

---

[84] *See* BOA Br. at 47-48; BOA Opp. at 53; BOA Reply at 17.

[85] *See* BOA Opp. at 52; Ex. 4 at BOA_AP00030627 (Notice of Charge).

[86] *See* BOA Opp. at 42-48, 55-57; BOA Reply at 16-20; *In re Kountze Bros.,* 27 F. Supp. 1002, 1003-04 (S.D.N.Y. 1938) (requiring an intention on the part of both parties that the deposited funds must be held and used exclusively for a special purpose), *aff'd,* 103 F.2d 785, 787 (2d Cir. 1939); *Peoples Westchester Savings Bank,* 961 F.2d at 331 (explaining that the argument that an account is special because the bank "accepted the [deposited] funds on a basis that they were to be held for a specific purpose . . . misperceives the meaning of 'specific purpose.' 'Specific purpose' connotes that, in holding the funds, the bank itself acts as an agent directly on behalf of the beneficial owner – a service for which the bank is separately compensated") (citations omitted); *Merrill Lynch Mortgage Capital, Inc.,* 293 F. Supp. 2d at 101-103, 106 (applying New York law to hold that a custodial account was a special account because the account agreement required segregation, and the Bank served as a servicing agent and used the account solely to aggregate payments and transmit these payments to Merrill); *Noah's Ark Auto Accessories, Inc. v. First Nat'l Bank of Rochester,* 316 N.Y.S.2d 663, 666 (Sup. Ct. 1970) (deeming an account a special account where it served "the express purpose of remitting directly to another bank"), *aff'd,* 37 A.D.2d 692 (App. Div. 1971).

[87] Hrg. Tr. 2-1-10 at 59:25-61:4 [Fielding testimony].

[88] *See, e.g.,* Hrg. Tr. 1-29-10 at 45:11-48:16 [Hawk testimony].

[89] *See* BOA Opp. at 42-43.

the Bank was able to invest the funds for its own purposes (hence the payment of interest) and Lehman could withdraw the funds for its own purposes. This scenario describes a general account, not a special account. A special account is one that is far less liquid and far more limited in its usage than the Deposit Account was here. Lehman never bargained for the protection of a special account. It cannot obtain the protections associated with one after the fact.

## CONCLUSION

For the foregoing reasons, and for those set forth in its Memorandum of Law in Support of Bank of America's Motion for Summary Judgment, its Memorandum of Law in Opposition to Lehman's Motion for Summary Judgment, and its Reply Memorandum of Law in Further Support of Bank of America's Motion for Summary Judgment, Bank of America respectfully urges the Court to grant summary judgment in favor of the Bank and to order the declaratory relief sought in the Bank's complaint, and to deny Lehman's motion for summary judgment.

Dated: New York, New York
March 12, 2010

SHEARMAN & STERLING LLP

By:    /s William J.F. Roll, III
     William J.F. Roll, III
     Fredric Sosnick
     Daniel H.R. Laguardia

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Attorneys for Plaintiff*
*BANK OF AMERICA, N.A.*

# UNREPORTED CASES



Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

United States District Court, S.D. New York.
In re: BRADLEES STORES, INC., et al., Debtors.
SHOPPERS WORLD COMMUNITY CENTER,
L.P., Appellant,
v.
BRADLEES STORES, INC., et al., Appellees.
**Nos. 00-16033 (BRL), 00-16035(BRL),
00-16036(BRL), 01-CV-3934 (SAS).**

Sept. 20, 2001.

Paul Traub, Maura Russell, Barbie D. Lieber,
Traub, Bonacquist & Fox, LLP, New York, NY,
Sander A. Rikleen, Francis C. Morrissey, Hutchins,
Wheeler & Dittmar, a Professional Corporation,
Boston, MA, for Appellant Shoppers World Com-
munity Center, L.P.

Adam C. Rogoff, Cadwalader, Wickersham & Taft,
New York, NY, for Appellee Bradlees Stores, Inc.

Thomas E. Lauria, Frank L. Eaton, White & Case,
LLP, Miami, FL, for Appellee S & S/B Lease Dis-
position LLC.

*MEMORANDUM DECISION*

SCHEINDLIN, J.

**\*1** Bradlees Stores, Inc. ("Bradlees") moved before
the United States Bankruptcy Court for the South-
ern District of New York for an order authorizing
its sale of certain lease designation rights and the
disposition of related leases. Shoppers World Com-
munity Center, L.P. ("SWCC") objected to that mo-
tion. The Bankruptcy Court entered a Memorandum
Decision and Order overruling SWCC's objection.
SWCC appeals from the Bankruptcy Court's order
pursuant to 28 U.S.C. § 158.

For the reasons set forth below, the Memorandum
Decision and Order of the Bankruptcy Court is af-

firmed.

## I. PROCEDURAL BACKGROUND

Bradlees is a publicly held company that, until re-
cently, operated 105 discount stores located in the
Northeastern United States.[FN1] SWCC is the own-
er of a retail shopping center located in Framing-
ham, Massachusetts, that it purchased from Sears in
November, 1995. SWCC is the primary landlord for
space in the Framingham shopping center (the
"Premises") that is leased to Wellons Realty Trust
("Wellons"), and affiliate of the Stop & Shop Com-
panies, Inc. ("Stop & Shop"), and subleased to
Bradlees.

> FN1. Under authorization from the Bank-
> ruptcy Court, Bradlees liquidated its entire
> inventory and, as of February 5, 2001, was
> no longer operating its stores.

Bradlees filed a voluntary Chapter 11 petition in the
Bankruptcy Court for the Southern District of New
York on June 23, 1995 ( *"Bradlees I"* ). As part of
*Bradlees I,* SWCC and Bradlees entered into a set-
tlement agreement (the "Settlement Agreement")
resolving certain disputes regarding Bradlees' occu-
pancy of the Premises. On December 26, 2000,
Bradlees filed a second Chapter 11 petition (
*"Bradlees II"* ). As part of *Bradlees II,* Bradlees
moved before the Bankruptcy Court for an order
authorizing an agreement (the "Lease Designation
Agreement") in which Bradlees would sell its rights
to designate certain leases (the "Lease Designation
Rights") to S & S/B Lease Disposition LLC ("S &
S/B"), an affiliate of Stop & Shop, and would sell
the related leases (the "Leases") through S & S/B.
SWCC objected to this motion to the extent that it
related to Bradlees' right to occupy the Premises.
On March 28, 2001, the Bankruptcy Court entered a
Memorandum Decision and Order (the "Sale De-
cision") overruling SWCC's objection and authoriz-
ing the Agreement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

## II. APPLICABLE STANDARD OF REVIEW

In bankruptcy cases, a District Court sits as an appellate court and applies the well-known dual standards of review. The Bankruptcy Court's findings of fact will only be set aside if they are clearly erroneous. *See* Fed. R. Bankr.P. 8013; *In re Artha Mgmt., Inc.,* 91 F.3d 326, 328 (2d Cir.1996). Questions of law are subject to *de novo* review. *See In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir.1992); *Seaman Furniture Co. of Union Square, Inc. v. Seaman-Mitchell Assoc. (In re Seaman Furniture Co. of Union Square),* No. 96 Civ. 4268, 1996 WL 741604, at *1 (S.D.N.Y. Dec. 27, 1996).

## III. FACTUAL BACKGROUND

### A. The Overlease and Sublease

On October 18, 1974, Stop & Shop, Bradlees' former corporate parent, entered into a thirty-year term lease with SWCC's predecessor in interest, Shoppers World Inc. (the "Overlease"). FN2 *See* Sale Decision, Ex. 3 to Appendix to Brief for Appellant SWCC ("Appellant App."), at 1 n. 1. Among other things, the Overlease included the following provisions: (1) that the Premises would be used, if at all, as a department store under the name "Bradlees" or such other name as the tenant might use for its department store line of business, (2) that the tenant would have the right to assign the Overlease or sublet all or part of the Premises with the landlord's consent (the "Lease Designation Rights"), and (3) that such assignments or subleases could only be made to (a) a subsidiary or affiliate of Stop & Shop, (b) an entity acquiring all or substantially all of Stop & Shop's assets or (c) an entity succeeding Stop & Shop's interest by merger, consolidation or similar procedure (the "Overlease Assignment Restrictions"). *See* Overlease, Ex. H to 3/8/01 Affidavit of SWCC's Counsel Sander A. Rikleen ("Rikleen Aff."), Ex. 2 to Appellant App.; Sale Decision at 4-5.

> FN2. The Overlease was later acquired by

Homart Development Co., predecessor to Sears. SWCC acquired the shopping center from Sears in November, 1995. *See* Appellant App. at 5 n. 6.

**\*2** In December, 1988, Stop & Shop assigned its rights and interests under the Overlease to Wellons. *See* Sale Decision at 5. Wellons then executed a sublease for the Premises with Bradlees, an affiliate of Stop & Shop (the "Sublease"). FN3 *See id.* The Sublease contains a cross-reference to the Overlease that applies the limitations in the Lease Designation Rights, including the Overlease Assignment Restrictions, to the Sublease. *See id* .

> FN3. The named sublessee was Bradlees of New England, Inc., which merged into Bradlees in 1994.

### B. The Massachusetts Actions

In July, 1992, Bradlees was sold to a newly created, independent company, thus ending the affiliation of Bradlees with Stop & Shop. *See id.* In January, 1994, a notice of default was sent from SWCC's predecessor-in-interest, Homart Development Co., to Wellons (the "Default Notice"). *See id.* The Default Notice insisted that Wellons was in default of the Overlease Assignment Restrictions because Bradlees was no longer an affiliate of Stop & Shop. *See id.* In response, Wellons and Stop & Shop commenced litigation in which they sought injunctive relief and damages resulting from the Default Notice. *See Stop & Shop Supermarket Co. v. Homart Dev. Corp.,* No. 94 Civ. 233 (Norfolk Superior Court) (the "Stop & Shop Action").

In March, 1995, Bradlees sued Sears in the Massachusetts Federal Court for Sears' alleged breaches of the Overlease. *See Bradlees Stores, Inc. v. Sears Dev. Co. (f/k/a/ Homart Dev. Co.) & Shoppers World Cmty Ctr., L.P.,* No. 85 Civ. 10685 (D.Mass.) (the "Bradlees Action"). SWCC was joined as a defendant when it purchased Shoppers World Complex from Sears later that year. Bradlees

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged, among other things, that Sears had taken certain actions with respect to the Premises that impeded Bradlees' ability to fully utilize the Premises and interfered with Bradlees' rights of use and quiet enjoyment of the Premises. *See* Sale Decision at 6.

In June, 1995, Wellons sued Sears in Massachusetts Federal Court for breach of the Overlease. *See Brian Hotarek, et al. Tr. of Wellons Realty Trust v. Sears Dev. Co. (f/k/a/ Homart Dev. Co.) and Shoppers World Cmty Ctr., L.P.,* 95 Civ. 11269 (D.Mass.) (the "Wellons Action"). Wellons later amended its complaint to incorporate claims for injunctive relief and damages resulting from the Default Notice. *See* Sale Decision at 6.

The Bradlees Action and the Wellons action were consolidated (the "Consolidated Action"). In the Consolidated Action, Sears claimed that Bradlees was not authorized to occupy the Premises because it was no longer an affiliate of Stop & Shop, as required by the Overlease Assignment Restrictions. *See id.* Sears also counterclaimed for a declaration that Bradlees' use of the Premises was a violation of the Overlease and was therefore impermissible. *See id.*

C. *Bradlees I* and the Settlement Agreement

On June 23, 1995, Bradlees filed a petition under Chapter 11 of the Bankruptcy Code (*Bradlees I* ). *See id.* at 2. In November 1997, Bradlees filed a motion in the Bankruptcy Court seeking a declaration that the automatic stay imposed by section 362 of the Bankruptcy Code prohibited Sears and SWCC from prosecuting defenses and counterclaims that challenged the validity of the Sublease and Bradlees' occupancy of the Premises. *See id.* at 6. The Bankruptcy Court directed the matter to mediation. *See id.* Mediation resulted in a settlement agreement that was approved by the Bankruptcy Court on May 5, 1998. *See* Settlement Agreement, Appendix to Brief of Appellees ("Appellees App."), at A0213.

**\*3** The Settlement Agreement provided, among other things, that:

- The Bradlees Action would be dismissed with prejudice. *See id.* ¶ 3.

- Sears would immediately pay $600,000 to Bradlees in full and final settlement of all of Bradlees' claims relating to the construction at and configuration of Shoppers World Complex. *See id.* ¶ 1.

- SWCC would recognize Bradlees' occupancy of the premises regardless of the outcome of the Wellons Action. Specifically, while the Wellons litigation was pending, SWCC would not seek to disturb Bradlees' use, enjoyment and possession of the Premises based on the fact that Bradlees was no longer an affiliate of Stop & Shop or based on SWCC's contention that Bradlees' use of the Premises violated the Overlease. If Wellons were to win the Wellons Action, SWCC would recognize Bradlees as Wellons' proper subtenant. If Wellons were to lose the Wellons Action, SWCC would enter into a direct lease with Bradlees on the same terms and conditions as the Sublease. *See id.* ¶ 5.

- Bradlees would operate the Premises only under the name "Bradlees." *See id.* ¶ 6.

- Both before and after conclusion of *Bradlees I,* Bradlees was only permitted to assign its right to occupy the Premises to its affiliates and/or subsidiaries (the "Assignment Restrictions"). If Bradlees sought to assign its rights to occupy in a manner not specifically permitted in the Settlement Agreement, SWCC would be free to assert that such events were grounds to terminate the Overlease. *See id.*

The parties also agreed that performance of the Settlement Agreement was "not intended, and shall not be deemed, to waive, limit or affect SWCC's or Bradlees' rights to object to future conduct or events which are not specifically permitted under

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Page 4

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

[the] Settlement Agreement." *Id.*

On May 5, 1998, the Bankruptcy Court entered an order approving the Settlement Agreement. *See* Sale Decision at 7. Thereafter, SWCC promptly paid $600,000 to Bradlees and executed releases and delivered them to Bradlees. *See* Check from Sears to Bradlees, Ex. E to Rikleen Aff., at 57; Releases, Ex. E to Rikleen Aff., at 58-61. The Massachusetts Federal Court then dismissed the Bradlees Action with prejudice. *See* Stipulation of Dismissal, Ex. E to Rikleen Aff., at 62.

The Settlement Agreement did not resolve the Wellons Action. *See* Settlement Agreement ¶ 4. On November 27, 2000, the District Court granted partial summary judgment in the Wellons action to Sears and SWCC, establishing Wellons' breach of the Overlease. *See* Sale Decision at 7; Order, Ex. G to Rikleen Aff. ("Wellons Order").

The Bankruptcy Court confirmed the reorganization plan in *Bradlees I* (the *"Bradlees I* Plan) on January 27, 1999. *See id.* at 2. Although the *Bradlees I* Plan was substantially consummated, the case was not closed. *See id.*

D. *Bradlees II* and the Lease Designation Agreement

**\*4** After confirmation of the *Bradlees I* Plan, Bradlees continued to suffer substantial operating losses. *See* Order Approving Lease Designation and Disposition Agreement ("Sale Order"), Appellee App. at A0059, ¶¶ K-L. After Bradlees failed to secure a purchaser for its business as a going concern, Bradlees began an orderly wind-down of its operations. *See id.* ¶ N. To that end, Bradlees solicited offers for the sale of various store locations and other assets. *See id.* On December 26, 2000 (the "Petition Date"), Bradlees filed new petitions pursuant to Chapter 11 of the Bankruptcy Code ( *Bradlees II* ).[FN4] *See* Sale Decision at 2.

> FN4. *Bradlees I* and *Bradlees II* have been consolidated for procedural purposes only

and are being jointly administered. *See* 1/25/01 Affidavit of Peter Thoran, Chairman and CEO of Bradlees ("Thoran Aff."), Ex. 1 to Appellant App., ¶ 4.

After the Petition Date, Bradlees and S & S/B arrived at an agreement pursuant to which S & S/B would acquire Bradlees' designation rights for its unexpired non-residential leases. *See* Lease Agreement and Disposition Agreement Between Bradlees and S & S/B ("Lease Designation Agreement"), Ex. A to Sale Order. Specifically, Stop & Shop agreed to pay a minimum of $150 million to Bradlees for the right to acquire the leases and the exclusive right to select and identify third-party designees to whom any or all of the leases might be sold and assigned. *See id.* at 8-10. After Stop & Shop's recovery of expenses and payment of the $150 million guaranteed amount, all proceeds from the sale or assignment of the leases were to be distributed 75 percent to Bradlees and 25 percent to Stop & Shop until an aggregate amount of $20 million was distributed. *See id.* at 11-12. Thereafter, all remaining proceeds would be distributed 50 percent to Bradlees and 50 percent to Stop & Shop, subject to a possible reimbursement in favor of Bradlees relating to certain potential rejection damages as set forth in the Lease Designation Agreement. *See id.*

On January 5, 2001, Bradlees filed a motion in the Bankruptcy Court requesting an order (1) approving the Lease Designation Agreement, (2) authorizing Bradlees to sell the designation rights for its unexpired non-residential real property leasehold interests to S & S/B, (3) authorizing Bradlees to assume and assign and sell (through S & S/B) the unexpired leases to assignee(s) free and clear of all liens, claims, encumbrances and interests, and (4) granting related relief. *See* Motion of Debtors ("Proposed Sale Order"), Appellee App. at A0001. Among other things, Bradlees argued that section 365(f) of the Bankruptcy Code permitted it to assign its designation rights under the Sublease stripped of any contractual restrictions on assignment. *See id.* ¶¶ 66-73.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

SWCC timely objected to the Proposed Sale Order to the extent that it related to Bradlees' right to occupy the Premises (the "Objection"). SWCC gave three grounds for its objection: (1) Bradlees could not invoke section 365(f) to avoid the Assignment Restrictions in the Settlement Agreement because the Settlement Agreement was not an executory contract, as required by section 365; (2) Bradlees was judicially estopped from assigning its Lease Designation Rights in the manner sought; and (3) Bradlees had waived the protections of section 365(f) in the Settlement Agreement. On February 6, 2001, the Bankruptcy Court entered an order approving the Lease Designation Agreement and authorizing Bradlees to sell its lease designation rights for its unexpired leases to S & S/B. *See* Sale Order. However, Bradlees' interest in the Premises was excluded from the Lease Designation Agreement pending resolution of SWCC's Objection.

E. The Bankruptcy Court's Sale Decision

**\*5** On March 28, 2001, the Bankruptcy Court entered its Memorandum Decision and Order overruling SWCC's Objection in its entirety. *See* Sale Decision. *First,* the court found that the Settlement Agreement was an executory contract for purposes of section 365 and that the Assignment Restrictions were unenforceable under section 365(f). *See id.* at 10-15. *Second,* the court held that Bradlees was not judicially estopped from seeking to avoid the Assignment Restrictions because Bradlees had taken no "factual position" that was inconsistent with the positions it took in *Bradlees I. Id.* at 9. *Third,* the court held that the Settlement Agreement was devoid of any waiver and that paragraph six of the Settlement Agreement contained an "explicit *reservation of rights." Id.* at 8 (emphasis in original).

III. DISCUSSION

On appeal, SWCC challenges all three of the Bankruptcy Court's holdings. SWCC again contends that: (1) Bradlees cannot invoke the protections of

section 365(f) because the Settlement Agreement in not an executory contract; (2) Bradlees is judicially estopped from seeking to avoid the Assignment Restrictions; and (3) the language of the Settlement Agreement waives Bradlees' right to avoid the Assignment Restrictions pursuant to section 365(f).

A. Applicability of Section 365(f)

Section 365 of the Bankruptcy Code permits a debtor to assume or reject any pre-petitition executory contract or unexpired lease. *See* 11 U.S.C. § 365(a); *In re Cannonsburg Envtl. Assoc., Ltd.,* 72 F.3d 1260, 1266 (6th Cir.1996) (holding that section 365 applies only to pre-petition agreements); *In re Merry-Go-Round Enter., Inc.,* 208 B.R. 637, 643 (Bankr.D.Md.1997) (same); *In re Leslie Fay Co.'s, Inc.,* 168 B.R. 294, 300 (Bankr.S.D.N.Y.1994) (same). Pursuant to section 365(f), a debtor may assign unexpired leases free from anti-assignment restrictions. *See* 11 U.S.C. § 365(f). SWCC argues that Bradlees is not entitled to the protections of section 365(f) because the Settlement Agreement was not an executory contract within the meaning of section 365. *See* Brief for Appellant SWCC ("Appellant Brief") at 10. SWCC's argument is based on two contentions. *First,* SWCC insists that the proper test for determining whether a contract is executory is the Countryman Test and that the Bankruptcy Court incorrectly concluded that the Settlement Agreement meets this test. *See id.* at 10. *Second,* SWCC argues that the Bankruptcy Court erred when it used the less stringent "Functional Approach" to conclude that the Settlement Agreement was executory. *See id.* at 15.

Before addressing the question of whether or not the Settlement Agreement is executory, it should be noted that the Agreement is clearly a pre-petition contract for purposes of section 365. It is well-settled that a settlement agreement is a contract that is construed according to general principles of contract law. *See Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999) (citing *Goldman v. Comm'r,* 39 F.3d 402, 405 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

Cir.1994); *Rexnord Holdings, Inc. v. Bidderman,* 21 F.3d 522, 525 (2d Cir.1994)). In this case, where the Settlement Agreement was approved more than two and a half years before the commencement of *Bradlees II,* it was clearly entered into pre-petition. The fact that the Agreement was entered into as part of *Bradlees I,* an earlier Chapter 11 case, is irrelevant because the two Chapter 11 cases are separate and distinct.[FN5] *See In re Jartran, Inc. (Jartran II),* 886 F.2d 859, 870 (7th Cir.1989) (the "second chapter 11 filing [was] ... distinct from the first filing ..."); *In re Toy King Distributors, Inc.,* 256 B.R. 1, 103 (Bankr.M.D.Fla.2000) ("[A] subsequent new case, filed after the reorganized debtor has confirmed a Chapter 11 plan in an earlier case, creates an entirely new estate."); *In re Jamesway Corp.,* 202 B.R. 697, 701 (Bankr.S.D.N.Y.1996) ("[T]he estate created in one bankruptcy case is distinct from that created upon the commencement of a subsequent case ...").[FN6] Having established that the Settlement Agreement is a pre-petition contract, I now turn to the question of whether that contract is executory.

> FN5. The distinction between consecutively filed bankruptcy cases is particularly applicable in this case because Bradlees substantially consummated its first plan of organization and filed its second Chapter 11 case in order to effect an orderly liquidation of assets. *See Jartran II,* 886 F.2d at 870 (holding that second Chapter 11 petition filed by debtor to liquidate its business, after it became clear that debtor could not meet obligations under prior confirmed plan, constituted a separate Chapter 11 case).

> FN6. In *In re Jamesway,* the Bankruptcy Court for the Southern District of New York held that the debtor's assumption of leases pursuant to section 365 in its first Chapter 11 case had no res judicata effect on the debtor's subsequently filed Chapter 11 case in which the debtor sought to re-

ject some of the same leases. *See* 202 B.R. at 704. Explaining its holding, the court stated that the two Chapter 11 cases were "distinct cases involving different debtors." *Id.*

1. The Countryman Test

\*6 The Bankruptcy Code does not define the term "executory contract ." The legislative history regarding this section states that "though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5844, 6303; *accord Nat'l Labor Relations Bd. (NLRB) v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6 (1984); *Eastern Air Lines v. Insur. Co. of State of Pennsylvania (In re Ionosphere Clubs ),* 85 F .3d 992, 998-99 (2d Cir.1996). Many courts have found the "some performance due" test in the legislative history too broad and sweeping. *See In re Riodizio, Inc.,* 204 B.R. 417, 424 (Bankr.S.D.N.Y.1997) (citing *Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233, 235 (7th Cir.1989)); *In re Spectrum Info. Tech., Inc.,* 190 B.R. 741, 746 (Bankr.E.D.N.Y.1996) ("Rarely does an agreement *not* involve unperformed obligations on both sides.") (emphasis in original); *In re Bluman,* 125 B.R. 359, 361-62 (Bankr.E.D.N.Y.1991). As a result, many courts have adopted Professor Countryman's "material breach" test. *See, e.g., Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.),* 50 F.3d 233, 239 (3d Cir.1995); *Gloria Mfg. Corp. v. Int'l Ladies Garment Workers' Union,* 734 F.2d 1020, 1021-22 (4th Cir.1984); *In re 375 Park Ave. Assoc., Inc.,* 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995); *In re Chateaugay Corp.,* 102 B.R. 355, 164 (S.D.N.Y.1989). The Countryman definition of an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 460 (1973). Under this test, a contract will only be deemed executory if "material future performance obligations remain on both sides" of the contract. *In re Bluman,* 125 B.R. at 361-62 (citing *In re Chateaugay Corp.,* 102 B.R. at 345).

Some courts believe that the Countryman Test is too static and rigid, creating a higher threshold for defining an executory contract than Congress intended. *See In re Riodizio,* 204 B.R. at 424 (reviewing cases); *In re Gen. Dev. Corp.,* 84 F.3d 1364, 1374 (11th Cir.1996). Thus, a number of courts have replaced the Countryman Test with a more flexible and lenient "Functional Approach". This test focuses upon whether or not the estate will benefit from the assumption or rejection of the contract: "[e]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, [the contract] may nevertheless be deemed executory under the functional approach if its assump[ion][or] rejection would ultimately benefit the estate and its creditors." *In re Gen. Dev. Corp.,* 84 F.3d at 1374; *see also In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978); *Cohen v. The Drexel Burnham Lambert Group, Inc. (In re The Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 707-709 (Bankr.S.D.N.Y.1992); *In re Bluman,* 125 B.R. at 362.^FN7

> FN7. There is substantial debate over the appropriateness of the Functional Approach. Courts that advocate the Functional Approach claim that the test more accurately reflects "the assume-reject election now codified" in section 365. *In re The Drexel Burnham Lambert Group, Inc.,* 138 B.R. at 690. In addition, advocates claim that the Functional Approach "conserves the time and effort that the parties and the court otherwise spend resolving the question of executoriness." *In re Riodizio,* 204

B.R at 422. Critics contend that the Functional Approach sidesteps the question of executoriness altogether and therefore ignores the statute's express requirement that the contract be executory. *See id. at 422* ("[I]gnoring executoriness rewrites the statute in a fundamental way") (citing *In re Child World, Inc.,* 147 B.R. 847, 851 (Bankr.S.D.N.Y.1992) ("Manifestly, th[e functional] approach ignores the statutory requirement that the contract to be assumed or rejected must be 'executory'.")); *Butler v. Resident Care Innovation Corp.,* 241 B.R. 37, 44 (Bankr.D.R.I.1999) ("[T]he functional analysis expressly ignores the statutory mandate that the contract be executory under § 365.").

**\*7** The Second Circuit has never expressly adopted either the Countryman Test or the Functional Approach. In its most recent pronouncement on the issue of what constitutes an executory contract, the court simply referred to the legislative history, stating that an executory contract is "a contract 'on which performance remains due to some extent on both sides'." *In re Ionosphere Clubs, Inc.,* 85 F.3d at 999 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. at 522 n. 6). Nevertheless, a number of courts in this circuit have used the Countryman Test for executoriness. *See, e.g., In re Schneeweiss,* 233 B.R. 28, 31 (Bankr.N.D.N.Y.1998); *In re Spectrum Info. Tech., Inc.,* 190 B.R. at 747 (Bankr.E.D.N.Y.1996); *In re Spectrum Info. Tech., Inc.,* 193 B.R. 400, 404-405 (Bankr.E.D.N.Y.1996); *In re 375 Park Ave. Assoc., Inc.,* 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995); *In re Bluman,* 125 B.R. at 362-63; *In re Chateaugay Corp.,* 102 B.R. at 164. In some cases, these courts have tested for executoriness under both the more stringent Countryman Test and the more flexible Functional Approach. *See In re Schneeweiss,* 233 B.R. at 31; *In re Spectrum Info. Tech., Inc.,* 190 B.R. at 747; *In re Spectrum Info. Tech., Inc.,* 193 B.R. at 404-405; *In re Bluman,* 125 B.R. at 362-63.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

In this case, the Bankruptcy Court examined the Settlement Agreement under both the Countryman Test and the Functional Approach and determined that the Settlement Agreement was an executory contract under either test. As explained below, this Court finds no error in the Bankruptcy Court's conclusion that the Settlement Agreement meets the more stringent Countryman Test. Accordingly, this Court need not review the Bankruptcy Court's application of the more lenient Functional Approach.

2. Analysis of the Settlement Agreement Under the Countryman Test

Under the Countryman Test, a contract is executory if failure of the parties to perform the obligations remaining due would constitute a material breach of the agreement. *See* Countryman at 460. To determine if failure of performance would constitute a material breach, courts look to state contract law. *See In re Riodizio,* 204 B.R. at 421; *In re Streets,* 882 F.2d at 235. Under New York law, a material breach is "one which would justify the other party to suspend his own performance, or a breach which is so substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976) (citations omitted); *see also, Katz v. Berisford Int'l PLC,* No. 96 Civ. 8695, 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000); *Lanvin Inc. v. Colonia, Inc.,* 739 F.Supp. 182, 195 (S.D.N.Y.1990). The question of whether there has been substantial compliance or material breach is a question of fact. *See Besicorp Group, Inc. v. Thermo Electron Corp.,* No. 90 Civ. 434, 1993 WL 105163, at *7 (N.D.N.Y. April 6, 1993) (citing *O'Connell Mgmt. Co. v. Carlyle-XIII Managers, Inc.,* 765 F.Supp. 779, 783 (D.Mass.1991)). Therefore, the Bankruptcy Court's determination will only be reversed if its findings of fact were clearly erroneous. *See* Fed. R. Bankr.P. 8013; *In re Artha Mgmt., Inc.,* 91 F.3d at 328.

**\*8** The Bankruptcy Court found that, under the Settlement Agreement, substantial performance was due from both Bradlees and SWCC. It found that Bradlees had not substantially fulfilled its obligation to operate the Premises only under the name "Bradlees" or its obligation to assign its rights to the Premises only to an affiliate and/or subsidiary of Bradlees. *See* Sale Decision at 12. As for SWCC, the court found that it had not fulfilled its obligations under the Settlement Agreement to (1) "not disturb Bradlees' use, enjoyment and possession of the Premises based upon the fact that Bradlees is no longer an affiliate of Stop & Shop or based upon the contention that Bradlees' use of the Premises is not permitted in the Overlease;" (2) "recognize Bradlees as Wellons' proper subtenant if Wellons wins the Wellons action;" and (3) *"enter into a direct lease with Bradlees"* on the same terms and conditions upon which Bradlees currently occupies the Premises." *Id.* at 11 (emphasis in original). SWCC contends that none of the outstanding obligations identified by the Bankruptcy Court constitute the kind of substantial underperformance contemplated by the Countryman Test.

SWCC argues that the Bankruptcy Court used "circular" reasoning when it invoked the Assignment Restrictions to conclude that substantial performance remained due from Bradlees because these restrictions are precisely what Bradlees is now seeking to "ignore". Appellant Reply at 5. SWCC's argument is not convincing for two reasons. *First,* other courts have found that, under the Countryman Test, a party's failure to comply with an assignment restriction may constitute substantial underperformance. *See Record Co., Inc. v. Bummbusiness, Inc. (In re Record Co.),* 8 B.R. 57, 59 (Bankr.S.D.Ind.1981) (holding that tenant's obligation to obtain landlord's consent to assignment of retail lease was a "crucial element" of tenant's performance of an agreement to purchase and reinforced the court's conclusion that the contract was executory). *Second,* SWCC's "circularity" argument improperly conflates the executoriness analysis with Bradlees' invocation of the protections afforded by section 365(f). The executoriness analysis examines an agreement on its face to determine whether there are material obligations that require

Page 9

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

substantial performance from the parties. As Bradlees specifically admits, but for its filing of a second Chapter 11 petition, the Assignment Restrictions would be valid and enforceable by SW-CC. *See* Appellee Brief at 22. Bradlees simply argues that, because it commenced *Bradlees II,* these otherwise enforceable Assignment Restrictions are legally void for the purposes of section 365. *See* Sale Motion ¶¶ 67-73. Accordingly, the Bankruptcy Court did not use "circular" reasoning when it determined that substantial performance remained due from Bradlees under the Settlement Agreement.

SWCC also contends that the Bankruptcy Court erred when it found that substantial performance was due from SWCC. *See* Appellant Brief at 12-15. SWCC insists that its obligation not to disturb Bradlees' use, enjoyment and possession of the Premises during the pendency of the Wellons Action was "illusory" because that obligation merely restated a pre-existing legal duty "to comply with Massachusetts landlord/tenant law" which "prohibits a landlord from interfering with a tenant's use, enjoyment and possession of premises through self-help." *Id.* at 12-13. This argument is fundamentally flawed because SWCC's obligation to "not disturb" Bradlees is not merely a prohibition against self-help. Rather, the Settlement Agreement prohibits SWCC from using *any* tactics to disturb Bradlees' use, enjoyment and possession of the Premises while the Wellons litigation is pending. Given the protracted litigation between the parties, it is reasonable to assume that this provision was included as a means of assuring Bradlees that, pending resolution of the Wellons Action, SWCC would not commence new litigation based upon its contention that Bradlees' occupancy of the Premises was in violation of the Overlease. Because Massachusetts law *specifically permits* a landlord to use civil litigation to interfere with a tenant's use, possession and enjoyment of premises, *see* Appellant Brief at 13, SWCC's obligation is far from "illusory".

**\*9** SWCC also contends that its obligation to ex-

ecute a direct lease with Bradlees in the event that it prevails in the Wellons action is a purely "ministerial" duty that does not render a contract executory. *Id.* at 14. SWCC cites *In re Streets* for the proposition that the requirement of delivery of title is not a significant underperformed obligation. *See id.* at 14. However, that case is distinguishable. In *In re Streets,* the Seventh Circuit found that, under applicable state law, the purchaser became the equitable owner of the property upon entry into the contract and was entitled to immediate possession of the property regardless of whether the seller delivered title. *See id.* at 235. In sharp contrast, the delivery of a direct lease is essential to establishing Bradlees' right to occupy the Premises. Thus, SW-CC's obligation to enter into a direct lease with Bradlees is clearly material for the purposes of executoriness. *See Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 472 (6th Cir.1989) (holding that vendee's obligation to deliver title was a material obligation still to be performed under land sale contract); *Butler v. Resident Care Innovation Corp.,* 241 B.R. 37 (Bankr.D. R.I.1999) (finding seller's failure to deliver deed constituted substantial underperformance of real estate contract where purchaser could not secure title while these obligations remained unperformed).

SWCC's reliance on the Third Circuit's decision in *In re Columbia Gas Systems, Inc.,* 50 F.3d 233 (3d cir.1995) is similarly flawed. In *Columbia Gas,* the Third Circuit held that a pre-petition settlement agreement was not an executory contract where the class members' only remaining obligations were to execute releases and complete supplemental contracts with the debtor. *See id.* In that case, the supplemental contracts that each class member was required to execute with the debtor merely restated terms that were "expressly stated in the settlement agreement itself" and were "designed to do no more than take the terms of the global settlement agreement ... and apply them to each class member." *Id.* at 243. Because the supplemental contracts "did not, [and were not] supposed to, alter the relationship forged by the settlement agreement," the court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

found that they were "functionally ministerial du-ties." *Id.*

Here, the direct lease contemplated by the Settlement Agreement bears no resemblance to the supplemental contracts deemed immaterial in *Columbia Gas.* Unlike the supplemental contracts in *Columbia Gas,* the direct lease would include terms and conditions that are not mentioned in the Settlement Agreement itself; these terms would significantly "alter the relationship" that existed between SWCC and Bradlees prior to their execution. *In re Columbia Gas,* 50 F.3d at 242. As a result, SWCC's obligation to enter into a direct lease with Bradlees is not a mere "ministerial" duty.

**\*10** SWCC also contends that its obligation to recognize Bradlees as a proper subtenant if Wellons prevails in the Wellons Action is "illusory" because it simply requires SWCC to "abide by the Massachusetts Federal Court's decision in the Wellons Action." Appellant Brief at 12. While this argument may have some merit, the fact remains that SWCC's two other outstanding obligations-namely, not to disturb Bradlees' use, enjoyment and possession of the Premises and execution of a direct lease with Bradlees-constitute substantial performance that remained due under the Settlement Agreement. Because the Bankruptcy Court's determination that substantial performance remained due from both Bradlees and SWCC was not clearly erroneous, the court did not err when it concluded that the Settlement Agreement was an executory contract under the Countryman Test.

**B. Judicial Estoppel**

SWCC's next argument is that Bradlees is judicially estopped from seeking to assign its rights to occupy the Premises in *Bradlees II* based on its assertions relating to the Settlement Agreement in *Bradlees I.* *See* Appellant Brief at 18-22. "[J]udicial estoppel is not extrinsically a matter of fact or law." *Desjardins v. Van Buren Cmty. Hosp.,* 37 F.3d 21, 23 (1st Cir.1994); *see also In re Klein,* No. 90 C. 6765,

1991 WL 204925, at [*]3 (N.D.Ill. Sept. 27, 1991). The ultimate determination that judicial estoppel does or does not apply is generally a question of law for the court to review *de novo,* whereas issues of fact underlying that determination will only be reversed for clear error. *See In re Macrose Indus. Corp.,* 186 B.R. 789, 797-98 (E.D.N.Y.1995); Fed. R. Bankr.P. 8013.

**1. Legal Standard for Judicial Estoppel**

The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken in a prior legal proceeding. *See In re Seaman Furniture Co. of Union Square,* 1996 WL 741604, at [*]2. It is a "rare remedy" used to avoid inconsistent outcomes and to prevent litigants from abusing the power of the court. *See Transport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania,* 123 F.Supp.2d 174, 189 (S.D.N.Y.2000) (citing *United States v. Hussein,* 178 F.3d 125, 130 (2d Cir.1999); *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71 (2d Cir.1997); *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir.1997)). To that end, a litigant who asserts judicial estoppel must establish (1) that "the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding" and (2) that the court has accepted the previous assertion in some manner. *AXA Marine and Aviation Ins. (U .K.) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.1996); *In re Seaman Furniture Co. of Union Square,* 1996 WL 741604, at [*]2 (citation omitted).

**2. Analysis**

**\*11** The Bankruptcy Court found that Bradlees' "promis[e]" in *Bradlees I* not to assign its rights to the Premises in contravention of the Assignment Restrictions did not prevent Bradlees from now seeking to make such an assignment because its present position was "purely legal." Sale Decision

Page 11

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

at 9. According to the Bankruptcy Court, Bradlees was simply arguing that, upon its second Chapter 11 filing, the Assignment Restrictions contained in the Sublease and Settlement Agreement became unenforceable under section 365(f). *See id.*

SWCC insists that Bradlees is now taking a factual position that is contrary to the position it took in *Bradlees I. See* Appellant Brief at 19. In *Bradlees I,* SWCC explains, Bradlees represented to the Bankruptcy Court that the terms of the Settlement Agreement, including the Assignment Restrictions, "represented a favorable resolution" of its dispute with SWCC and were "in the best interest of its estate and its creditors." *Id.* Having taken this position in *Bradlees I,* SWCC contends that Bradlees is now estopped from taking the position that it may invoke the protections of section 365 to "avoid the terms of its judicially approved Settlement Agreement." *Id.*

The Bankruptcy Court did not err in rejecting SWCC's judicial estoppel argument. SWCC has failed to point to any *factual position* taken by Bradlees in its effort to invoke section 365(f) that is contrary to a position taken in *Bradlees I.* It is undisputed that, in *Bradlees I,* Bradlees urged the Bankruptcy Court to approve the Settlement Agreement, including the Assignment Restrictions. It is also undisputed that, in *Bradlees I,* Bradlees represented to the Bankruptcy Court that the Settlement Agreement was "fair, equitable and reasonable" and "in the best interests of its estate and its creditors." *See* Motion For Entry of an Order Approving Settlement ("Settlement Motion"), Ex. 2 to Appellant App., ¶¶ 19-20. These assertions are clearly factual positions and the Bankruptcy Court's approval of the Settlement Agreement constituted "judicial acceptance" of those positions. *See Reynolds v. Comm'r,* 861 F.2d 469 (6th Cir.1988) (holding that, in the bankruptcy context, court acceptance of an agreement or stipulation constitutes "judicial acceptance" for purposes of judicial estoppel).

Bradlees' current claim that section 365(f) permits it to freely assign its rights to the Premises is based

on only two factual propositions: (1) that the Settlement Agreement is an "executory contract" under section 365 and (2) that the Assignment Restrictions contained in the Sublease and Settlement Agreement constitute "anti-assignment provisions" under section 365(f)(1). *See* Sale Motion ¶¶ 67-73; Appellee Brief at 12-18. Contrary to SWCC's suggestion, Bradlees does not, and need not, argue that the anti-assignment provisions would be detrimental to its estate or its creditors. Section 365(f) "works *by operation of law* to invalidate" lease assignment restrictions. *In re Jamesway Corp.,* 201 B.R. 73, 78 (Bankr.S.D.N.Y.1996) (emphasis added) (citing *In re Office Prod. of Am., Inc.,* 140 B.R. 407, 410 (Bankr.W.D.Tex.1992); *In re Howe,* 78 B.R. 226, 229 (Bankr.D.S .D.1987)). That section assumes, as a matter of law, that the free "assignment of unexpired leases will assist the debtor in its reorganization or liquidation efforts." *See id.* Therefore, once the Bankruptcy Court decided that the Settlement Agreement was an executory contract which included an anti-assignment provision, the voidability of the Assignment Restrictions was *purely a matter of law,* thereby precluding the application of judicial estoppel.FN5 *See id.*

> FN5. SWCC's argument is not supported by the two cases it highlights in its brief because, in both of those cases, the estopped party took a clearly inconsistent factual position in two proceedings. In *Reynolds,* the Tax Commissioner was estopped from taking a position in a tax court proceeding that it had *conceded* was contrary to a position taken in an earlier court-approved settlement. *See* 861 F.2d at 437. The only issue before the court of appeals was whether the Bankruptcy Court's approval of the settlement constituted sufficient "judicial acceptance" to invoke judicial estoppel. *See id.* at 470. In *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414 (3d Cir.1988), a debtor was estopped

Page 12

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

from making certain breach of contract and fraud claims against its creditor in a state court action that was commenced after the Bankruptcy Court had approved a settlement agreement between the parties. There, the doctrine of judicial estoppel applied because the debtor's state court claim that the creditor's breach "was the catalyst to its Chapter [11] filing" was "clearly contrary to its Chapter [11] treatment of the [debtor's] claim as undisputed." *Id.* at 419-20.

## C. Waiver

**\*12** SWCC's final argument is that the Settlement Agreement waived Bradlees' right to invoke the protections of section 356(f). The issue of waiver, where the underlying facts are undisputed, is a question of law that this Court will review *de novo. See In re Macrose Indus. Corp.,* 186 B.R. at 797-98 (citing *Eastern Sys., Inc. v. West 45th St. Indus. Condominiums, Inc.,* 105 B.R. 219, 227 (Bankr.S.D.N.Y.1989) (addressing waiver as a question of law)).

## 1. Legal Standard for Waiver

"Waiver is the intentional relinquishment of a known right." *In re Seamans Furniture of Union Square,* 1996 WL 741604, at \* 4; *In re Jamesway,* 201 B.R. at 76 (citing *Johnson* 304 U .S. 458, 464 (1938)). It must be evidenced by "a clear manifestation of intent and be unmistakable and unambiguous." *In re Jamesway,* 201 B.R. at 77 (citing *Port Distrib. Corp. v. Pflaumer,* 880 F.Supp. 204, 211 (S.D.N.Y.), *aff'd,* 70 F.3d 8 (2d Cir.1995)). The party asserting waiver bears the burden of proof. *See id.; In re Seamans Furniture of Union Square,* 1996 WL 741604, at \* 4. Thus, SWCC must prove that when Bradlees entered into the Settlement Agreement it intended to waive its right to invoke the protections of section 365(f) in a subsequent bankruptcy proceeding.

## 2. Analysis

The Bankruptcy Court held that the Settlement Agreement was "devoid of any waiver" of Bradlees' right to invoke the protections of section 365. Sale Decision at 8. Moreover, the court found that the parties agreed to "an explicit *reservation of rights"* because the Agreement stated in pertinent part: "[T]he parties' performance of this Settlement Agreement is not intended, and *shall not be deemed, to waive, limit or affect* SWCC's or Bradlees' right to object to *future conduct* or events which are not specifically permitted under this Settlement Agreement ." *Id.* (emphasis in original) (quoting Settlement Agreement ¶ 6).

SWCC argues that the only "rational" way to interpret the Assignment Restrictions is as an agreement by Bradlees to "permanently waiv[e] its right to assign [its occupancy] rights pursuant to section 365(f) in the future." Appellant Brief at 23-24. SWCC reasons that Bradlees' consent to the Assignment Restrictions must relate to the future because, prior to the Settlement Agreement, Bradlees did not have any contractual right to assign its occupancy. *See id.*

SWCC also contends that the Bankruptcy Court improperly construed the Settlement Agreement as containing an explicit reservation of Bradlees' rights under section 365. *See id. First,* SWCC argues that the Bankruptcy Court's interpretation is belied by the express language of the Agreement. According to SWCC, the language that the Bankruptcy Court referred to simply "authorizes SWCC to object to any assignment of Bradlees' interest in the Premises 'not specifically permitted' by the Settlement Agreement, and expressly authorizes Bradlees to object to any future conduct of SWCC 'not specifically permitted' by the Settlement Agreement. It does no more ." *Id.* at 23 (quoting Settlement Agreement ¶ 6). *Second,* SWCC argues that the Bankruptcy Court's interpretation is incompatible with "common sense and any rational business purpose SWCC could have been seeking to achieve" in the Settlement Agreement. *Id.* at 24. It

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

reasons that, because SWCC was bargaining for restrictions on Bradlees' right to use the Premises and assign its occupancy rights in the Premises during its pending Chapter 11 case, it would have been illogical for SWCC to have agreed to a provision that explicitly reserved Bradlees' right to disregard those restrictions in the future. *See id.*

**\*13** A thorough review of the Settlement Agreement leads to the inescapable conclusion that it contained neither an explicit reservation nor a waiver. The Settlement Agreement states, in relevant part, that Bradlees has not waived its right *"to object* to future conduct or events that are *not specifically permitted"* by the Agreement. Settlement Agreement ¶ 6 (emphasis added). Because the Assignment Restrictions *are* specifically permitted in the Agreement, this language cannot be construed as an explicit reservation of the right to object to those restrictions.

At the same time, there is no indication that Bradlees explicitly waived its right to invoke section 365(f) in the future. SWCC bears the burden of proving Bradlees' "unmistakable and unambiguous" intent to waive its rights. *In re Jamesway,* 201 B.R. at 77. This burden must be strictly enforced in the context of section 365(f), where Congress has taken a strong stance against assignment restrictions that hinder debtors' rehabilitation efforts. *See In re Standor Jewelers West, Inc.,* 129 B.R. 200, 202 (9th Cir.1991); *In re U.L. Radio Corp.,* 19 B.R. 537 (Bankr.S.D.N.Y.1982) (noting that section 365(f) reflects the "express policy of Congress favoring assignment"); *In re Howe,* 78 B.R. at 231 ("[Section 365(f)] reflects the express Congressional policies favoring assumption and assignment of executory contracts and leases ..."); *Robb v. Schindler,* 142 B.R. 589, 591 (D.Mass.1992) (noting that section 365(f) voids anti-assignment clauses that restrict the ability of the debtor to realize the maximum value of its lease upon assignment). SWCC has argued persuasively that Bradlees could only have intended that the Assignment Restrictions would apply to future assignments. *See* Appellant Brief at

23-24. However, SWCC has not provided any evidence that Bradlees also intended to waive its right to invoke section 365(f) to avoid these restrictions in subsequent bankruptcy proceedings.[FN6] Accordingly, this Court declines to infer that such a waiver exists.[FN7]

> FN6. SWCC cites a number of cases in which courts have enforced earlier, court-approved settlement agreements waiving a debtor's right to the automatic stay or other rights under the Bankruptcy Code. *See* Appellant Mem. at 24-26. However, in each of those cases, the court-ordered agreement contained an explicit waiver of a specific section of the Bankruptcy Code. *See, e.g., In re Springpark Assocs.,* 623 F.2d 1377, 1379 (9th Cir.1990) (court-ordered stipulation explicitly referred to "automatic stay issued pursuant to Rule 12-43, Rules of Bankruptcy Procedure"); *In re Atrium High Point Ltd. Partnership,* 189 B.R. 599, 603 (Bankr.M.D.N.C.1995) (court-ordered agreement explicitly stated that debtor would not oppose any motion "seeking relief from or modification of the automatic stay of 11 U.S.C. § 362(a) in any subsequent case ..."). In contrast, the Settlement Agreement in this case makes no mention of section 365(f).

> FN7. Significant portions of the parties' memoranda of law are spent debating Bradlees' contention that the *Bradlees I* debtors could not have waived the right of the *Bradlees II* debtors to invoke the protections of section 365(f) because the *Bradlees I* debtors are "separate and distinct" from the *Bradlees II* debtors. *See* Appellee Brief at 21-26. Because I find that there was no waiver, I need not address this argument.

IV. CONCLUSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23
**(Cite as: 2001 WL 1112308 (S.D.N.Y.))**

For the forgoing reasons, Bradlees was entitled to invoke the protections of section 365(f) to invalidate the Assignment Restrictions in the Settlement Agreement. Accordingly, the Bankruptcy Court's decision and order overruling SWCC's objection to the Lease Designation Agreement is affirmed.

S.D.N.Y.,2001.
In re Bradlees Stores, Inc.
Not Reported in F.Supp.2d, 2001 WL 1112308 (S.D.N.Y.), 47 Collier Bankr.Cas.2d 23

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.