WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
Lehman Brothers Holdings Inc. and Lehman
Brothers Special Financing

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>　　　　　　　　　　　　　　　Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| In re:<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>　　　　　　　　　　　　　　　Debtor. | Chapter 11 Case<br>No. 08-13888 (JMP) |
| BANK OF AMERICA, N.A.,<br><br>　　　　　　Plaintiff and Counterclaim-Defendant,<br><br>　v.<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>　　　　　Defendant and Counterclaim-Plaintiff, and<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>　　　　　　　　　　　　　　Defendant. | Adv. Proc. No.<br>08-01753 (JMP) |

## DEBTORS' POST-HEARING MEMORANDUM

Defendant/Counterclaim-Plaintiff Lehman Brothers Holdings Inc. ("Lehman" or "LBHI") and Defendant Lehman Brothers Special Financing ("LBSF") respectfully submit this Post-Hearing Memorandum, addressing the evidentiary hearing held on January 29 and February 1 and 2, 2010 ("Evidentiary Hearing"). As the Court requested, this memorandum will identify significant points that were established at the Evidentiary Hearing and explain how the testimony supports specific assertions made in the Debtors' prior submissions and the conclusions that the Debtors believe that the Court should reach.[1]

## PRELIMINARY STATEMENT

The Court must determine whether Bank of America ("BOA" or the "Bank") improperly seized cash collateral from an account pledged exclusively for overdraft protection, in order to set off debts completely unrelated to overdrafts. Before the Evidentiary Hearing was held, the Court already had before it an extensive documentary record submitted in connection with the summary judgment motions. At the December 10, 2009 oral argument of those motions, the Court noted one question that it found particularly "troublesome" regarding the Bank's conduct: "Was this [purported right of setoff] an issue that they simply ignored completely [during the negotiations]? Or was this an issue as to which they were, to use the term we used during argument, waiting in the weeds? Frankly, either interpretation is unflattering. *And I want to know more about this factually before delving into the legal issues*." (Transcript of Oral Argument ("Oral Arg. Tr.") at 140:3-8, 140:14-17 (Dec. 10, 2009).)

The Court also wanted to explore BOA's reliance on Section 14—the Security Agreement's boilerplate "Other Rights" provision. The Court pressed BOA's counsel on December 10 to explain what in Section 14 had been "specifically negotiated" that might support

---

[1] Debtors understand that the Unsecured Creditors Committee will be filing a joinder in support of this brief.

the Bank's position, but it got no direct answer. (Oral Arg. Tr. at 77:7-9.) So, in ordering the Evidentiary Hearing, the Court indicated that it was particularly interested in hearing what the BOA witnesses had said and what their intent was regarding a right of setoff, both during the negotiations of the Security Agreement and during the events that led up to it. (Oral Arg. Tr. at 59:12-14; 139:24-140:2.)

BOA, however, did not provide any new information or evidence at the Evidentiary Hearing concerning the parties' or even its own intent with respect to setoff. It did not even try to develop testimony to show that both parties understood or intended that BOA would have a broad right of setoff during the events leading up to the execution of the Security Agreement. In fact, it made no attempt to establish that BOA unilaterally believed when the deal was struck that BOA retained a broad right of setoff with respect to any indebtedness other than overdrafts. And the reason, of course, is that there is no evidence remotely supportive of BOA's position on this topic. Setoff rights were the furthest thing from the parties' minds, because this deal was always solely about providing BOA with the protection it demanded from potential overdrafts, and there was a clear, explicit understanding, captured by the plain language of the Security Agreement, as well as in the Bank's internal documents, that the pledge account could be used for nothing else.

Instead, in his opening statement on January 29, BOA's counsel introduced the theory that the parties had negotiated a "two-part deal"—a theory never articulated in the hundreds of pages of briefs that BOA had previously filed, or during the December 10 hearing. One "part" of the negotiations supposedly concerned limiting the collateral pledge and the security interest to overdraft debt; the second "part" supposedly ensured that this limitation would not affect the deposit account, which would, according to BOA, be subject to an unfettered right of setoff. But the second part of the deal was a complete fiction. As the testimony at the Evidentiary Hearing

immediately confirmed, the "second" part was never even discussed, let alone negotiated and agreed upon. Accordingly, BOA can point to no contemporaneous signed writing memorializing the "second" part of the deal, as required by the Security Agreement's unambiguous integration clause. And once again, as Lehman had explained at the December 10 hearing, as important as what BOA's witnesses and counsel have said is what its witnesses did not testify to but would have if BOA had a defensible position in this case.

Thus, on their direct examinations:

- Not one of BOA's four witnesses testified that there was even any unilateral belief on the part of BOA that the Bank would have the right to take the collateral for any purpose other than to cover overdrafts;

- There was no testimony that any BOA witness ever uttered a word to anyone from Lehman—or even internally—to suggest that the Bank believed it had a right of setoff that permitted it to apply the collateral to indebtedness other than overdrafts;

- While BOA had previously argued that, although the "pledge" and the security interest provided by the Security Agreement were limited solely to overdrafts, the "pledge account" supposedly was not. Randy Sparks, BOA's inside lawyer and chief negotiator, confirmed that there was no distinction between the "pledge" and the "pledge account." (Evid. Hearing Tr. (Randolph Sparks testimony) at 165:7-25, 179:17-180:7 (Jan. 29, 2010));[2] and,

- None of BOA's witnesses testified to counsel's two part deal—it was, as it appeared, pure fiction, and contradicted by the documents whose accuracy BOA's witnesses acknowledged.

Moreover, on cross examination BOA's witnesses *expressly admitted* that:

- The sole purpose of the collateral pledge demanded by BOA was to provide BOA with protection from the risk of potential overdrafts; no other risk or permissible use of the collateral was ever discussed. (Evid. Hearing Tr. (Sally Hawk testimony) at 97:14-19, 98:5-10 (Jan. 29, 2010); Sparks at 168:8-11; Evid. Hearing Tr. (James Dever testimony) at 212:20-22 (Jan. 29, 2010).)

- None of BOA's negotiators ever said anything to Lehman to suggest that the Bank believed it had a right to access the collateral for any debts other than overdrafts. (Hawk 98:4-10; Sparks 164:9-14; Dever 212:14-22.)

---

[2] After the first full cite for each witness, giving the date on which they testified, each witness's testimony will be cited by "[Witness Surname] at" followed by the pin cite.

- In fact, they admitted that there was never any discussion whatsoever between the Bank and Lehman with respect to any right of setoff. (Sparks at 78:19-24.)

- There was never any discussion whatsoever of the "Other Rights" provision (Sparks testimony at 147:5-12), and no BOA witness ever suggested that it would provide BOA with a right to set off the collateral against debts other than overdrafts. (Sparks testimony at 78:19-24; Evid. Hearing Tr. (Stirling Fielding testimony) at 50:10-12 (Feb. 1, 2010); Evid. Hearing Tr. (Andrew Yeung testimony) at 78:19-24, 84:16-21 104:2-15 (Feb. 1, 2010); Evid. Hearing Tr. (Emil Cornejo testimony) at 154:8-12 (Feb. 1, 2010); Evid. Hearing Tr. (Paolo Tonucci testimony) at 175:24-176:2, 188:2-9, 206:20-24 (Feb. 1, 2010).)

- To the contrary, Kathleen Gowin confirmed the accuracy of her recap noting the "understanding," which Lehman had explicitly communicated to BOA, that "[t]he *pledge account* is for overdraft exposure and not broader indebtedness." (Evid. Hearing Tr. (Kathleen Gowin testimony) at 222:22-223:6, 225:22-226:14 (Jan. 29, 2010); Exhibit 34 (emphasis added).) Sparks later confirmed to Lehman that the deposit account would be "dedicated solely to this collateral pledge" and "earmarked as collateral." (Exhibit 42.)

Consistent with these admissions, Lehman's witnesses confirmed what Lehman has maintained from the outset: the pledge of collateral was given exclusively to cover overdraft debt. (Tonucci at 205:3-8; 161:17-24.) No other permissible use of it was ever mentioned, and no right of setoff was intended or, indeed, even discussed. (Fielding at 50:10-12; Yeung at 78:19-24, 84:16-21, 104:2-15; Cornejo at 154:8-12; Tonucci at 175:24-176:2, 188:2-9, 206:20-24.)

Finally, the testimony of both parties' representatives at the hearing matched the documentary record previously presented to the Court: there is not a single BOA document—including the lengthy deck prepared as part of the Bank's overdraft initiative, BOA's handwritten notes and typed recaps of the parties' negotiations, and the numerous internal BOA emails in the record—that even remotely supports the contention that BOA believed it could set off the pledged funds against debts other than overdrafts, much less that it ever communicated such a belief to Lehman. That BOA never did any of these things is now undisputed.

As detailed below, the hearing provided definitive answers to the questions the Court raised, and confirmed that: (1) both parties clearly understood and intended that the pledged

collateral could be used solely to cover potential overdrafts, just as the heavily-negotiated definition of "Indebtedness" made clear; (2) none of the BOA negotiators believed—much less informed Lehman of any belief—that Section 14 of the Security Agreement conferred or preserved any broad right of setoff permitting the Bank to use the collateral to cover indebtedness other than overdrafts; and (3) as the Court suspected on December 10, the Evidentiary Hearing unequivocally confirmed that after "engag[ing] in a negotiation that was focused in a very, very determined way, on a particular business issue, . . . [t]he 500 million dollars that was posted in accordance with the [S]ecurity [A]greement . . . has been taken for another purpose . . . in connection with a derivative transaction" (Oral Arg. Tr. at 140:19-141:1)—contrary to the parties' intent and in flagrant violation of both the Security Agreement and the automatic stay

Moreover, the Evidentiary Hearing confirmed that all of the relevant facts in this case are exactly as Lehman presented them in its prior submissions to the Court. (Debtors' Motion for Summary Judgment ("Debtors' MSJ") at 7-28, Debtors' Statement of Undisputed Facts.) And, as Lehman's briefs on the cross-motions for summary judgment demonstrate, controlling law leaves no alternative except to require BOA to return the confiscated funds together with statutory interest.

## POINTS ESTABLISHED BY THE EVIDENTIARY HEARING

The circumstances leading up to the negotiation of the Security Agreement are addressed in Point 1 below. As BOA's own witnesses testified, and Lehman's witnesses confirmed, BOA never once mentioned any purpose for demanding the pledged collateral—or any potential *use* of that collateral—except to secure overdraft risk. Point 2 addresses the evidence of the parties' intentions during the negotiations. After the Evidentiary Hearing, there can be no dispute that Lehman understood the Security Agreement to limit BOA's right to apply the funds in the

pledged account solely to overdraft debt, and that BOA knew of that understanding and *agreed with it*.[3]   At no time during the negotiations did BOA discuss with Lehman—or even discuss internally—the possibility that the funds could be applied to debts unrelated to overdrafts. Finally, Point 3 considers what remains of BOA's *post hoc* litigation position that it possessed a right to set off the pledged funds against any Lehman debt.   The Evidentiary Hearing conclusively put that claim to rest, confirming that no one at BOA believed or intended that the Bank would retain a right of setoff after executing the Security Agreement.

## POINT 1

### The Events Leading Up to the Negotiation of the Security Agreement.

    1.1   ***BOA demanded that Lehman provide collateral in a pledged account for one reason alone—to secure overdraft risk.***

        1.1.1   BOA's demand for a cash deposit of hundreds of millions of dollars was the direct product of the Bank's "OD Risk Mitigation Plan."[4]   Debtors' MSJ at 23, Debtors' Reply at 4, 6.

- BOA was concerned about overdrafts in the broker-dealer sector.  (Hawk at 47:8-22.)

- Hawk led the project to determine how to mitigate the risk of overdraft exposure to such overdrafts (Hawk at 48:17-75:7), while simultaneously participating in broader risk mitigation projects.  (Hawk at 45:11-46:17, 47:23-25.)

- Hawk determined that "[i]t was important for [BOA] to mitigate the risk associated with the daylight [overdraft] limits," (Hawk at 61:11-13), and that the Bank required protection (Hawk at 63:9-19 ["we knew we were generally uncomfortable with the exposure [to Lehman's overdrafts] . . . we were

---

[3] At the December 10, 2009 oral argument, the Court observed:  "I don't know if it's stipulated or not that that was what the negotiation was about, that there were certain general provisions that were rejected, that there was an intent on the part of Lehman Brothers to limit any right of offset to overdrafts and nothing else, it seems to me that that's a disputed issue potentially." (Oral Arg. Tr. at 59:4-9.)  As demonstrated *infra*, whatever potential dispute may have existed then has been conclusively resolved now:  Lehman did intend to limit the use of the pledged funds to overdraft debt, and BOA knew of that intent and assented to it.

[4] Numbered paragraphs address significant factual assertions or legal arguments in the parties' briefs or otherwise made by counsel.  The ensuing text set forth in bullet points addresses testimony from the Evidentiary Hearing that bears on those claims.

looking for some kind of protection"].)

- BOA decided to "request deposits that would be pledged by [Lehman] to [BOA] and *used as collateral against future overdrafts*." (Dever at 209:17-210:5 (emphasis added); *see also* Exhibit 94 [same]; Exhibit 202 ["securing collateral *to offset potential ODs*"] (emphasis added).)

## 1.2 *BOA never mentioned any purpose or use of the collateral apart from overdraft risk.*

1.2.1    At no time did BOA discuss with Lehman any reason for its demand for collateral except to cover overdraft risk.  Debtors' MSJ at 23, Debtors' Reply at 3, 6.

- BOA's own witnesses testified that overdraft exposure was the only risk ever discussed with Lehman to explain the Bank's demand for the pledged collateral.  (Hawk at 96:21-97:19; Dever at 205:7-15, 212:7-22, 215:22-25.)

- Lehman's witnesses agreed.  (Fielding at 22:10-12; Cornejo at 135:19-21, 136:18-21, 138:21-23, 139:3-6; Tonucci at 201:16-21; Evid. Hearing Tr. (Janet Birney) at 25:3-8 (Feb. 2, 2010); cf. Yeung at 64:19-23, 65:17-21 [no other purpose discussed during negotiations].)

1.2.2    Nor did BOA ever suggest that the collateral could be used to set off a debt unrelated to overdrafts.  Debtors' MSJ at 23, Debtors' Reply at 3, 6.

- BOA's witnesses also testified that the only use of the collateral ever discussed with Lehman was to cover overdrafts.  (Hawk at 98:5-10; Dever at 212:20-22; cf. Sparks at 168:17-20, 169:8-12, 174:22-175:2, 175:8-12 [no other use discussed during negotiations].)

- Again, Lehman's witnesses confirmed this account, explaining that "[a]t no stage on any of the calls did anyone from Bank of America suggest anything other very explicitly than this [pledge account] was to compensate for overdrafts across the cash accounts."  (Fielding at 25:19-21; *see also id.* at 20:14-18; Cornejo at 136:22-25, 138:21-23, 139:7-18; Birney at 39:5-6; *cf.* Yeung at 79:15-18 [no other use discussed during negotiations].)

- Accordingly, Lehman understood that the cash deposit requested by BOA "was intended to cover intraday overdrafts," and nothing else.  (Tonucci at 205:3-8; 161:17-24.)

1.2.3    BOA's narrow focus on overdraft risk in its discussions with Lehman was no accident.  One unnamed person within BOA contemplated broadening its message to seek protection beyond security for overdrafts, but BOA *expressly rejected* that idea, and chose instead to focus on overdraft risk alone.  Debtors' Reply at 6 n.4.

- Dever understood that the Bank might seek protection against risks other than overdrafts. (Dever at 212:4-6, 215:22-216:6.) But Hawk "tempered it significantly to only focus on the [overdraft] issue." Accordingly, Dever "remain[ed] focused on . . . seeking a deposit for the overdraft" in communicating the Bank's demand to Lehman. (Dever at 205:7-15, 215:18-21.)

- Neither Dever nor anyone else at BOA mentioned to Lehman any concern apart from overdrafts when discussing BOA's demand for collateral. (Hawk at 97:14-19, 98:5-10; Sparks at 164:9-14, 168:8-11; Dever at 212:20-22; Fielding at 20:14-18, 22:10-12; Cornejo at 135:19-21, 139:15-18; Tonucci at 205:9-12; Yeung at 79:15-18.)

**1.3    *BOA would accept only a pledge of collateral, not an ordinary deposit account, to reduce its overdraft exposure.***

1.3.1    Lehman initially proposed depositing funds in an ordinary (or "vanilla")

account, but BOA insisted on a pledge of collateral instead.  Debtors' Reply at 27.

- Pledge accounts support "particular product[s]," such as overdraft lines, and are subject to liquidity restrictions. (Gowin at 230:14-231:12; Hawk at 66:8-12.)

- The pledge account at issue here was, according to BOA, "particularly to support daylight overdraft limits at Bank of America." (Gowin at 231:18-25.)

- BOA believed that only a pledge account would adequately mitigate overdraft risk because of the restrictions on Lehman's ability to withdraw the funds. (Hawk at 64:11-17, 65:7-11; 66:8-12, 74:7-16 ["My view was that if we didn't have some kind of pledge associated with that cash it would not mitigate the risk fully, because of . . . how Lehman could have withdrawn the funds during the day."]; Fielding at 47:1-25, 49:17-18, 49:24-50:5.)

- This was not how Lehman wanted to proceed.  It first tried to dissuade BOA from insisting on its unprecedented demand for a cash deposit as a condition of permitting intraday overdrafts. (Dever at 192:24-193:2, 194:11-13.)

- When that failed, Lehman asked whether BOA "would consider a vanilla account . . . *without a specific pledge*." (Gowin at 221:21-23 (emphasis added); Exhibit 29.)

- A "vanilla" or plain demand deposit account ("DDA") is one "where within the terms of the agreement the customer can generally withdraw the funds at any time." (Sparks at 104:15-19.)

- BOA rejected the option of a plain cash account because "that was not a structure [it was] looking for." (Sparks at 131:17-23; Hawk at 75:3-7.)  In particular, BOA did not believe that a cash deposit would be sufficient because Lehman could have freely withdrawn the funds. (Hawk at 64:21-25 ["if we had just a cash deposit . . . at any minute of any day they could have removed that cash from the account"].)

- Internally, BOA discussed a number of ways to reduce its overdraft exposure to Lehman (Hawk at 56:8-22), but the Bank rejected every option other than a pledge of cash collateral. (Hawk at 64:3-17; 79:11-20; 80:21-81:10; 82:1-4.)

- Thus, BOA informed Lehman "that the bank will only accept a pledged account." (Gowin at 222:17-223:1.)

- Accordingly, Lehman's understanding when the account was established "was that these weren't regular cash accounts at all. They were pledged, they were restricted." (Fielding at 56:14-20.)[5]

1.3.2    The three-day waiting period before Lehman could access the pledged funds was a significant restriction, by both parties' accounts. Debtors' Reply at 29-30.

- With a typical major cash account, Lehman cash managers would view the account hourly and could move money, literally, in seconds to manage intraday balances. (Fielding at 19:19-24 [move in two seconds], 20:5-7 [look at hourly].)

- The three-day hold on this account gave BOA control over releasing the funds—control that it needed "to ensure that it didn't end up in an overdraft situation." (Hawk at 66:8-12.)

- In addition to the three-day hold, another withdrawal restriction was that Lehman "could not reduce the balance of the collateral below the level of any outstanding overdrafts at the time." (Sparks at 176:21-177:1.)

- Accordingly, Lehman understood "that these weren't regular cash accounts . . . they were restricted." (Fielding at 56:14-20.)

- BOA agreed. Sparks testified that withdrawal restrictions are inconsistent with a regular *demand* deposit account, the defining feature of which is that the deposited funds are available on demand. (Sparks at 104:17-19; 159:21-23 ["Q. And so [the limit placed on the depositor's ability to withdraw funds] is inconsistent with the concept of a demand deposit account, correct? A. In general, yes."]; 176:21-177:1.)[6]

1.4    **BOA forced Lehman to supply the funds for the collateral pledge in just three business days.**

---

[5] This testimony from Fielding, who, as cash manager, the Court noted was a particularly suitable witness on this topic, contradicts BOA's argument that the account holding the collateral was just a "regular DDA," the most basic form of cash account.

[6] Lehman struck the sentence in Section 5 of the original draft that Sparks correctly described as inconsistent with a DDA, because it prohibited withdrawal without the Bank's prior written consent. (Sparks at 159:4-23, 183:13-24; Yeung testimony at 70:2-7.) But BOA inserted another restriction equally inconsistent with a DDA instead—the three-day notice requirement—which was included in the executed version. (Sparks at 176:2-9; Yeung at 82:3-8; Ex. 37.)

1.4.1    BOA forced Lehman to provide hundreds of millions of dollars of collateral within days, and was completely inflexible as to the timing.  Debtors' MSJ at 14.

- BOA was unwavering in its August 25 deadline for supplying collateral. (Dever at 198:18-25 [deadline]; 201:13-18 [affirming deadline]; 201:24-202:5 [meeting deadline]; 210:15-21 [no flexibility], 212:25-213:6, 213:12-15, Exhibit 217 ["unwavering"]; Sparks at 164:5-14.)  *See also* Debtors' MSJ at 12, 14, 17.

- The deadline was enforced by the threat that, without the pledged collateral, BOA would cut Lehman's daylight overdraft limit to zero on the morning of August 25th.    (Sparks at 157:22-158:8.); *see also* Debtors' MSJ at 13, Debtors' Reply at 30.

- The looming deadline created enormous pressure on Lehman because intraday overdraft credit is the "life-blood of the cash management team."  (Fielding at 8:17-25, 21:11-14, 22:21-23:5 ["we did have no option but to put this money on deposit, or to lose all of our intraday credit lines"].)

## POINT 2

### The Negotiation of the Security Agreement

2.1    *During the negotiation of the Security Agreement, BOA acceded to Lehman's position that the pledged collateral could be applied only to overdraft debt.*

2.1.1    The terms of the Security Agreement were agreed upon during accelerated negotiations, held specifically for the purpose of providing security for overdrafts, and the Court noted this "significant point" during argument in December.  (Debtors' MSJ at 14; Oral Arg. Tr. at 58:25-29:3.)  The definition of "Indebtedness" in the Security Agreement was concededly the "sticking point" and the "focus of the debate" in those negotiations.  BOA Opp. at 2.

2.1.2    BOA initially proposed a broad definition of "Indebtedness," which would have allowed the Bank to use the pledged funds to cover any Lehman indebtedness.  Debtors' MSJ at 16.  But when Lehman rejected this proposal, BOA immediately acquiesced, itself redrafting the Indebtedness definition to reflect a narrow focus on overdrafts, consistent with the parties' prior discussions.  Debtors' MSJ at 20, Debtors' Reply at 9.

- The definition of "Indebtedness" that BOA first proposed in the initial draft of the Security Agreement would have permitted the Bank to apply the collateral to all debts and liabilities of Lehman, its subsidiaries, and affiliates.  (Sparks

at 159:9-12, 159:24-160:3.)

- Lehman rejected this definition because it did not conform to the parties' discussions as to the scope of the pledge, which, per a call earlier that day, was limited to overdrafts. (Yeung at 70:2-7; Sparks at 140:23-141:11 [definition of Indebtedness was primary change].)

- BOA acquiesced, narrowing the definition of Indebtedness to refer only to overdrafts (Sparks at 145:11-12), and then accepting Lehman's addition of "*solely in respect*," and making a slight change in the wording to "solely in respect *of* overdrafts." (Sparks at 172:21-173:7.)

2.1.3   BOA also initially proposed that Lehman sign a pre-printed "Customer Agreement," which contained an express right of setoff as broad as the Bank's original definition of "Indebtedness."  Lehman rejected this proposal as well, commenting next to the setoff provision: "Shouldn't this section be governed by the Security Agreement?"  (Exhibit 36.)  After receiving Lehman's mark-up, BOA simply dropped the Customer Agreement from the negotiations, and it was not executed in any form.  Debtors' MSJ at 18-20, Debtors' Reply at 8-9.

- Yeung's comment on the Customer Agreement, *see* Exhibit 36, was an indication to BOA that it should either remove the paragraph or make it refer to the Security Agreement. (Yeung at 109:20-110:2.)

- Yeung did not specifically use the word "rejection," but "if you read the section and read the comment, it's clear that it's not an acceptance." (Yeung at 111:7-9.)

- BOA put up no resistance to Lehman's rejection of the setoff right in the Customer Agreement.  It never discussed the markup of the agreement with Lehman, provided another draft, or insisted on retaining the agreement at all. Instead, after Lehman's rejection of the setoff right, BOA simply abandoned the Customer Agreement altogether, and never suggested that it wanted a broad right of setoff, or believed that it had one, in any other form or document. (Yeung at 110:11-17.)

2.2   ***BOA knew that Lehman understood that the Security Agreement would preclude BOA from applying the funds in the pledge account to any debt other than overdrafts.***

2.2.1   Lehman explicitly told BOA that its revisions to the draft Security Agreement would reflect the "understanding[]" that "[t]he pledge account is for overdraft exposure and not broader indebtedness," as accurately noted in Gowin's recap of the parties'

August 22nd 3:00 p.m. teleconference, *see* Exhibit 34, which was distributed to the BOA

participants. Debtors' Reply at 9.

- Gowin's recap was an accurate, contemporaneous record of what was said. (Gowin at 219:2-6 [responsible for note-taking], 221:5-12 [contemporaneous], 222:22-223:6 [accurate].)

- Gowin specifically recalled that she "was writing exactly what [Yeung] was saying" when she recorded his statement that Lehman's mark-up would reflect the parties' "understanding" that the pledge account was to be for overdraft exposure and not broader indebtedness. (Gowin at 226:1-2 (emphasis added).)

- Gowin's recap conformed to Sparks' independent recollection of the parties' discussion. (Sparks at 138:5-12, 166:22-167:4.)

- After the recap was circulated to the BOA team, no one at BOA suggested that it was inaccurate. (Gowin at 227:24-228:2, 228:9-17.)

- Gowin's recap contained all significant points raised in the discussion (Gowin at 227:11-14.) No one at BOA suggested otherwise. (Gowin at 228:3-5.)

2.3 ***BOA <u>agreed</u> with Lehman's understanding of the effect of the Security Agreement.***

2.3.1 As BOA has conceded, BOA Opp. at 2, limiting the pledge account was

important to Lehman. The Bank not only understood Lehman's position during the negotiations,

it confirmed to Lehman that the pledged collateral would, as Lehman understood, be used solely

for overdraft protection. *See* Exhibit 42; Debtors' MSJ at 21-22, Debtors' Reply at 10.

- Sparks testified that BOA agreed with Lehman's position that the pledge account was for overdraft exposure and not broader indebtedness. (Sparks at 170:17-22.)

- Sparks wrote that the deposit account would be "dedicated solely to the collateral pledge" and "earmarked as collateral" in order to "distinguish [the account] from an operating account which has funds flowing in for a variety of purposes. And that was not the structure" intended here. (Sparks at 174:18-21.)

2.4 ***BOA never mentioned the possibility that it could use the pledged collateral to set off debts unrelated to overdrafts.***

2.4.1 There is nothing in the record to indicate that anyone at BOA even

suggested *internally*, or believed—and BOA certainly did not suggest *to Lehman*—that contrary

to the parties' understanding, the Bank could use the pledged collateral to set off Lehman debts unrelated to overdrafts.  Reply at 9-10.

- No BOA witness testified that the Bank believed, at the time it entered into the Security Agreement, that it had the broad right of setoff it relies on here.

- Not one BOA witness testified that anyone at the Bank even discussed internally a right of setoff, despite knowing that Lehman understood that the pledge account would be solely for overdraft protection, and not broader indebtedness.

- Witnesses from both sides of the deal consistently testified that BOA never discussed a right of setoff with Lehman.  (Sparks at 78:19-24; Fielding at 50:10-12; Yeung at 78:19-24, 84:16-21, 104:12-15; Cornejo at 154:8-12; Tonucci at 175:24-176:2, 188:2-9, 206:20-24.)

- Indeed, BOA never mentioned that it believed it could access the pledged collateral to cover any debt apart from overdrafts.  (Hawk at 98:4-10; Sparks at 161:11-15, 175:3-12; Yeung at 78:19-24, 79:15-18, 84:16-21; Fielding 20:14-18; Birney at 35:21-23; Cornejo at 154:8-12; Tonucci at 175:9-11, 175:24-176:2, 188:2-9 ["the intention was to have this linked to overdrafts, you know, intraday credit"], 206:20-24.)

### POINT 3

### The Evidentiary Hearing Conclusively Disposed
### of the Factual Predicates of BOA's Defense

3.1  *Section 14 of the Security Agreement was not intended to provide BOA a right to set off debts unrelated to overdrafts.*

3.1.1  BOA's defense in this case rests entirely on the claim that its confiscation of the pledged collateral was authorized by the Security Agreement's "Other Rights" provision, Section 14.  At the December 10, 2009 hearing, the Court observed:  "Bank of America . . . seeks cover in general language of the security agreement.  *They're going to have to do better than that during the evidentiary hearing to convince me that they're right*."  (Oral Arg. Tr. at 141:1-5 (emphasis added).)

3.1.2  But BOA did *worse* than that during the evidentiary hearing.  Once again, most telling is the evidence that BOA did *not* introduce:  it presented no testimony, no document—no evidence of any kind—that BOA believed, even unilaterally, that Section 14

provided it with a right of setoff.  Needless to say, had BOA actually believed the Security Agreement gave it a right of setoff, as it now claims, such evidence would have figured prominently in the testimony of the Bank's witnesses (and its prior briefs).

- BOA has conceded that interpreting Section 14 to allow a right of setoff would render the definition of "Indebtedness"—admittedly, the focus of the negotiations—"meaningless *here*."  BOA Opp. at 2.

- Yet Sparks never suggested to Yeung that BOA had a right of setoff or that Section 14 had anything to do with setoff rights.  (Sparks at 161:11-15.)

- In fact, Sparks admitted that there was no discussion of Section 14 (Sparks at 147:5-12), and Yeung agreed.  (Yeung at 80:11-19.)

- Sparks also testified that he did not intend the retention of Section 14 to respond in any way to Yeung's handwritten comment on the pre-printed Customer Agreement, rejecting a right of setoff.  (Sparks at 147:1-4.)

- Similarly, Yeung did not understand the retention of the provision to respond to his comment on the Customer Agreement.  (Yeung at 112:22, 113:21-25.)

3.1.3   In light of BOA's complete failure of proof on the critical issue of the parties' intent regarding Section 14—one on which the Court specifically wanted to hear evidence (Oral Arg. Tr. at 139:24-140:2)—it is now undisputed that neither party believed or intended that the Bank would have a right of setoff, or any right to use the collateral for debts unrelated to overdrafts.

3.2   ***Contrary to BOA's contentions, there was never a distinction drawn between the "pledge" and the "pledge account."***

3.2.1   BOA's Opposition to Lehman's summary judgment motion was based on the contention that even though the "pledge" and the security interest created by the Security Agreement were strictly limited by the contractual definition of "Indebtedness," *i.e.*, debts "solely in respect of overdrafts," the "pledge account" supposedly was not—such that the Bank retained a broad right of setoff entitling it to use the collateral pledge to cover indebtedness completely unrelated to overdrafts.  But BOA's own witnesses rejected counsel's absurd attempt

to draw this false distinction between the "pledge" or the security interest, on the one hand, and the "pledge account," on the other. Reply at 7-8.

- Sparks freely admitted during his direct testimony that the distinction relied on by BOA could not be drawn. (Sparks at 165:7-10 ["Q. [I]t was the pledged account, not the security interest, [that was exclusively for overdraft debt,] correct? A. *I don't think you can separate the pledge account and the security interest*."] (emphasis added), 165:16-25, 179:17-180:7.)

- During the contract negotiations, Gowin's recap of the parties' teleconference noted the "understanding" that the "*pledge account*"—not merely the security interest or the "pledge"—was for overdraft exposure, not broader indebtedness. (Gowin at 228:9-12; *see also* Exhibit 34.)

- Gowin recorded Yeung's exact words. (Gowin at 226:1-2, *see supra* ¶ 2.2.)

- Gowin confirmed that her recap was an accurate record of the calls, and no one at BOA ever suggested otherwise or told her that there was no such understanding (Gowin at 227:15-17, 228:9-18; Sparks at 168:12-169:12.)

- Indeed, Sparks confirmed that BOA *agreed* with Lehman's understanding. (Sparks at 170:17-22, *see supra* ¶ 2.3.)

3.3 **There was no "two-part deal," as BOA's counsel claimed for the first time at the Evidentiary Hearing.**

3.3.1 BOA's counsel introduced a new argument—for the first time, after extensive discovery, briefing, and oral argument—at the Evidentiary Hearing. He claimed that there was "a two-part deal, a cash deposit in a regular deposit account and a limited security interest in the cash running in favor of the bank . . . . And each part of that two-part deal carried its own set of rights and obligations and characteristics." (Evid. Hearing Tr. at 13:18-23.)

3.3.2 Critically, counsel repeatedly promised in his January 29, 2010 opening statement that BOA would support its newly minted two-part deal theory with *evidence from the hearing*:

- "[H]ere, *the Court will see* that both parties . . . understood and negotiated the arrangement just that way." (Evid. Hearing Tr. at 13:15-18.)

- "[A]s *the Court will see*, those two parts of the deal shared one very important point of intersection in the negotiation between the parties: the other rights provision in the security agreement, Section 14." (Evid. Hearing Tr. at 14:7-10.)

- "With . . . Section 14, . . . as *the Court will see*, the parties agreed that the set

of rights and obligations associated with one part, the security interest, would not negate the rights and obligations associated with the other part, the deposit account." (Evid. Hearing Tr. at 14:11-18.)

3.3.3    But the Court saw none of this evidence because there was none to see, as BOA's "two-part deal" scenario was pure fiction.

3.3.4    The parties did not "understand and negotiate" a two-part deal. None of the witnesses knew a thing about it—or gave any testimony supporting it.

- Hawk, who was in charge of the overdraft initiative and fully aware of the negotiations with Lehman, particularly in the final stages, failed to provide any testimony regarding the alleged two-part deal. She never suggested that she was even aware of any two-part transaction, much less what its terms were or in what enforceable document they might have been contained.

- The same is true with respect to Dever, who communicated BOA's demand for collateral to Lehman, and Gowin, who accurately recorded all the significant points discussed and agreed upon by the parties.

- Sparks, who negotiated the Security Agreement, not only never mentioned any two-part deal, when asked the direct question whether it was the "security interest" or "the pledge account" that was solely for overdraft exposure, he answered: "But *I think those two sentences say exactly the same thing*." (Sparks at 165:16-23 [emphasis added].)

- Yeung, Lehman's principal negotiator, was likewise unfamiliar with the purported two-part deal, despite BOA's counsel's concerted efforts to evoke a recognition of it: "Q. [Y]ou knew that there would be two parts to [the deal], the security interest which was your focus and the cash deposit—the cash account which was going to be somebody else's focus, right? A. No. *I'm not aware of what that other process would have been*." (Yeung at 89:2-6 [emphasis added].)

- BOA's counsel nonetheless continued to try to implant through questioning a memory of something that never occurred: "Q. [T]here was another part, which was the establishment of the accounts to be created, pursuant to the security agreement, right?" (Yeung 89:17-18.) Yeung answered that "the setting up of the account *wouldn't be something a lawyer would do*." (Yeung at 89:19-20.)

3.3.5    Tellingly, BOA did not call any other witnesses who might have had knowledge of the second "part" of the deal—including when it was negotiated, what its terms were, or where it was memorialized.

3.3.6   The two-part deal theory is also foreclosed by the Security Agreement's integration clause, which provides that "this written Security Agreement and any other documents executed in connection with the Security Agreement represent the final agreement between the parties."  (Sec. Agmt. § 19 (emphasis added).)   It is undisputed that no other documents were executed in connection with the Security Agreement.  Thus, not only is there no person who could have negotiated the second "part" of the deal, there is no enforceable agreement that could reflect it.

- BOA failed to call any witness to testify as to the alleged "part two," including New York-based Janet Birney, who is still employed by Lehman and could have testified.

- The Wholesale Banking System (WBS) terms and conditions were not discussed with Lehman during the negotiations of the Security Agreement. (Sparks at 161:24-162:25.)

- Janet Birney never saw a copy of the terms and conditions during the relevant time period.  (Birney at 14:17-15:2.)

3.3.7   Similarly, there was no evidence that Section 14 was inserted as a "point of intersection" between the alleged two parts of the deal.  As already noted, *see supra* ¶ 3.1.2, Section 14 was never even discussed, so *a fortiori* it was not discussed in connection with any two-part deal.

3.3.8   Finally, the parties did not "agree" that the definition of "Indebtedness" would apply only to the security interest.  As already noted, *see supra* ¶ 2.3, they agreed that the "pledge account" would be exclusively for overdraft protection and not broader indebtedness.

3.4   ***After the Evidentiary Hearing, BOA's defense rests on three trivial and specious points.***

3.4.1   Because it is now absolutely clear that the parties never intended Section 14 to provide for a right of setoff, BOA's defense rests on only three points:  (1) that Lehman made a cash deposit; (2) that Section 14 was retained in the Security Agreement; and (3) that the

Security Agreement did not contain an explicit provision waiving a right of setoff. None of these need detain the Court.

3.4.2 The collateral was in the form of cash for one reason—so that it could effectively secure *overdraft* risk.

- A cash deposit was the *only* form of protection that BOA would accept, due to the liquid nature of the overdrafts themselves. (Hawk at 57:5-8.) No testimony suggested that BOA insisted on a cash deposit in order to secure risks unrelated to overdrafts.

- Moreover, the fact that the collateral pledge consisted of cash—or that it was deposited in an account labeled as a DDA—is meaningless: the issue is what the parties' intentions were concerning the purpose and permissible use of that pledge. And the intent of the parties to limit the use of that pledge, and the pledge account, solely to overdraft debt was spelled out explicitly in the Security Agreement upon which the Bank insisted, and has now been confirmed beyond dispute by the testimony at the Evidentiary Hearing.

3.4.3 As already noted, *see supra* ¶ 3.1, Section 14 was a boilerplate provision that was never even discussed and was not intended to provide a right of setoff.

3.4.4 Finally, it is hardly surprising that the parties did not include language explicitly "waiving" any purported right of setoff in the Security Agreement. Their entire course of dealings, the negotiation of the Security Agreement in particular, and the definition of "Indebtedness" all made clear that the pledged collateral was to be exclusively for overdraft protection.

## CONCLUSION

Lehman's earlier submissions identified six separate legal grounds, amply supported by the record and abundant legal authority, each of which independently requires the return of the pledged funds confiscated by BOA, along with statutory interest at 9 percent. BOA's efforts to resist these conclusions were never colorable, and they were conclusively demolished by the live testimony at the Evidentiary Hearing. Below we set forth the primary dispositive conclusions of law supporting each of the grounds asserted by Lehman, refer the Court to the points in Lehman's prior briefs addressing them, and direct the Court to the points in this submission and

the record of the Evidentiary Hearing that demonstrate each of them beyond dispute.

I.   BOA breached the Security Agreement by seizing Lehman's collateral to satisfy indebtedness unrelated to overdrafts.

    A.   The Security Agreement could and did preclude any right of setoff, as it expressly limited BOA's right to apply the collateral to debts solely in respect of overdrafts.  (Debtors' MSJ at 36-38; Reply at 14, 22.  Evid. Hearing:  *see supra* at ¶ 2.1.)

    B.   BOA knew of Lehman's understanding that the pledged collateral would be exclusively for overdraft debt, not broader indebtedness.   And BOA agreed with that understanding, and confirmed it to Lehman.  (Debtors' MSJ at 33, 36-38; Reply at 13-19.  Evid. Hearing:  *see supra* at ¶¶ 2.2, 2.3.)

    C.   Even if BOA had secretly intended to retain a general right of setoff, it would make no difference because BOA never communicated that intent to Lehman, despite knowing that Lehman's understanding was to the contrary.  And as BOA's counsel expressly conceded, only the parties' *manifest* intent is relevant.  (Debtors' MSJ at 32-35; Reply at 13-15.  Evid. Hearing (counsel's assertion):  *see supra* at ¶¶ 2.3, 2.4.)

    D.   Section 14 of the Security Agreement was not intended to, and did not, provide BOA with a general right of setoff.  BOA's contrary interpretation of Section 14 is legally impermissible because it would conflict with other, more specific provisions of the Security Agreement; render the key definition of Indebtedness meaningless; and be incompatible with the parties' entire course of dealings in connection with the pledge of collateral.  (Debtors' MSJ at 34-36; Reply at 19-24.  Evid. Hearing:  *see supra* at ¶ 3.1.)

    E.   BOA's attempt to find a right of setoff in unsigned agreements or practices is barred by the express Integration clause contained in Section 19 of the Security Agreement.  (Debtors' MSJ at 31.  Evid. Hearing:  *see supra* at ¶ 3.3.6.)

II.   In any event, BOA had no right of setoff as a matter of law where, as here, the parties intended that the funds would be pledged as collateral for a specific purpose, which BOA held in trust.  (Debtors' MSJ at 39-43; Reply at 26-32.  Evid. Hearing:  *see supra* at ¶ 1.1 and ¶ 3.4.2.)

III.   BOA also had no right of setoff as a matter of law because the parties' clear intent, embodied in the Security Agreement, was to establish the pledge account for the sole purpose of providing the Bank with protection from overdrafts, making this a "special purpose account," to which no right of setoff is attached.

    A.   Under New York law, the dispositive factor in determining whether an account is general or "special purpose" is whether the parties *intended* to create an account limited to a specific purpose—and here, the intent of the parties to do so is overwhelming and undisputed.  (Debtors' MSJ at 44; Reply at 32.  Evid. Hearing:  *see supra* at ¶¶ 1.1, 1.2, 2.1, 2.2, 2.3, 2.4.)

    B.   BOA rejected Lehman's proffer of a general (vanilla) account, insisting instead on a collateral pledge governed by an express Security Agreement.  (Debtors' MSJ at 49; Reply at 27-28.  Evid. Hearing:  *see supra* at ¶ 1.3.)

- The Security Agreement's significant restriction on Lehman's ability to withdraw the collateral, upon which BOA insisted, further confirms that this was not an ordinary, general account. (Debtors' MSJ at 47-48; Reply at 30. Evid. Hearing: *see supra* at ¶ 1.3.2.)

IV.     BOA has attempted to frame the question in this case as whether a setoff right was waived. Even putting aside that BOA never had a setoff right to begin with, any such right would have been waived by BOA's conduct, which was entirely inconsistent with an intent to retain a general setoff right, and which, to the contrary, demonstrated the Bank's intent and agreement to limit its right to apply the collateral solely to overdrafts. (Debtors' MSJ at 36-38; Reply at 25. Evid. Hearing: *see supra* at ¶ 3.4.4.)

V.      Given the express terms of the Security Agreement and the clear intent of the parties to limit BOA's right to apply the collateral solely to potential overdrafts, the Bank's appropriation of the collateral to cover indebtedness other than overdrafts, without seeking leave of the Court, constituted a clear and willful violation of the automatic stay.

    A.      Because BOA knew that its attempt to effect a setoff as to debts other than overdrafts would be, at the very least, extremely aggressive and subject to serious dispute, its confiscation of the pledged funds without first seeking leave from the Court was a clear and willful violation of the automatic stay provision. (Debtors' MSJ at 49-51; Reply at 37. *See also* Oral Arg. Tr. at 97-101 (Court noting that BOA acted "recklessly" and at its peril).)

    B.      BOA failed to present any evidence whatsoever to satisfy its burden of establishing that there are compelling circumstances sufficient to warrant retroactive relief from the stay. (Debtors' MSJ at 51-53; Reply at 44.)

VI.     Even if BOA could show that it had a right of setoff under the Security Agreement with respect to indebtedness other than overdrafts, the Court can and should deny the setoff as a matter of equity.

    A.      The Bank's setoff was contrary to the clear intent of the parties with respect to the use of the collateral that BOA coerced Lehman to provide. (Debtors' MSJ at; Reply at. Evid. Hearing: *see supra* at ¶¶ 1.1, 1.2, 1.4.)

    B.      The setoff was taken in clear and willful violation of the automatic stay. (Debtors' MSJ at 52; Reply at 44-46. Evid. Hearing: *see supra* at ¶ 2.2.)

    C.      Permitting the setoff would be patently unjust and would unfairly prejudice other creditors. (Debtors' MSJ at 58-59; Reply at 46-49. Evid. Hearing: *see supra* at ¶¶ 1.1, 1.2, 1.4, 2.3.)

For all of the foregoing reasons as well as those set out in Debtors' previous submissions to the Court, the Debtors respectfully request that the Court order the return of the $508,808,584.29 confiscated by BOA together with statutory interest at 9 percent from September 15, 2008, and any other remedy the Court deems just and necessary.

Dated: March 12, 2010
        New York, New York                    Respectfully submitted,


                                              By: /s/ Richard A. Rothman_____

                                              Richard A. Rothman, Esq. #RR-0507

                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, NY 10153-0119
                                              Telephone: (212) 310-8000

                                              Peter D. Isakoff, Esq. #PI-1614

                                              WEIL, GOTSHAL & MANGES LLP
                                              1300 Eye Street, N.W.
                                              Washington, DC 20005
                                              Telephone: (202) 682-7000

                                              *Attorneys for Debtor*
                                              *Lehman Brothers Holdings Inc. and*
                                              *Lehman Brothers Special Financing*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

POINTS ESTABLISHED BY THE EVIDENTIARY HEARING ............................. 5

POINT 1    The Events Leading Up to the Negotiation of the Security Agreement ................... 6

    1.1    BOA demanded that Lehman provide collateral in a pledged account for one reason alone—to secure overdraft risk ........................................................... 6

    1.2    BOA never mentioned any purpose or use of the collateral apart from overdraft risk .................................................................................................... 7

    1.3    BOA would accept only a pledge of collateral, not an ordinary deposit account, to reduce its overdraft exposure ............................................................. 8

    1.4    BOA forced Lehman to supply the funds for the collateral pledge in just three business days ..................................................................................... 9

POINT 2    The Negotiation of the Security Agreement ......................................................... 10

    2.1    During the negotiation of the Security Agreement, BOA acceded to Lehman's position that the pledged collateral could be applied only to overdraft debt ............................................................................................. 10

    2.2    BOA knew that Lehman understood that the Security Agreement would preclude BOA from applying the funds in the pledge account to any debt other than overdrafts ............................................................................... 11

    2.3    BOA agreed with Lehman's understanding of the effect of the Security Agreement. ......................................................................................... 12

    2.4    BOA never mentioned the possibility that it could use the pledged collateral to set off debts unrelated to overdrafts. ....................................... 12

POINT 3    The Evidentiary Hearing Conclusively Disposed of the Factual Predicates of BOA's Defense ................................................................................................... 13

    3.1    Section 14 of the Security Agreement was not intended to provide BOA a right to set off debts unrelated to overdrafts. ..................................................... 13

    3.2    Contrary to BOA's contentions, there was never a distinction drawn between the "pledge" and the "pledge account." ................................................. 14

    3.3    There was no "two-part deal," as BOA's counsel claimed for the first time at the Evidentiary Hearing .................................................................... 15

    3.4    After the Evidentiary Hearing, BOA's defense rests on three trivial and specious points .......................................................................................... 17

    CONCLUSION ............................................................................................ 18