FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------: | | |
| | : | Chapter 11 |
| In re | : | |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| ------------------------------------------------------------: | | |
| In re | : | Chapter 11 |
| | : | |
| | : | Case No. 08-13888 (JMP) |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : | |
| | : | (Jointly Administered) |
| | : | |
| Debtor. | : | |
| ------------------------------------------------------------: | | |
| BANK OF AMERICA, N.A., | : | |
| | : | Adversary Proceeding |
| Plaintiff and Counterclaim-Defendant, | : | |
| | : | Case No. 08-01753 (JMP) |
| | : | |
| v. | : | |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., | : | |
| | : | |
| Defendant and Counterclaim-Plaintiff, and | : | |
| | : | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : | |
| | : | |
| Defendant | : | |
| ------------------------------------------------------------: | | |

**MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY**
**JUDGMENT OF LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN**
**BROTHERS SPECIAL FINANCING INC. AND DENYING MOTION FOR**
<u>**SUMMARY JUDGMENT OF BANK OF AMERICA, N.A.**</u>

APPEARANCES

SHEARMAN & STERLING LLP
*Attorneys for Bank of America, N.A.*
599 Lexington Avenue
New York, NY 10022

> William J.F. Roll, III, Esq.
> Daniel H.R. Laguardia, Esq.
> Kristen M. Fitzmaurice, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc.*
767 Fifth Avenue
New York, NY 10163

> Richard A. Rothman, Esq.
> Kevin F. Meade, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc.*
1300 Eye Street, N.W.
Suite 900
Washington, DC 20005

> Peter D. Isakoff, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Official Committee of Unsecured Creditors*
51 Madison Avenue, 22nd Floor
New York, NY 10010

> James C. Tecce, Esq.
> Eric Kay, Esq.

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

As extensively documented in the Report of Anton R. Valukas, Examiner (the "Examiner's Report") (ECF Doc. # 7531)[1], a number of large commercial banks that had customer relationships with Lehman were becoming increasingly uneasy about the financial condition of Lehman Brothers Holdings Inc. ("Lehman" or "LBHI") during the summer of 2008.  These institutions separately pursued a variety of measures calculated to improve their positions and mitigate their respective exposures to the possible consequences of a Lehman failure.  Bank of America ("BOA") was one such institution.

The litigation before the Court deals with BOA's rights of setoff relating to a secured interest-bearing cash collateral account in the amount of $500 million that was posted by LBHI with BOA only a few weeks before LBHI filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]  In reviewing the evidence presented, the Court has focused close attention on some of the activities of BOA and LBHI during this prepetition period.  This evidence shows how one major bank responded to the brewing economic crisis and endeavored to protect itself.  In this instance, BOA was particularly worried about the risk of suffering potentially significant losses in the course of performing its customary role as Lehman's clearing bank with respect to multiple securities transactions handled by the bank each business day.

---

[1] The Examiner's Report noted that this litigation was pending but carefully avoided making any comments regarding the merits of the dispute that might influence the Court's deliberations.

[2] LBHI filed its petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 (the "Petition Date").

BOA, as one of Lehman's principal clearing banks, understood that temporary overdrafts would appear within the Lehman demand deposit accounts at various times during the banking day. These transitory negative balances were a natural occurrence in the deposit accounts of any financial services business routinely engaging in large scale brokerage and investment banking transactions. Due to timing variances and the numerous separate deposits and withdrawals on any given day, on occasion the accounts would reflect negative balances before the close of business. BOA would disregard any such negative balances as an accommodation to its customer. Based on experience, BOA relied on the cash management practices of its customer and reasonably expected that there would be a positive balance on deposit at the end of day. In effect, in continuing to honor checks at times when no funds were on deposit to cover advances, BOA momentarily extended unsecured credit to Lehman pending the clearance of deposits that would yield a positive balance at the end of the day.

These otherwise routine intra-day overdrafts[3] became a major preoccupation at BOA as a result of a $650 million overnight overdraft in one of the Lehman accounts at BOA that was discovered in July 2008. That unexpected attention-grabbing event, along with deepening apprehension about the state of the financial markets in general and Lehman in particular, caused BOA to review its relationship with Lehman and take action in August to better protect itself from the perceived risk of intra-day overdrafts of the magnitude that had just occurred.

[3] An intra-day overdraft is the term that describes the financial accommodation by a bank to its customer that permits checks written by the customer to clear throughout the banking day even at times when the account does not appear to have sufficient funds to cover those checks. This common practice amounts to a short-term extension of credit by the bank to its customer in the reasonable expectation that there would be positive balances in the account at the end of each banking day.

The current litigation between LBHI and BOA sheds light on actions taken by BOA to better protect itself from Lehman-related credit risk in August 2008, only a matter of weeks before LBHI filed for bankruptcy. That additional protection took the form of a newly-created and newly-funded cash collateral account subject to terms and conditions of a security agreement executed on August 25, 2008 following expedited negotiations.

The facts are undisputed.[4] LBHI and many of its subsidiaries had multiple cash management accounts with BOA including a demand deposit account that Lehman used for clearing securities trades. The relationship between BOA and Lehman was global, multifaceted and involved the transfer and reconciliation of vast sums of cash on a daily basis. Although Lehman theoretically had the discretion and ability to move its banking relationship elsewhere, in practical terms it would have been very cumbersome and time consuming to replace BOA. The relationship between LBHI and BOA was really too big to change.[5]

In July 2008, at a time of high anxiety in the global financial markets, BOA experienced the wake-up call of a $650 million overnight overdraft in one of its Lehman wholesale banking system checking accounts. Although this huge overdraft was

---

[4] The parties each filed motions for summary judgment premised on the purely legal nature of the dispute. At oral argument on December 10, 2009, the Court scheduled an evidentiary hearing that was held on January 29, February 1 and February 2, 2010 (the "Evidentiary Hearing") to obtain a fuller understanding of the facts surrounding the negotiation and execution of the security agreement including its boilerplate "Other Rights" provision.

[5] Despite some evidence in the record relating to the ability of LBHI to transfer its accounts to another large commercial bank, the Court concludes that such a move could not be accomplished efficiently without significant business interruptions. The parties recognized that commercial reality in their dealings with each other. For that reason, BOA had a great deal of leverage in making a demand for collateral and in imposing a tight timetable for completing the documentation and requiring the deposit of collateral.

traceable to a non-recurring error within Lehman's cash management system and promptly was cured, BOA understandably was unsettled by the occurrence and began to consider measures to protect itself from the risk that such a material overdraft might happen again, particularly at a time when LBHI was under increasing financial pressure. Although BOA had other exposures to the credit risk of LBHI, BOA focused its attention exclusively on managing the intra-day overdraft risk.

The evidence presented by the parties points to two opposing positions at the core of this dispute. First, BOA and LBHI negotiated a security agreement that indisputably had a single business objective in mind – mitigation of overdraft risk. Second, no one during the negotiations said a word about the possibility that cash collateral being set aside for overdraft protection might be used for any other purpose, but it is equally true that BOA never expressed any intent to waive any of its legal rights including the well-understood right of setoff. Thus, the question before the Court is whether the security agreement drafted by the parties, when fairly construed as a whole, allows cash collateral pledged for a specified purpose to be set off against other unrelated obligations owed by LBHI to BOA.

Given the procedural history, this becomes an all or nothing $500 million question for BOA and LBHI's estate. Either BOA is able to keep the cash that it has taken or the funds must be returned to the estate for eventual distribution to all creditors. In doing what it did, BOA made some surprisingly bold moves here, especially with respect to matters that are hardly free from doubt. When LBHI filed for bankruptcy relief on September 15, 2008, $500 million was then being held by BOA in a restricted Eurodollar account in its Cayman Islands branch, but no intra-day overdrafts were

outstanding at that time or thereafter.[6]  On November 10, 2008, BOA, without first

obtaining relief from the automatic stay imposed by the Bankruptcy Code and in alleged

reliance on the safe harbor language of section 362(b)(17) of the Bankruptcy Code, took

the money on deposit in that account for application against amounts allegedly owed by

LBHI to BOA arising out of certain entirely unrelated derivative transactions.[7]  BOA

thereafter promptly commenced this adversary proceeding seeking a determination that

its action in taking the funds was exempt from the automatic stay and not a stay violation

or, in the alternative, seeking retroactive relief from the stay with respect to the offset of

the funds.

    This deliberately aggressive and calculated strategy seems to be a current example

of the old aphorism that possession is nine-tenths of the law, but BOA's combative

approach has done nothing to alter the legal analysis as to the underlying issue.

Regardless of which party is the plaintiff here, the questions to be decided are purely

legal, namely, whether the funds taken by BOA were properly subject to being set off

under the circumstances and whether such a setoff is permissible under applicable law

without first obtaining stay relief.  BOA surely must have known that the setoff of the

disputed funds under these circumstances would be vigorously challenged and that it was

consciously assuming the risk of being found liable for violating the automatic stay.

---

[6] There is a discrepancy in the parties' records as to whether there were overdrafts
amounting in total to $5,039 across five LBHI accounts as of the Petition Date.  The
Court finds that such discrepancy is immaterial to the outcome of this matter.

[7] The derivative transactions are governed by a 1996 ISDA Master Agreement between
Nationsbank, N.A. (now BOA) and Lehman Brothers Special Financing Inc. ("LBSF"), a
subsidiary of LBHI, debtor in the above-referenced jointly-administered chapter 11 cases
and co-defendant in this adversary proceeding.  LBHI provided a guarantee in connection
with the ISDA Master Agreement.  BOA terminated the derivative transactions on the
Petition Date.  As of November 10, 2008, BOA alleged that, pursuant to the terms of the
ISDA Master Agreement, LBHI, as guarantor, owed it $1.9 billion.

Thus, the only additional question presented by the procedural posture is the consequence to BOA, if any, for acting at its peril and exercising self help based on the untested proposition that it had the right to set off the funds in the Eurodollar account without first having been granted the authority to do so. To the extent that the Court finds that BOA's actions were without legal justification, the Court also will need to fashion a remedy that may include the award of appropriate sanctions.

The Court concludes that the parties never intended to cash collateralize unspecified obligations of LBHI to BOA. The Evidentiary Hearing leaves no room for doubt on that subject. The term "Indebtedness" as used in the security agreement was narrowly defined to relate solely to claims for intra-day overdrafts and nothing more. That narrowing of the definition was consistent with BOA's objectives at the time to provide security for any intra-day overdraft exposure.

The indebtedness being secured would arise, if at all, as a consequence of the ever-changing cash balances within a dynamic cash management system. As such, the indebtedness was fleeting and might exist at one point during the day only to disappear when accounts settled and were reconciled at the end of the banking day. Even though the risk associated with these negative account balances was elusive and hard to predict or quantify, BOA became insistent that it be granted a security interest in $500 million of cash (originally, BOA wanted as much as $1 billion[8]) as a condition to providing ongoing intra-day overdraft advances for Lehman. The ultimatum was clear. BOA was not

_____

[8] The parties discussed the possibility of opening a so-called "plain vanilla" account in which LBHI would be able to withdraw freely any or all of the funds deposited with BOA. BOA did not like that idea and wanted to constrain the ability to remove funds. The result was a $500 million account subject to language of a negotiated security agreement that granted a security interest in the funds to BOA and imposed a notice requirement as a condition to withdrawing any funds from the account.

8

willing to accept the risk of ongoing discretionary intra-day overdrafts unless binding

documentation acceptable to the bank was in place by the time the Asian markets opened

on Monday, August 25, 2008.

As noted earlier, because of the complexity of LBHI's cash management systems,

accounts simply could not be moved quickly enough to another bank.  For that reason, in

demanding cash collateral before the opening of the markets within days of the start of

the negotiations, BOA was exercising palpable economic leverage that it recognized

would have a foreseeable adverse impact on the ability of LBHI to maintain its ordinary

business operations.  LBHI, at a time of increasing financial distress, found itself in the

coerced position of facing a demand for collateral that it could not refuse.  The setting

matters here and highlights how inequitable it would be for BOA to succeed in improving

its position relative to other creditors on account of the circumstances enabling it to exert

powerful leverage tied to Lehman's cash management practices.

The security agreement was negotiated by the parties under the stress of the

moment and with the added pressure of a fixed and very tight deadline.   LBHI really had

no choice.  If it did not acquiesce in BOA's specific demands for collateral, BOA

threatened to discontinue the practice of clearing checks if intra-day overdrafts occurred,

thereby causing potential serious disruption in LBHI's ability to function normally.  This

was the situation when LBHI signed the security agreement and delivered $500 million to

BOA as security for overdrafts.

The security agreement does not extend to indebtedness unrelated to overdrafts

and does not refer to obligations arising under derivatives contracts or other aspects of the

business relationship between BOA and Lehman.  Thus, BOA's secured claim pursuant

to the security agreement was expressly limited to a pledge of assets to secure overdraft indebtedness and nothing more.  The question remains whether BOA is entitled to retain the funds it has seized on grounds of a common law right of setoff, even though that concept was never specifically mentioned by the parties at any time during their negotiations.  Based on the evidence presented, BOA's common law right of setoff appears to have been completely disregarded while drafts of the security agreement were being exchanged.  It is unclear whether this was an oversight or whether BOA consciously decided not to mention the point.  Either way, BOA relies heavily on the fact that setoff was not waived by BOA and that the broadly-worded boilerplate provisions of section 14 of the security agreement preserve "all rights, powers and remedies given to the Bank by virtue of any statute or rule of law."

But the boilerplate of section 14 preserving all rights, powers and remedies of BOA cannot be read to override the plainly-expressed intent of the parties to the negotiations that produced the security agreement.  There are no disputed facts regarding that intent.  From the perspective of BOA, the intent was to secure intra-day overdrafts.  From the perspective of Lehman, the intent was to do whatever was required to keep its cash management system functioning normally.  Thus, the parties concentrated their attention on different aspects of the same narrow issue.

The narrative of the negotiating history is clear – BOA rejected a so-called "plain vanilla" account and instead insisted on a special secured account to protect itself from overdraft risk.  The funds deposited in that account were available as cash collateral for a single stated purpose and could not be withdrawn by Lehman without prior notice.  Given the restrictions on Lehman's ability to withdraw the funds, the parties recognized that the

account could not be used by Lehman to pay other business obligations and that

withdrawal of the funds would mean the loss of Lehman's ability to incur intra-day

overdrafts in its other BOA accounts.   Because these funds were not generally available

to Lehman, they were also not generally available to BOA, despite any boilerplate

language that purported to preserve all of the bank's rights and remedies.  In short,

section 14 authorized BOA to preserve all of its rights and remedies, but those rights and

remedies, considered in context, were limited to an account that was exclusively

dedicated to overdraft protection and do not support an unintended application of the

funds to unrelated obligations between the parties.

The outcome reached here does include a measure of irony.  If instead of creating

a special account, BOA had agreed to an ordinary ("plain vanilla") unrestricted demand

deposit account, BOA, by virtue of applicable law, unquestionably would have had the

right to set off any funds on deposit in such an account against any mutual obligation of

Lehman.  By means of seeking and obtaining the additional protection of a security

agreement that restricted access to the pledged funds and that defined "Indebtedness"

narrowly, BOA at the same time limited its own rights to apply those funds to other

obligations.  Although this may seem to be an example of asking for more and getting

less, BOA did get precisely what it bargained for – a dedicated fund to cover an identified

banking risk.  It did not get – nor was it entitled to receive – a cash windfall to apply

against any other outstanding Lehman debt.

In construing the agreement as a whole, the Court concludes that BOA needed to

do more than simply rely on the standard reservation of rights language set forth in

section 14.  At a minimum, it was incumbent upon BOA if it wanted the fund to provide a

broader range of protection to expand the definition of indebtedness or otherwise make clear that funds in the account would be exposed to a general right of setoff.

As explained more fully in the following sections of this opinion, the Court finds that BOA did not have the right to set off amounts in the special cash collateral account. BOA's actions in setting off those funds violated the automatic stay and did not fall within any applicable exemption to the automatic stay. The Court grants summary judgment in favor of Lehman and against BOA, directs BOA to return the funds together with interest and shall conduct a further hearing to consider any appropriate sanctions to be imposed against BOA.

### Standard

Summary judgment is appropriate when there is "no genuine issue as to any material fact," so that the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The court must view the facts in the most favorable light to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (citations omitted). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

Prior to oral argument on their cross-motions for summary judgment, the parties acknowledged that the questions are purely legal and that there are no genuine issues of material fact in dispute. At oral argument, the Court ordered the Evidentiary Hearing in order to further explore and develop facts relevant to the intention of the parties during

the period of negotiation of the security agreement.  After the Evidentiary Hearing, and

consistent with the direction of the Court, each of the parties submitted supplemental

papers referencing the record and discussing the evidence presented in relation to their

respective summary judgment papers.  Accordingly, at this juncture there are no genuine

issues of material fact in dispute, and the Court finds that it is appropriate to determine

the legal issues under the summary judgment standard.

### *Background*

BOA provided clearing services to support Lehman's worldwide foreign

exchange and other financial activities for some sixteen years prior to the Petition Date.

(Wang Dec.[9] Appx. II, Ex. 3, Dever Dep. Tr. 14:2-15.)  In connection with its provision

of clearing services, BOA permitted Lehman to incur unsecured intra-day overdrafts

within certain limits.  (Dever Dep. Tr. 31:25-32:12.)  By virtue of this banking practice,

BOA allowed Lehman to transfer funds from its accounts in anticipation of receipts

regardless of whether such accounts had a positive balance.  (Dever Dep. Tr. 29:24-30:7.)

BOA and Lehman understood, however, that any intra-day overdraft was to be eliminated

by the close of each business day to prevent it from ripening into a "book" or "overnight"

overdraft, and Lehman would be charged a fee for overnight overdrafts.  (Wang Dec.

Appx. II, Ex. 7, Hawk Dep. Tr. 198:8-17.)

On Friday, July 25, 2008, Lehman incurred an overnight overdraft in the amount

of $650 million in one of its accounts.  (Wang Dec. Appx. I, Exs. 151, 152, 153.)  The

---

[9] Citations to "Wang Dec." are to Declaration of Bin Wang in Support of Defendants
Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing and
Counterclaim-Plaintiff Lehman Brothers Holdings Inc.'s Motion for Summary Judgment
(ECF Doc. # 54).

overdraft was cleared on Monday, July 28, 2008, the next business day.  (Wang Dec. Appx. I, Ex. 194.)

On Thursday, August 14, 2008, BOA executives informed Lehman executives that Lehman needed to make a $650 million deposit "soon," but no later than mid-September, in order to retain its intra-day overdraft limits.  (Wang Dec. Appx. I, Exs. 91, 94.)  On Wednesday, August 20, 2008, James Dever, the BOA principal relationship contact with Lehman, informed Paolo Tonucci, the treasurer of Lehman, that Lehman would need to post a $1 billion deposit by Monday, August 25, 2008 to avoid having its intra-day overdraft limit set to zero.  (Wang Dec. Appx. I, Ex. 94.)

In a subsequent conference call between BOA and Lehman, BOA reiterated the requirement that Lehman advance a $1 billion deposit subject to a security agreement by Monday, August 25, 2008 or its intra-day overdraft limit would be set to zero.  (Wang Dec. Appx. I, Exs. 25, 29; Wang Dec. Appx. II, Tab 4, Fielding Dep. Tr. 133:17-137:9.)  On the same call, Lehman asked whether BOA would consider a so-called "vanilla" account without a "specific pledge."  (Wang Dec. Appx. I, Ex. 29; Fielding Dep. Tr. 141:20-142:4.)  BOA refused, instead insisting on a "pledge" of collateral that would be subject to a security agreement.  (Wang Dec. Appx. I, Ex. 29; Hawk Dep. Tr. 138:12-139:4, 140:7-21.)  A series of subsequent discussions between BOA and Lehman focused on the negotiation of a security agreement.  At approximately 11:00 p.m. on Thursday, August 21, 2008, BOA sent Tonucci a draft "Security Agreement" and a pre-printed "Customer Agreement."  (Wang Dec. Appx. I, Ex. 27.)

The initial draft of each document included various provisions that were unacceptable to Lehman.  (Wang Dec. Appx. I, Ex. 144.)  Prominent among these was

the definition of "Indebtedness" in the security agreement and section 3 of the customer

agreement that would have allowed for a broad and unlimited right of setoff.  (Wang Dec.

Appx. I, Ex. 36.)  Specifically, the definition of "Indebtedness" in the initial draft of the

security agreement read, in pertinent part:

> "Indebtedness" means (a) any and all existing and future indebtedness and
> liabilities of every kind, nature and character, direct or indirect, absolute or
> contingent, liquidated or unliquidated, voluntary or involuntary and whether for
> overdrafts, principal, interest, premiums, fees, indemnities, damages, costs,
> expenses or otherwise, of [LBHI] … to [BOA] … whether associated with any
> credit or other financial accommodation made to or for the benefit of [LBHI] …
> by [BOA] … or otherwise and whenever created, arising, evidenced or acquired
> … and (b) all obligations of [LBHI] now or hereafter existing under this
> Agreement … .

(Wang Dec. Appx. I, Ex. 27.)

Section 11(c) of the initial draft of the security agreement further provided that

BOA could "[a]pply, without notice, any funds in any Deposit Account against the

Indebtedness."  In addition, section 3 of the draft customer agreement provided, in

pertinent part:

> You hereby grant [BOA] … a continuing security interest in, lien on, and right of
> set-off with respect to, all Financial Instruments and other property, including
> cash balances … now or hereafter held or carried by [BOA] in your accounts …
> as collateral security for the payment and performance of all your obligations to
> [BOA] now existing or hereinafter arising, whether or not such obligations arise
> under this Agreement or any other agreement between [BOA] and you … .

(Wang Dec. Appx. I, Ex. 27.)

The parties continued to negotiate on Friday, August 22, 2010.  Lehman's in-

house attorney committed to provide a markup of the drafts before the close of business

and alerted BOA to LBHI's position that the pledge agreement would be only for

"overdraft exposure and not broader indebtedness."  (Wang Dec. Appx. I, Ex. 144.)  In its

markup of the draft documents, Lehman, *inter alia*, struck the definition of

"Indebtedness," inserting a footnote in its stead that read "Indebtedness should only be defined to cover overdraft exposure." (Wang Dec. Appx. I, Ex. 36.) Moreover, Lehman commented that section 3 of the customer agreement should "be governed by the Security Agreement." (Wang Dec. Appx. I, Ex. 36.)

Lehman also struck the section initially at section 15 entitled "<u>Other Rights</u>." It provides as follows:

> The rights, powers and remedies given to [BOA] by this Agreement shall be in addition to all rights, powers and remedies given to [BOA] by virtue of any statute or rule of law. Any forbearance or failure or delay by [BOA] in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy hereunder shall not preclude the further exercise thereof; and every right, power and remedy of [BOA] shall continue in full force and effect until such right, power or remedy is specifically waived by an instrument in writing executed by [BOA].

(Wang Dec. Appx. I, Ex. 36.)

BOA responded to Lehman's markup on the same day. (Wang Dec. Appx. I, Ex. 37.) It revised the definition of "Indebtedness" to read, in relevant part, as follows:

> "<u>Indebtedness</u>" means (a) any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or involuntary for overdrafts … owed to [BOA] … and (b) all obligations of [LBHI] now or hereafter existing under this Agreement … .

(Wang Dec. Appx. I, Ex. 37.) BOA also re-inserted the section entitled "<u>Other Rights</u>". The parties never discussed the provision, including whether it would provide BOA with a right to set off the collateral against debts other than overdrafts. (1/29/10 Tr. 78:19-24, 147:5-12 (Sparks); 2/01/10 Tr. 50:10-12 (Fielding), 78:19-24, 84: 16-21, 104:2-15 (Yeung), 154:8-12 (Cornejo), 175:24-176:2, 188:2-9, 206:20-24 (Tonucci).) The section

appeared in every subsequent draft, and is section 14 of the executed security agreement. (Wang Dec. Appx. I, Ex. 4.)

Section 10 of the security agreement provides for an event of default if, *inter alia*, "[LBHI] … commences any case, proceeding, reorganization or other action under any bankruptcy or other law." (Wang Dec. Appx. I, Ex. 4.) Section 11 of the security agreement, in turn, allows BOA, upon an event of default, to, *inter alia*, "[e]xercise as to the Deposit Account all of the rights, powers and remedies … of a secured party under the UCC … and any other applicable law." (Wang Dec. Appx. I, Ex. 4.) The parties did not further discuss the customer agreement, and it was never executed in any form. (Wang Dec. Appx. II, Tab 9, Sparks Dep. Tr. 160:17-161:23.)

After continued negotiations over the weekend, the parties finalized the security agreement on Sunday, August 24, 2008. It required collateral to be deposited in the amount of $500 million. (Wang Dec. Appx. I, Ex. 4.) The security agreement permitted withdrawal of the collateral "so long as [LBHI] shall have given written notice to [BOA] of such … removal … at least three … business days prior to the date of such proposed … removal." (Wang Dec. Appx. I, Ex. 4.) Moreover, as finalized, the security agreement defined "Indebtedness," in relevant part, as follows:

> "Indebtedness" means (a) any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or involuntary, *solely in respect of overdrafts* of [LBHI] … and (b) all obligations of [LBHI] now or hereafter existing under this Agreement.

(Wang Dec. Appx. I, Ex. 4.)

Significantly, the execution version of the security agreement also includes the following "whereas" clauses (inserted by BOA):

> WHEREAS, pursuant to the terms of the deposit account agreements between [BOA] … and [LBHI] … [BOA] may, but [is] not obligated, to permit [LBHI] to incur overdrafts in accounts maintained with [BOA] … ; and
>
> WHEREAS, without in any way affecting the uncommitted nature of [BOA's] … option to permit such overdrafts, [BOA] … *require[s] that any such overdrafts be fully covered by cash collateral.*

(Wang Dec. Appx. I, Exs. 4, 40) (emphasis added).

No permissible use of the collateral other than to protect BOA against the risk of overdrafts was ever discussed during the negotiations. (1/29/10 Tr. 97:14-19, 98:5-10 (Hawk), 168:8-11 (Sparks), 212:20-22 (Dever).)

During the course of the negotiations, BOA informed Lehman that there would be two accounts connected with the security agreement. Specifically, in an e-mail to in-house counsel for Lehman, in-house counsel for BOA explained that

> [t]his [account #6550xxx465] is a regular DDA [demand deposit account] that will be dedicated solely to this collateral pledge. Lehman will deposit funds earmarked as collateral into this account. The funds will then be moved to Cayman branch to create the agreed upon Eurodollar deposit.

(Wang Dec. Appx. I, Ex. 42; Sparks Dep. Tr. 193:2-4.)

The parties executed the security agreement on Monday, August 25, 2008. (Wang Dec. Appx. I, Ex. 4.) Shortly thereafter, Lehman wired $500 million to the DDA account no. 6550xxx465 (the "465 Account"). The 465 Account was on BOA's wholesale banking system platform. (Wang Dec. Appx. I, Exs. 59, 60.) BOA placed a permanent "hold" on the 465 Account at its inception, meaning that the funds could not be withdrawn without special authorization and a manual override of the hold. (Alpert Dep. Tr. 72:21-74:6.)

After BOA received the deposit, a BOA trader executed a trade for a one-month Eurodollar time deposit that was marked as "pledged." (Alpert Dep. Tr. 23:7-13; Wang

Dec. Appx. I, Ex. 70.)  Accordingly, the funds were removed from the 465 Account and

booked to account number 4xxxx1 in BOA's Cayman Branch (the "Cayman Account,"

together with the 465 Account, the "Deposit Account").  (Sparks Dep. Tr. 148:2-149:22.)

Interest, which would not accrue until the deposit's maturity date of September 25, 2008,

was to be wired into the 465 Account.  (Wang Dec. Appx. I, Exs. 55, 98, 99.)  Thereafter,

Lehman did not deposit or withdraw any collateral, nor did it use either the 465 Account

or the Cayman Account for any purpose.  (Wang Dec. Appx. I, Ex. 98; Sparks Dep. Tr.

149:15-22.)

        As of the Petition Date, there were negligible, if any, overdrafts across all LBHI

accounts at BOA.  Moreover, despite the fact that none of BOA's negotiators ever had

said anything to Lehman indicating that BOA believed it had a right to access the

collateral for any obligations other than those relating to overdrafts, on November 10,

2008, BOA sent Lehman a "Demand for Payment Under Guarantee," claiming that it had

the right to set off some $1.9 billion that LBSF allegedly owed under a 1996 ISDA

Master Agreement between LBSF and Nationsbank, N.A.[10] against some $509.3 million

in funds held in various LBHI accounts at BOA.  (1/29/10 Tr. 98:4-10 (Hawk), 164:9-14

(Sparks), 212:14-22 (Dever); Wang Dec. Appx. I, Ex. 19.)  In the same letter, BOA

notified Lehman that it would exercise its claimed right of setoff that same day.  (Wang

Dec. Appx. I, Ex. 19.)  Consistent with that demand, on November 10, 2008, BOA swept

$508,808,584.29[11] from various LBHI accounts into a suspense account and then onto

BOA's general ledger.  (Compl. at ¶ 1; Wang Dec. Appx. I, Exs. 11, 12, 13, 14, 15.)  The

_____

[10] As set forth above, LBHI provided a guarantee in connection with the 1996 ISDA
Master Agreement.

[11] BOA initially swept an additional $496,000.00 from an account of Lehman Brothers
Inc. but subsequently returned the funds.  (Wang. Dec. Ex. F.)

swept funds included, *inter alia*, the $500 million in the Deposit Account and $1.8 million in accumulated interest.

On November 21, 2008, Lehman sent a demand letter to BOA.  The demand letter (i) stated that the setoff had violated the security agreement and the automatic stay and (ii) demanded return of LBHI's funds.  (Wang Dec. Ex. E.)  In apparent response, on November 26, 2008, BOA commenced this adversary proceeding, seeking a declaratory judgment that it acted within its rights when it exercised its alleged right of setoff.  (Compl. at ¶ 1.)  LBHI counterclaimed for the return of funds seized, statutory interest, and other relief, including attorneys' fees and costs for BOA's alleged violation of the automatic stay.  (Countercl. at ¶ 82.)  On February 4, 2009, the Court "SO ORDERED" a Stipulation and Consent Order Permitting Intervention of Official Committee of Unsecured Creditors (the "Committee") in the adversary proceeding. (ECF Doc. # 13). The Committee has supported Lehman's position and has participated in all aspects of this litigation.

## *Discussion*

### I.      **BOA Did Not Have the Right to Set Off the Deposited Funds**

Section 553 of the Bankruptcy Code does not provide for an independent right of setoff, but rather incorporates any pre-existing setoff right that may exist under state law so long as such setoff complies with the prerequisites set forth in section 553(a).  *See* 11 U.S.C. § 553(a) (explaining that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case…"); *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (noting that "with certain exceptions, whatever right of

setoff otherwise exists is preserved in bankruptcy").  The prerequisites for setoff require

that "(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim

against the creditor must also be prepetition; and (3) the debtor's claim against the

creditor and the debt owed the creditor must be mutual."  *In re Lehman Bros. Holdings*

*Inc.*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009) (citation omitted).

 The decision to allow setoff is within the sound discretion of the bankruptcy

court.  *See Lehman*, 404 B.R. at 757.  Equity favors the right of setoff as a means to avoid

multiplicity of lawsuits, inconvenience, injustice, and inefficient use of judicial resources.

*Id*.  Accordingly, setoff ordinarily should be permitted "unless the court finds after due

reflection that allowance would not be consistent with the provisions and purposes of the

Bankruptcy [Code] as a whole."  *Bohack Corp. v. Borden, Inc. (In re Bohack Corp.)*, 599

F.2d 1160, 1165 (2d Cir. 1979).

 In deciding whether to allow setoff, then, the Court must first identify whether

New York[12] common law provides BOA with a right to set off the deposited funds.

Under New York common law, funds within a "special purpose" account are not subject

to setoff, while funds within a general deposit account are subject to setoff.  *See In re*

*Applied Logic Corp.*, 576 F.2d 952, 958 (2d Cir. 1978) (stating that "a bank cannot

exercise a set-off against a deposit which is known by it to be dedicated to a special

use...") (citations omitted); *Swan Brewery Co. v. United States Trust Co.*, 832 F. Supp.

714, 718 (S.D.N.Y. 1993) (same).  This inability to set off funds deposited into a

"special" account is due to the fact that "the bank becomes a bailee of the depositor, the

---

[12] Whether BOA possesses a common law right to setoff is a matter of New York law.
*See* Wang Dec. Appx. I, Ex. 4 (security agreement) § 16(d) ("This Agreement shall be
governed by and construed according to the internal laws of the State of New York …").

title of the thing deposited remaining with the latter." *Swan,* 832 F. Supp. at 717

(citations omitted).

As a general matter, a strong presumption exists under New York law that a

deposit account is a general account and not a special purpose account. *See Swan*, 832

F.Supp. at 718-19 (collecting cases). To override this presumption, evidence must

demonstrate that the parties mutually intended to set aside the funds for a specific

purpose. *See Swan*, 832 F.Supp. at 718 ("Whether an account is general or specific

depends upon the mutual intent of the parties") (citations omitted); *Gray v. First Nat'l

Bank & Trust Co.*, 189 N.E. 557, 559-60 (N.Y. 1934) (whether a deposit is "a special

deposit or fund, to be kept intact and used for a specific purpose, depends … upon the

intent of the parties").

In determining the mutual intent of the parties, courts have considered "all of the

circumstances" surrounding the creation of an account. *Swan*, 832 F.Supp at 719. An

express agreement between parties that an account will be a special purpose account may

demonstrate "mutual intent" for purposes of rebutting the presumption. *See Swan*, 832

F.Supp. at 719-20 (presumption not rebutted when correspondence indicated that parties

had never agreed as to nature of the account); *Merrill Lynch Mortgage Capital, Inc. v.

F.D.I.C.*, 293 F. Supp. 2d 98, 105 (D.D.C. 2003) ("A depositor can overcome this

presumption by proving the existence of an agreement, express or implied, that an

account was a special deposit") (citations omitted); *Noah's Ark Auto Accessories, Inc. v.

First Nat'l Bank*, 316 N.Y.S.2d 663, 666 (Sup. Ct. 1970) (presumption rebutted when

parties "clearly" agreed that account was a special purpose account). Other factors that

courts have examined to ascertain the parties' mutual intent include: (1) whether the

parties agreed to segregate the funds; (2) whether the bank paid interest on the funds; (3) whether the depositor lacked an unfettered right to withdraw the funds; and (4) whether a third party possessed an interest in the funds.  *See, e.g., Official Committee of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re The Bennett Funding Group, Inc.),* 212 B.R. 212, 212-15 (B.A.P. 2d Cir. 1997) (presumption not rebutted when "all of the provisions of [agreement] … along with the facts and circumstances of the relationship of the parties" demonstrate an intent to create a general account).

The undisputed facts show that, under all the circumstances, BOA and LBHI mutually intended to create a special purpose account.  This mutual intent is manifested in both the terms of the security agreement itself, as well as the parties' conduct at each stage of the creation, negotiation, and consummation of that agreement.

### A.  The Plain Language of the Security Agreement Demonstrates that the Parties Intended to Create a Special Purpose Account

Principles of state law govern the interpretation of contractual provisions in bankruptcy.  *See Butner v. United States*, 440 U.S. 48 (1979).  Under New York law, the "ultimate objective in interpreting" an agreement is to determine "the intention of the parties as derived from the language employed."  *Tom Doherty Assocs. Inc. v. Saban Entm't Inc*., 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994) (citation and internal quotation marks omitted).  In so doing, the court must consider "each word … along with not only all the other words that surround it, but also the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances." *The Northwestern Mut. Life Ins. Co. v. Delta Airlines, Inc. (In re Delta Airlines, Inc.)*, 608 F.3d 139, 146 (2d Cir. 2010) (citations and internal quotation marks omitted)

(vacating district court decision that affirmed a bankruptcy court's interpretation of a contract in way that defeated the intentions of the parties).

The plain language of the security agreement reveals that the parties mutually intended to create a special account for a distinct limited purpose that should not be eligible for setoff under New York law.  For one thing, the security agreement's prefatory language expressly states that the parties entered into the agreement governing the creation of the Deposit Account for the sole, limited purpose of protecting BOA in the event of an intra-day overdraft.  *See* Wang Dec. Appx. I, Ex. 4 (security agreement) at 1 ("Whereas" Clause I) ("WHEREAS … the Bank and/or its subsidiaries and/or affiliates … may, but are not obligated to, permit the Pledgor, its subsidiaries and affiliates ***to incur overdrafts in accounts maintained with the Bank***…") (emphasis added); *id.* at 1 (Whereas Clause II) (WHEREAS … the Bank, its subsidiaries and affiliates … ***require that any such overdrafts be fully covered by cash collateral***") (emphasis added). Although such "whereas" clauses have no operative effect, they do offer guidance as to the intentions of the parties when entering into the security agreement.  Moreover, the Court finds it significant that it was BOA, and not LBHI, that added the clauses to the security agreement.

The operative provisions of the security agreement are consistent with and confirm the mutual intent of the parties memorialized in the "whereas" clauses.  Notably, the security agreement defines "Indebtedness" in a very limited fashion relating "solely in respect of overdrafts."[13]  The significance of this tightly focused definition becomes

---

[13] Wang Dec. Appx. I, Ex. 4 (security agreement) § 2 ("'Indebtedness' means (a) any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or

apparent when read in conjunction with section 11 of the security agreement, which governs BOA's remedies following an event of default by LBHI. This section permits BOA to seize the collateral only for the purpose of satisfying the amount of "Indebtedness" existing under the security agreement. *See* Wang Dec. Appx. I, Ex. 4 (security agreement) § 11(c) ("If an Event of Default occurs, the Bank may do any one or more of the following: … (c) Apply, without notice, any funds in any Deposit Account against the Indebtedness"). Viewed together, then, sections 2 and 11(c) confirm the only expressly stated purpose of the security agreement – *i.e.*, to collateralize "Indebtedness" directly related to intra-day overdrafts, and to authorize BOA to use the collateral to satisfy any such intra-day overdraft.

Although BOA recognizes that the language of section 11(c) grants it a contractual right to apply the collateral to any overdrafts following an event of default, it does not concede that its rights are tied exclusively to overdrafts.[14] According to BOA, section 11(c) of the security agreement is not the sole remedy available upon the occurrence of an event of default because the limiting language only appears in the definition of the term "Indebtedness." BOA argues, "it is entirely reasonable that the Security Agreement thus limited the security interest to the negotiated definition of Indebtedness, but there is no reason to import that limitation in the definition to other portions of the Agreement…" BOA Opp'n to Mot. at 25-26. BOA cites two

---

involuntary, ***solely in respect of overdrafts of the Pledgor*** … including, without limitation, daylight and overnight overdrafts and all costs, expenses, and reasonable attorneys fees…") (emphasis added).

[14] Memorandum of Law in Opposition to Lehman Brothers' Motion for Summary Judgment and in Further Support of Bank of America's Motion for Summary Judgment, dated Nov. 3, 2009, ECF Doc. # 58 ("BOA Opp'n to Mot") at 23.

boilerplate reservations of rights provisions -- sections 11(d)[15] and 14[16] -- as support for

the proposition that the parties intended that the collateral would be available for

additional purposes beyond simply securing overdraft protection.[17]

     The Court disagrees with BOA's self-interested reading of these general

provisions and declines to interpret the plain language of the security agreement in the

manner urged by BOA.  BOA attributes exceptional and unwarranted significance to the

boilerplate[18] language of section 14.  As a general matter, courts typically accord full

---

[15] Wang Dec. Appx. I, Ex. 4 (security agreement) § 11(d) ("If an event of default occurs, the Bank may … exercise any … remedy provided under this Agreement or by any applicable law").

[16] *Id.* § 14 ("The rights, powers, and remedies given to the Bank by this Agreement shall be in addition to all rights, powers, and remedies given to the Bank by virtue of any statute or rule of law.").

[17] BOA further relies on sections 11(d) and 14 to argue that the security agreement does not waive BOA's pre-existing state law setoff rights. *See, e.g.,* BOA Opp'n to Mot. at 23 ("The unambiguous language of the agreement contains no waiver of the Bank's right of setoff"). While it is true that BOA did nothing to waive its setoff rights, it is more significant that it never raised the issue at all in negotiations and never gave any notice to LBHI that the pledged collateral might one day be applied unexpectedly to unrelated indebtedness.  The argument that the right, not having been waived, should enable BOA by stealth to reduce swap indebtedness and improve its position relative to other creditors is a convenient use of form language to contradict the actual agreement reached by the parties.  In the context of these negotiations, the Court concludes that the parties never stated any intention to expose this collateral to a general right of setoff and that BOA's non-waiver argument based on boilerplate language must fail because it conflicts with the expressed intent of the parties to dedicate the collateral to a designated purpose.

[18] BOA disputes the characterization of section 14 as "boilerplate," instead characterizing this provision as a "negotiated term of fact."  12/10/09 Tr. at 72:24-5; 75:20-21 ("it wasn't even boilerplate because it was negotiated").  While the inclusion of section 14 as a whole may have resulted from negotiation between the parties, the specific language contained therein was not negotiated.  Rather, this provision appears to have been copied verbatim from BOA's standard forms and, accordingly, was not drafted with this particular transaction in mind. *See also* 12/10/09 Tr. at 77:17-78:14 ("COURT:  Nobody drafted this with particular reference to this transaction?  It's a form that was used for the transaction, correct?  [COUNSEL FOR BOA]:  This provision was used in this transaction, as it has been in many others.  You're right … I don't think there's evidence

force and effect to boilerplate language within a contract. *See, e.g., In re Victory Mkts., Inc.*, 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998) ("[E]ven if the operative provisions [in the contract] were to be considered boilerplate, we cannot accept the contention that language of that character is to be disregarded ... At no time should the source of language affect its efficacy").  Nonetheless, the Court must simultaneously construe the boilerplate language in a way that does not undermine the overarching purpose of the security agreement. *See, e.g., Montblanc-Simplo GmbH v. Aurora Due. S.r.l.*, 363 F.Supp.2d 467, 475 (E.D.N.Y. 2005) ("Where the strict reading of one provision will render another provision meaningless, or without effect, such reading should be rejected") (citation omitted); *Williams Press, Inc. v. State*, 335 N.E. 2d 299, 302 (N.Y. 1975) ("We read the writing as a whole.  We seek to give each clause its intended purpose in promotion of the primary and dominant purpose of the contract") (citations omitted).

Accordingly, the Court concludes that sections 11(d) and 14 simply cannot be fairly interpreted to negate or override specific provisions in the agreement that are consistent with the clearly expressed intentions of the parties to collateralize an identified overdraft risk.  Accepting BOA's proposed construction of boilerplate sections 11(d) and 14 would effectively leave BOA with an unlimited right of setoff with respect to all manner of indebtedness notwithstanding the fact that the agreement was entered into for the stated purpose of securing any "Indebtedness" that might arise "solely in respect of overdrafts."  This reading of the language would lead to unintended consequences by giving greater significance to the meaning of general provisions than the more specific

---

to that effect in the record … It's part of what I think is the bank's -- this bank's and probably many other banks' standard forms.  As long as we are speculating on that…".)

provisions within the security agreement.  This is contrary to the way that agreements are

to be construed.  The specific is supposed to trump the general, not vice versa.  *See*

*Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) (explaining that it

is a fundamental rule of contract construction that "specific terms and exact terms are

given greater weight than general language") (citations and internal quotations omitted).

       The best way to harmonize the specific and general provisions of the security

agreement is to find that these provisions are consistent with the special purpose to secure

indebtedness relating to intra-day overdrafts.  The boilerplate cannot be properly

construed as granting rights to BOA in the collateral for all purposes.  BOA engaged in a

negotiation to achieve a particular objective and to obtain security to cover a specified

risk.  The deposit of collateral was not intended to serve as a fund to secure any or all of

BOA's many other exposures to the credit risk of Lehman.  Such an expansive

improvement in position was never contemplated by the parties and would both ignore

BOA's limited purpose for having created the security agreement and would disregard

the narrowly focused meaning of the term "Indebtedness" as used in the security

agreement.

**B.    Extrinsic Evidence Demonstrates that the Parties Intended to Create a
       Special Purpose Account Exempt from Setoff**

       In light of the unambiguous language of the security agreement, the Court does

not need to examine extrinsic evidence.  *See, e.g., Int'l Multifoods Corp. v. Commercial*

*Union Ins. Co.*, 309 F.3d 76, 83 (2d. Cir. 2002) (noting that "[i]f the court finds that the

contract is not ambiguous it should assign the plain and ordinary meaning to each term

and interpret the contract without the aid of extrinsic evidence") (citation and internal

quotation marks omitted).  Nonetheless, given the divergent views of the parties as to the

proper interpretation of the same language, it is useful to review the negotiations surrounding the creation and execution of the security agreement, as well as the characteristics of the resulting Deposit Account. This examination confirms that the parties intended to create a special purpose account exempt from setoff under New York law.

BOA demanded that the Deposit Account be established for the limited purpose of mitigating its exposure to intra-day overdrafts and wanted collateral to secure credit customarily extended to Lehman in the course of its daily banking relationship.[19] In the months preceding LBHI's filing, BOA became alarmed at its potentially large exposure to Lehman's daylight overdrafts. This alarm was heightened on July 25, 2008, when LBHI overdrew approximately $650 million from a segregated client account at BOA.[20] In response, BOA requested "deposits that would be pledged by [Lehman] … and used as collateral against future overdrafts." 1/29/10 Tr. 209:22-23 (Dever). The message delivered to LBHI by Dever, a senior banker and relationship manager at BOA, dealt with this one concern and nothing else – how to address "the overdraft issue." 1/29/10 Tr. 212:7-12 (Dever).

The initial discussions between the parties as to the form of the Deposit Account confirm that they intended to structure an account for the specific purpose of securing overdraft exposure. Initially, LBHI proposed a "plain vanilla" account to address BOA's anxiety with respect to overdraft exposure.[21] Such a "plain vanilla" account, had it been

---

[19] 1/29/10 Tr. 54-57 (Hawk).

[20] (Wang Dec. Appx. I, Exs. 151, 152, 153).

[21] *See* 1/29/10 Tr. 79:14-20 (Hawk); 221:21-23 (Gowin).

created, would have permitted LBHI broader and unrestricted access to its funds,[22] but

BOA rejected that proposal as too loose because the absence of a security interest would

have given LBHI the freedom to withdraw these funds at will and, in effect, restore

BOA's exposure.[23]  The Deposit Account, on the other hand, restricted LBHI's ability to

withdraw the collateral and achieved the objective of securing BOA's exposure to LBHI

overdrafts.

The parties did not even mention the issue of setoff at any time during their

negotiations.[24]  BOA's negotiators, for example, testified that their discussions with LBHI

concerning the security agreement related exclusively to the need to obtain collateral to

secure overdrafts.[25]  Similarly, the Lehman personnel involved in the negotiations --

Tonucci, the treasurer of Lehman, and Stirling Fielding, the European head of treasury

operations, -- understood that the requested deposit "was intended to cover intra-day

---

[22] *See* 1/29/10 Tr. 104:15-19 (Sparks).

[23] *See* 1/29/10 Tr. 64:18-65:6, 74:7-16 (Hawk) (explaining a pledge was required to mitigate the Lehman overdraft risk).

[24] *See* Memorandum of Law in Reply to Bank of America's Opposition to Lehman's Motion for Summary Judgment, dated Nov. 9, 2009, ECF Doc. # 65, at 17 ("In short, neither side discussed the issue of setoff with respect to the collateral…"); 12/10/09 Tr. 122:9-11 (statements by Lehman counsel) ("[BOA was] not negotiating a broad right of setoff, which was never discussed"); 1/29/10 Tr. 14:20-25 (statements by BOA counsel) ("there is no evidence of … any discussion of the waiver of the right of setoff…"); Debtors' Post-Hearing Memorandum, dated Mar. 12, 2010, ECF Doc. # 85, at 2 ("Setoff rights were the furthest thing from the parties' minds").

[25] 1/29/10 Tr. 98:5-10 (Hawk) (no discussion of BOA accessing the collateral for any reason other than securing Lehman overdraft); 212:14-22 (Dever) (same); 174:22-175:2 (Sparks) (same).

overdrafts" and nothing more.[26] Thus, the parties were talking about a limited subject matter that did not include a general right of setoff.

This clear focus on pledging the deposited funds for a single purpose reflects the intention of the parties to treat these funds as "collateral" ineligible for setoff.   Under New York law, a bank is unable to set off a debt against pledged "collateral."  *See, e.g., Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d. Cir. 2002) (*quoting Pink v. Am. Sur. Co. of N.Y.*, 28 N.E. 2d 842, 844 (N.Y. 1940)) ("a person holding monies pursuant to a contract obligation is 'a trustee . . . as to monies in its hands belonging to the [beneficiary] or to be applied to a specific purpose,' in which case setoff may not be applied") (additional citation omitted).  The transaction, as documented by the parties, is consistent with a pledge of collateral intended to be exempt from setoff, and not the creation of a simple debt.  The security agreement defines LBHI as a "Pledgor" and its deposit of $500 million as "Collateral."  *See* Wang Dec. Appx. I, Ex. 4 (security agreement) § 4.  The extrinsic evidence in relation to the security agreement also supports the conclusion that the funds were being pledged for the specific purpose of securing intra-day overdraft credit.[27]

The negotiations between BOA and LBHI with respect to the definition of "Indebtedness" confirm the intent of the parties.  Initially, BOA wanted to define the term "Indebtedness" with broad language that would have permitted a more expansive right of

---

[26] 2/1/10 Tr. 205:2-8 (Tonucci); 25:15-21 (Fielding) (BOA never mentioned that the pledge account was for anything other than security for the pledge accounts); 79:15-18 (Yeung) (same).

[27] 1/29/10 Tr. 209:22-23 (Dever); 1/29/10 Tr. 98:5-10 (Hawk) (no discussion of BOA accessing the collateral for any reason other than securing Lehman overdraft); 174:22-175:2 (Sparks) (same)).  *See also* 2/1/10 Tr. 205:2-8 (Tonucci); 25:15-21 (Fielding).

setoff, but LBHI rejected that definition.[28]  That rejection of a broad definition of

"Indebtedness" was followed by the ultimate selection of a tightly worded definition that

is confined to the intra-day overdraft issue that precipitated the discussions.  *See* Wang

Dec. Appx. I, Ex. 4 (security agreement) § 2 (defining "Indebtedness" as "solely in

respect of overdrafts").  This process of revision reflected the negotiations and

effectuated the agreement of the parties.  1/29/10 Tr. 170:17-22 (Sparks).  It is undisputed

that the language chosen by the parties for the security agreement reflects the mutual

intent to secure the risk associated with intra-day overdrafts.[29]

    The negotiations with respect to a customer agreement proposed by BOA also

confirm this intent of the parties.  Initially, BOA proposed that LBHI sign a pre-printed

standard form of customer agreement which contained an express right of setoff as broad

as BOA's original definition of "Indebtedness."  Andrew Yeung, an attorney for LBHI,

rejected this provision of the customer agreement.[30]  BOA thereafter dropped the

customer agreement from the negotiations, and the form was never executed.

    The negotiations between BOA and LBHI also fail to support BOA's legal

interpretation of sections 2, 11(c), 11(d), and 14 of the security agreement.  BOA argues

that the narrowly drafted definition of "Indebtedness" in section 2 should not be read to

---

[28] Joint Stipulation of Undisputed Facts, dated Dec. 7, 2009, ECF Doc. # 74 at ¶ 22
(indicating "Indebtedness should only be defined to cover overdraft exposure"); ¶ 24
(BOA's acceptance of new definition of Indebtedness).

[29] 1/29/2010 Tr. 222:22-223:6, 225:22-226:14 (Gowin) (confirming that the
"understanding" which Lehman communicated to BOA was that "the pledge account is
for overdraft exposure and not broader indebtedness"); 2/1/10 Tr. 205:3-8; 161:17-24
(Tonucci).

[30] 2/1/10 Tr. 111:7-9 (Yeung) (recognizing that he did not use the word "rejection" in his
comments to the proposed customer agreement, but that "if you read the section and read
the comment, its clear that its not an acceptance").

limit BOA's rights, including rights of setoff, arising from the operative provisions of the
security agreement.  BOA contends that the security agreement reflects what amounts to
a "two part deal" – "a cash deposit in a regular deposit account and a limited security
interest in the cash running in favor of the bank."  1/29/10 Tr. 13:18-24 (BOA counsel).
The negotiating history as reflected in the record does not support the existence of such a
"two part deal."

    An examination of the characteristics of the Deposit Account corroborates the
express mutual intent of the parties to create a special purpose account.  For example, the
special purpose of the Deposit Account is confirmed by the restrictions that BOA placed
on LBHI's ability to withdraw the deposited funds.  Any withdrawal request by LBHI
was subject to a three-day notice period.  *See* Wang Dec. Appx. I, Ex. 4 (security
agreement) § 4 ("The Pledgor may, from time to time in its sole discretion … remove
Collateral on deposit in the Deposit Account so long as the Pledgor shall have given
written notice to the Bank of such … removal of Collateral at least three (3) business
days prior to the date…").

    The parties understood that LBHI had severely restricted its ability to gain access
to the funds deposited in this account.  In addition to the restrictions imposed by the
three-day notice period, BOA also placed the deposited funds on an "indefinite" hold.[31]
BOA explains this indefinite freeze on LBHI's withdrawal rights alternately as an "extra
administrative precaution," and as an "operational means [to ensure] LBHI compliance
with the three-day notice requirement."  BOA Opp'n to Mot. at 52 n75.  Regardless of

---

[31] *See* Wang Dec. Appx. I, Ex. 71 (BOA employees were warned that if "anyone sees
entries passing through the account … they must NOT touch them.  This is the collateral
for the Lehman accounts and must not be released.  The account is on indefinite hold, but
please be sure no one touches it").

how this internal practice may be characterized, BOA had erected barriers to protect the deposited funds and, as a condition to maintaining demand deposit accounts at BOA with overdraft privileges, would not allow these funds to be touched by LBHI.

As a commercial matter, LBHI's ability to withdraw the deposited funds was further constrained by LBHI's dependency on its long-standing banking relationship with BOA at the time of negotiating the security agreement. For at least sixteen years before LBHI filed for bankruptcy, BOA provided essential clearing services to LBHI.[32] The intra-day overdraft credit that BOA provided to LBHI was the critical "life-blood" of liquidity without which LBHI would have been forced to cease ongoing daily operations.[33]

Moreover, LBHI effectively lacked the ability to simply "walk away" from BOA and transfer its accounts to a competing commercial bank offering comparable services because such a process would have taken months to complete.[34] It would not have been an easy transition to accomplish because LBHI at this point also suffered from negative perceptions in the marketplace, thereby making it that much more difficult to jump seamlessly to another clearing bank. As a result, this was an asymmetrical negotiation between sophisticated parties conducted at a time of growing apprehension as to LBHI's financial strength. BOA had the distinct advantage in this negotiation of situational

---

[32] Dever Dep. Tr. at 14:2-15.

[33] Wang Dec. Appx. II Ex. 6, Harney Dep. Tr., at 26-28 ("the slowing of payments… [could] create a perception … of a crisis of liquidity"); Wang Dec. Appx. II Tab 8, Mazzella Dep. Tr. at 39-42 ("the system would grind to a halt").

[34] 2/1/10 Tr. 15:5-12 (Fielding) ("We did consider [transferring accounts to obtain overdraft protection from a competing bank]… However, these things take two to three months…").

leverage over LBHI.[35]  Once the funds were segregated at BOA, LBHI faced the practical

dilemma of being unable to withdraw the deposited funds and thereafter continue

functioning in the ordinary course of its business without overdraft protection.  LBHI was

stuck and had no choice but to maintain the deposited funds with BOA.

Careful analysis of the interest feature of the Deposit Account does not indicate,

as argued by BOA, that the parties intended to create a general account.  While the

payment of interest may be one indication that a depositor intended an account to be a

general account, it is not dispositive.[36]  Here, the security agreement provided that BOA

would pay interest to LBHI on the deposited funds,[37] but that provision standing alone

does not conclusively transform the Deposit Account into a general account.  The fact

that this was an interest bearing account was an incidental aspect of the overall

arrangement designed to soften the adverse impact of removing the funds from LBHI's

direct control.  The rate earned on the deposited funds was calculated at or below the

market rate.[38]  More importantly, the inclusion of an interest component in the security

---

[35] BOA officials recognized as much.   Dever Dep. Tr. at 129-30.

[36] *Compare Merrill Lynch*, 293 F.Supp. 2d at 108-09 (citations omitted) (applying New York law, court held that parties expressly agreed in governing contract to create special purpose account, and, accordingly, payment of interest was "not material") *with Bennett*, 212 B.R. at 215 (identifying the fact that the debtor was paid interest on all of the amounts on deposit as a "critical term" indicating that the account was general).

[37] *See* Wang Dec. Appx. I, Ex. 4 (security agreement) § 6 ("Interest Payments. Notwithstanding the Bank's security interest in the proceeds of the Deposit Account, the Bank will continue to pay to the Pledgor any interest accruing thereunder until the occurrence of an Event of Default under this Agreement") (emphasis in original).

[38] *See* Wang Dec. Appx. II, Tab 10, Tonucci Dep. Tr. at 103-4 ("the return that we were getting on the account was … at or below … the level that we would normally expect to get on our deposits…our intention was to earn some interest, but it wasn't for the purposes of earning interest").

agreement appears to have been introduced by BOA, not LBHI, in an effort to assuage

LBHI concerns.[39]

Similarly, the question of whether the parties agreed to segregate the collateral is

a factor to be evaluated in determining whether the Deposit Account should be

characterized as a special purpose account.  *See, e.g., Peoples Westchester Savings Bank

v. F.D.I.C.*, 961 F.2d 327, 331 (2d Cir. 1992) (presumption not rebutted given the

absence of "clear evidence of intent to create a special deposit, or an explicit agreement

between an attorney and a bank to segregate funds").  The parties have chosen to

highlight different points in relation to this question.  Lehman has emphasized that BOA

assigned a unique "Global Customer Information" number to the Deposit Account as a

means to differentiate the account and to keep it separate, and, in any event, recognized

the unique purpose behind the pledged collateral.[40]  BOA has argued that the security

agreement did not require the segregation of the collateral,[41] and that such segregation

was never requested by LBHI[42] and never occurred.  The Court concludes that regardless

---

[39] Hawk Dep. Tr. at 28 (the intent was to make the deposit as "palatable" as possible).

[40] *See* Wang Dec. Appx. II, Ex. 1, Alpert Dep. Tr. at 48 (BOA assigned a Global Customer Information number in order to "set up [the Deposit Account] as a stand-alone client totally separate from the existing Lehman Brothers Holding Inc. relationship."); Wang Dec. Appx. I, Ex. 42 (Sparks' Email) ("This is a regular DDA that will be dedicated solely to this collateral pledge.  Lehman will deposit funds earmarked as collateral into this account").

[41] BOA Opp'n to Mot. at 50 ("it is undisputed here that the Security Agreement did not require the Bank to keep LBHI's deposit separate from the Bank's other funds held on deposit…").

[42] Bank of America's Post-Hearing Memorandum in Further Support of Its Motion for Summary Judgment and in Opposition to Lehman's Motion for Summary Judgment, dated Mar. 12, 2010, ECF Doc. # 84, at 18 ("First, the witnesses confirmed that Lehman did not ask the Bank to keep the deposited funds segregated from its other funds (a key indicator), even though Mr. Tonucci was familiar with lockbox accounts and Ms. Birney

of the labels used to describe the account and irrespective of whether the collateral was segregated in a formal manner, the account was intended to function and in practice did function as a segregated account established for the special limited purpose of securing any indebtedness that might arise on account of intra-day overdrafts.  That was the only reason for setting up this particular account.

BOA points out certain other account characteristics in an effort to demonstrate that the Deposit Account should be classified as a general account.  One such characteristic is that no third party has an interest in the account.  Although the interest of a third party in an account may be indicative of a special limited purpose, the absence of any interest by a third party does not transform the account into a general account when the parties have expressly agreed in a governing contract to the contrary.[43]  Another characteristic identified by BOA involves the fact that the Deposit Account itself was a conventional "Eurodollar DDA Account."  BOA introduced evidence demonstrating that such accounts were familiar to LBHI employees and were viewed as general deposit accounts,[44] but BOA's reliance on the familiar form of the Deposit Account seeks to treat as ordinary what the evidence demonstrates to be an extraordinary transaction.

---

testified that such segregation was often negotiated in connection with security agreements").

[43] *Compare Spencer Cos. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194, 200 (Bankr. D. Mass. 1987) (applying New York law and identifying that third-party interest in the account is a common feature of special accounts) *with In re Ben Franklin Retail Store, Inc.*, 202 B.R. 955 (Bankr. N.D. Ill. 1996) (finding a special purpose account, despite absence of third-party interest) and *In re Airwest Int'l*, 70 B.R. 914 (Bankr. D. Haw.1987) (same).

[44] *See e.g.* BOA Opp'n to Mot. at 49 n.65 (characterizing Eurodollar time deposit accounts as a general account); 2/2/10 Tr. 43:21-23 (Rahavy) (explaining how Lehman employees viewed Eurodollar deposits as "bank deposits").

This account was created in response to urgent demands made by BOA, not at the request of BOA's customer and not to provide BOA with collateral to secure all of its Lehman-related exposure. The purpose is unmistakably clear – to provide incremental security to BOA for a specific, well-defined overdraft risk, not a general cash collateral account. In the end, the Court's decision to characterize this account as a special purpose account is based on the totality of the circumstances of the negotiations that produced this account. The formulaic approach urged by BOA disregards the clearly expressed mutual intent of the parties to provide collateral for only one kind of indebtedness and elevates form above substance.[45] The plain language of the security agreement, and related extrinsic evidence, support the conclusion that the account created to cover overdraft exposure was designed exclusively for that special purpose.

## II. BOA's Seizure of Collateral Violated the Automatic Stay

The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midatlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 503 (1986) (citations omitted). The stay "is crucial for the benefit and protection of creditors and the central bankruptcy objective of equal treatment of creditors." *Delta Air Lines, Inc. v. Bibb (In re Delta Air Lines)*, 359 B.R. 454, 459 (Bankr. S.D.N.Y. 2006). "When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the debtor." *United Sav. Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 369 (1988). The Code expressly prohibits

---

[45] *Merrill Lynch*, 293 F. Supp. 2d at 109 ("The form of the account (checking, interest-bearing, etc.) does not matter. The critical point is whether a bank and a depositor have agreed that an account is to be a special deposit or not ") (citations omitted).

exercising a setoff of any debt that arose before commencement of the case.  11 U.S.C. § 362(a)(7).  In seeking relief from the automatic stay to exercise setoff, a creditor must establish cause and satisfy the initial burden of proof.  *Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Indus., Inc.,)*, 907 F.2d 1280, 1285 (2d Cir. 1990).

Due to the importance of the automatic stay, the Supreme Court has held that the proper procedure for a creditor-bank that wishes to exercise a right of setoff against a debtor is to place a temporary administrative hold on the debtor's account while promptly seeking relief from the stay.  *See Strumpf*, 516 U.S. at 19-20.  When a creditor fails to obtain leave of the court and then seeks retroactive approval of a setoff that had been taken while the automatic stay was in effect, the creditor "must (1) prove the validity of the setoff it seeks and (2) justify its failure to … move for relief from the automatic stay to exercise setoff rights."  *Shugrue v. Chem Bank, Inc. (In re Ionosphere Clubs, Inc.)*, 177 B.R. 198, 206 (Bankr. S.D.N.Y. 1995).  Retroactive relief from the automatic stay is an "extraordinary measure" and a creditor must demonstrate "unusual and unusually compelling" facts to justify that relief.  *See Haughton v. Alipio (In re Alipio)*, 380 B.R. 645, 649 (Bankr. D. Conn. 2007) (citations omitted).

Retroactive relief from the automatic stay is not warranted here.  As discussed above, BOA is not entitled to setoff under applicable non-bankruptcy law because the funds seized by BOA were held in a special purpose account and constituted pledged collateral.  BOA possessed the collateral and had instituted an administrative hold on those funds.  The funds unquestionably were secure, and there was no risk of withdrawal or any decline in value of the funds held by BOA.  Despite the fact that no urgency

existed, BOA decided without obtaining relief from the stay simply to take the money and then seek to justify its actions after the fact.

Notwithstanding the conclusions reached in this decision that no right to setoff existed, the Court recognizes that BOA must have determined based on its own review of the facts and the law and after conferring with counsel that it had the ability to exercise a setoff right without first seeking relief from the stay.  In essence, in taking the action that it did without prior judicial approval, BOA needed to be correct as to each of two highly debatable propositions.  First, that it had the right under the circumstances to offset the collateral pledged by LBHI, and second, that it could exercise that right without having to file a motion for relief from the automatic stay.

BOA's stated justification for its strategy of seizing first and seeking comfort later is the exception to the automatic stay set forth in section 362(b)(17) of the Bankruptcy Code, one of the so-called "safe harbor" provisions.  This provision deals expressly with "the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement . . . forming a part of or related to any swap agreement . . . ."  11 U.S.C. § 362(b)(17).

Despite the fact that the quoted language plainly is tied to contractual netting rights under swap agreements (including any master agreement for such agreements), BOA has chosen to rely upon this exception to the automatic stay as authority for its self-help taking of collateral having no connection to any swap transaction.  BOA argues that section 362(b)(17) cannot be intended to limit setoff only when the debt and the claim

arise under derivatives contracts, because "contractual rights" as defined in section 560[46] includes "common law" setoff rights that exist independent of any derivative contracts. *See* BOA Opp'n to Mot. at 69-70.

No such authority for reaching unrelated pledged collateral can be found within the plain language of subsection (b)(17).  Section 362(b)(17) must be read together with section 560, including section 560's definition of a "contractual right." That definition states, in substance, that a "contractual right" may be set forth in a rule or bylaw of derivatives clearing organizations and exchanges or may arise under common law or by reason of normal business practice.  The definition is a very flexible one, but it does offer guidance regarding the commercial objective of the exception to allow markets to function without interference due to the bankruptcy of a swap counter-party.  Simply put, the automatic stay should not impact the exercise of a contractual right of setoff that is otherwise consistent with recognized customs and practices of market participants who engage in swap transactions.

Given this deference to the market, the initial question to be considered is whether a contractual right to offset exists in the first place.  Assuming that there is such a right, the inquiry turns to whether that right may be exercised "under any security agreement or arrangement or other credit enhancement *forming a part of or related to* any swap agreement" (emphasis added).  The language, thus, specifies that in order to qualify for

---

[46] 11 U.S.C. § 560 ("The exercise of any contractual right of any swap participant or financial participant to … offset or net out any termination values or payments amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed … by operation of any provision of this title… As used in this section, the term 'contractual right' includes a right set forth in a rule or bylaw of a derivatives clearing organization, … a multilateral clearing organization …, a national securities exchange, a national securities association …").

the exception the security agreement must be part of or must relate to a swap agreement.

Ultimately, application of the exception will depend upon a determination as to whether a

right is being exercised under a security agreement that has a sufficient connection to a

swap agreement.  Whether the exception will apply to a particular security agreement

calls for a review of the facts and circumstances of each transaction or series of

transactions and, of necessity, must be decided on a case by case basis by market

participants or, in the event of a dispute, by the Court.

BOA effected its unauthorized taking of LBHI's funds without the benefit of any

controlling precedent, relying instead upon its own untested interpretation of the language

of section 362(b)(17).  Nonetheless, BOA apparently takes comfort in the fact that the

language of this section became less restrictive under the 2006 amendments to the

Bankruptcy Code.  In 2005, section 362(b)(17) exempted from the automatic stay:

> [t]he setoff by a swap participant or financial participant of
> a mutual debt and claim under or in connection with one or
> more swap agreements that constitutes the setoff of a claim
> against the debtor for any payment or other transfer of
> property due from the debtor under or in connection with
> any swap agreement against any payment due to the debtor
> from the swap participant or financial participant under or
> in connection with any swap agreement or against cash,
> securities or other property held by, pledged to, or under
> control of, or due from such swap participant or financial
> participant to margin, guarantee, secure or settle any swap
> agreement.

Former 11 U.S.C. § 362(b)(17) (2005).  As reformulated in 2006, section 362(b)(17)

exempts from the automatic stay:

> [t]he exercise by a swap participant or financial participant
> of any contractual right (as defined in section 560) under
> any security agreement or arrangement or other credit
> enhancement forming a part of or related to any swap
> agreement, or of any contractual right (as defined in section

42

560) to offset or net out any termination value, payment
amount, or other transfer obligation arising under or in
connection with 1 or more such agreements, including any
master agreement for such agreements.

11 U.S.C. § 362(b)(17).

While it is true that the language of this subsection, as amended, has become

broader, the current language is not so loose in its wording and reasonable application

that unrelated security agreements or unrelated collateral such as that before the Court

may be taken, without judicial oversight or restraint, to satisfy claims of a swap

participant.  Such a result-oriented reading of the language is not supported by the text

and would conflict with the contemporaneous legislative history surrounding the

enactment by Congress of the Financial Netting Improvements Act of 2006.  *See* H.R.

Rep. No. 109-648, available at 2006 WL 6165926 (indicating that amended language was

intended to merely make "technical changes to the netting and financial contract

provisions" of the Bankruptcy Code in order to "update the language to reflect current

market and regulatory practices").  Moreover, the interpretation urged by BOA would run

afoul of the longstanding maxim that exceptions to the automatic stay are to be construed

narrowly.  *See, e.g., In re Enron Corp.*, 314 B.R. 524, 534 (Bankr. S.D.N.Y. 2004)

(exceptions to the automatic stay are to be narrowly construed).

Accordingly, BOA's conduct does not qualify for the exception set forth in

section 362(b)(17) based on the very same record considered by the Court in finding that

BOA is unable under these facts to establish its right to setoff under New York law.  The

collateral quite obviously never had any direct or indirect relationship to claims of BOA

arising under a swap agreement and was pledged by LBHI exclusively to secure overdraft

risks.  The undisputed facts make clear that this particular exception to the automatic

stay, even when interpreted in the broad manner urged by BOA, does not authorize a

taking of a specially-designated fund of collateral to offset unrelated swap exposure.

This conclusion focuses attention on a troublesome aspect of the current

procedural posture.  It is inconceivable given the negotiating history that BOA believed

that LBHI would readily concur with its determination with respect to its purported setoff

rights and its interpretation of section 362(b)(17).  Given the circumstances, the timing,

the legal uncertainty and the material sums involved, some disagreement and conflict

between the parties was clearly foreseeable if not inevitable.  This background makes it

even more astonishing that BOA would make the premeditated tactical decision to

deliberately seize the collateral without first moving the Court for stay relief.  Given the

importance of the automatic stay and the adverse consequences for knowingly violating

it, that is a decision not lightly made.

Nonetheless, BOA brazenly elected to violate the stay with apparent disregard for

the consequences of its actions, seeking comfort after the fact by commencing an

adversary proceeding.  In a smaller chapter 11 case, such unchecked economically self-

interested behavior could very well destroy a debtor's ability to reorganize.  Here the

numbers involved are much larger, and BOA certainly has the resources to restore the

funds plus any damages that may be awarded, but the violation here is a serious one

involving a significant fund of cash.  It is difficult to understand how BOA could have

thought that taking the money was the right thing to do without first seeking permission

from the Court.  While being free to advance novel theories, lenders and other

counterparties must be obedient to the bankruptcy law as it is written and should exercise

great care in determining the applicability of any claimed exception to the automatic stay before presuming to have the right to take debtor property without court approval.

BOA acted with the advice of experienced and sophisticated counsel. The Court assumes that BOA was fully informed regarding the untested, uncertain and extremely aggressive legal position that it was advancing and the risks it was thereby assuming that the exception to the automatic stay on which it relied might be found inapplicable to the seizure of LBHI's collateral. BOA, in the Court's view, had a responsibility to approach the setoff issue with far more restraint than was shown here, and the Court believes that the actions taken were surprising and, quite frankly, disappointing for a leading financial institution that should care a great deal about its reputation. BOA's setoff of property of Lehman is not supported by any reasonable application of the exception to the stay to the undisputed facts, and further proceedings will be needed to determine an appropriate remedy for this calculated violation of Section 362(a)(7) of the Bankruptcy Code.

### *Conclusion*

For the reasons stated, LBHI's motion for summary judgment is granted, and the motion for summary judgment of BOA is denied. BOA's seizure of the deposited funds was an unauthorized and impermissible setoff in violation of the automatic stay in LBHI's bankruptcy case. LBHI is directed to submit a proposed form of order granting its motion for summary judgment in accordance with this decision, directing a return of the $500 million fund plus interest and denying the motion of BOA for summary judgment while reserving decision on the issue of any costs, damages or sanctions to be awarded. The parties are instructed to contact chambers to arrange a status conference within two

weeks from the date of this decision for purposes of scheduling any further proceedings

that may be appropriate to determine the amount of any further monetary award.


Dated: New York, New York
          November 16, 2010

_s/ James M. Peck_
Honorable James M. Peck
United States Bankruptcy Judge